# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CARLOS TREVINO** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | **Cause No. SA-01-CA-306-FB** |
| | § | |
| **NATHANIEL QUARTERMAN, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Institutional Division,** | § | |
| **Respondent.** | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

## THIS IS A CAPITAL DEATH PENALTY CASE

## EXHIBITS - VOLUME IV

WARREN ALAN WOLF
115 E. Travis Street, Suite 746
San Antonio, TX 78205
Tel. 210.225.0055
Fax 210.225.0061
Texas Bar No. 21853500

*ATTORNEY FOR PETITIONER*

# EXHIBIT 18

Bexar County Sheriff's Office Business Record



### *Bexar County Sheriff's Office*
### *Ralph Lopez, Sheriff*

**TO:**  Warren Alan Wolfe
Attorney At Law
105 S. St. Mary's Street
San Antonio, Tx. 78205

**THRU:**  Lt. Victor Quintanilla
Booking Operations Supervisor

**FR:**  Ofc. Jackie Franklin
Information Desk Officer

**RE:**  Inmate Trevino, Carlos, Sid #539716

**DT:**  October 2, 2003

Per your request, a review of the Attorney/Official Visitation Log was performed for inmate Trevino, Carlos, Sid #539716. According to our records, the below information was obtained:

| Name of the Visitor | Date of Visit | Time In/Time Out |
|---|---|---|
| Mario Trevino | February 9, 1997 | 16:51/17:55 |
| Mario Trevino | February 27, 1997 | 10:42/12:05 |
| Mario Trevino | May 8, 1997 | 11:15/12:43 |
| Mario Trevino | June 1, 1997 | 16:15/16:45 |

*Jackie Franklin*
Jackie Franklin #1274

VQ/ml

State of Texas    §

County of Bexar    §

### AFFIDAVIT

     Before me, the undersigned authority, personally appeared _JACKIE FRANKLIN_____ , known to me to be the person whose name is subscribed to the following instrument, and having been first duly sworn, upon his/her oath deposes and states the following:

     My name is _JACKIE FRANKLIN_____. I am over 18 years of age and am a resident of Bexar County, Texas and I am fully competent and able to testify herein. I am fully aware and have personal knowledge of the facts set forth herein.

_Jackie Franklin_____

Sworn to and subscribed before me by the said _Jackie Franklin_ on this the __23___ day of October, 2003 to certify which witness my hand and seal.

_Josie Montgomery_____
Notary Public, State of Texas
_Josie Montgomery_____
Notary's Printed Name

My commission expires: __1/7/06_____

```
JOSIE MONTGOMERY
Notary Public, State of Texas
My Comm. Expires 01-07-2006
```

# EXHIBIT 19

## Affidavit of Juanita Trevino DeLeon

SWORN STATEMENT OF JUANITA TREVINO DELEON

STATE OF TEXAS               §

COUNTY OF BEXAR          §


My name is JUANITA TREVINO DELEON. I live at 108 Montezuma Walk, San Antonio, Texas 78207. My telephone number is 281-9006. My date of birth is 09/08/73.

I can read and write the English language.

Carlos Trevino is my nephew and I have known him all of my life. Carlos' mother, Josephine Trevino would go out drinking regularly. His father, Peter Trevino was not around much. His real, biological father is unknown.

Carlos was was hit by a car while crossing the Flores street. This happened in 1986 or 1987. He was living on Sayers Street.

One time Carlos took me to the carnival. We rode on the "thunderbolt" ride. It was the first ride we got on. The next thing I knew I was covered in blood. Carlos' nose started to bleed. He would get frequent nose bleeds after the car accident. The would just start on their own. Carlos would put toilet paper up his nose and hold his nose back to get it stop bleeding.

Carlos was a hard worker. He worked for Ruben Gonzales. He worked for Ruben after he got out of prison the first time.

Janet Cruz is the mother of Carlos' children, Julio and Carlos, Jr.

I am very close to Carlos. My mother passed away when I was 12 years old. I could tell Carlos anything. I told him about my first crush on a boy. I told him about a lot of things. I trusted him. I would tell him if I had any problems with my boyfriend Mario (Cantu). I trust him. I love him.

One time I talked Carlos into skipping school.

When he lived on Dahlia Walk his mother would just leave, abandoning him.

We would go to Normoyle Park. We would go with his uncles. In the summertime Carlos liked to go swimming. He would play board games such as "Connect 4", "Sorry" and "Kootie". He also enjoyed arts and crafts. He would also play basketball and volleyball.

Page 1 of 2

page 2 of 2, Juanita Trevino DeLeon Sworn Statement

I remember the first time Carlos got I trouble with Mario Cantu and Albert Cantu. They were on the roof of of Lowell Middle School. The others left leaving Carlos behind. Carlos did not run. Mario told me about this incident. Mario did not get into trouble.

Juanita would always talk Carlos into going to the park at night at 9 or 10 p.m. when he was not supposed to. Carlos would say that he was going out to see Mario instead of Juanita.

In the summer of 1993, Mario talked Carlos into going to 1604 South. They went swimming. By doing this they left Janet and me locked out of the house. When they came back they both smelled like the river. They "stunk like fish". They said that "...they had gone to the store". I was mad at Mario but I could not get mad at Carlos.

The day I came to court to testify at Carlos's trial I met with attorney Mario Trevino in the cafeteria . He told me just to say what we talked about in the cafeteria and not to add anything else.


THE STATE OF TEXAS          §


COUNTY OF BEXAR             §


BEFORE ME, the undersigned authority, on this day personally appeared JUANITA TREVINO DELEON, known to me to be the person whose name is subscribed to the foregoing instrument and, being by me first duly sworn, upon oath declared that the statements contained therein are true and correct

_Juanita DeLeon_
JUANITA TREVINO DELEON

Subscribed and sworn to before me, this 30 day of June
____, 2003 A.D. to certify which witness my hand and seal of office:

_Melissa Gomez_
Notary Public

```
★ MELISSA GOMEZ
  Notary Public, State of Texas
  My Commission Expires
  March 11, 2007
```



# EXHIBIT 20

## 1989 ABA Guidelines
for Appointment and Performance of Counsel
on Death Penalty Cases

Search Engine Document View   American Bar Association
       Original Document:
    http://www.abanet.org/legalservices/sclaid/sclaid2.pdf

# American Bar Association
# Guidelines for the Appointment
# and Performance of Counsel
# in Death Penalty Cases
# February, 1989

The American Bar Association recommends adoption of these Guidelines, subject to such exceptions as may be appropriate in the military, by entities providing counsel in death penalty cases.

## INTRODUCTION

At its 1989 Midyear Meeting, the American Bar Association House of Delegates adopted Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. These Guidelines amplify previously adopted Association positions on effective assistance of counsel in capital cases and the need for adequate compensation and support and provide a concrete procedure for the appointment of attorneys with appropriate experience and training to represent defendants in capital cases. In addition, they enumerate the minimal resources and practices necessary to provide effective assistance of counsel.

Some national standards have been written for appointment of counsel for eligible defendants generally; general standards for defense counsel have been established; and specific Performance Guidelines for Criminal Defense Representation exist in draft form. While some local standards may exist for capital representation, national guidelines on the assignment and performance of counsel in capital cases did not exist prior to these Guidelines. Experience has demonstrated that capital trials and appeals are extremely specialized and demanding and that the appointment of unqualified, inexperienced counsel can be very costly in terms of delay and expense. These Guidelines will greatly assist jurisdictions planning for the handling of capital cases in a manner that does not clog their courts, while assuring effective assistance of counsel.

### Background

With initial support from the ABA Standing Committee on Legal Aid and Indigent Defendants (SCLAID), the National Legal Aid and Defender Association (NLADA) developed, over the course of several years, Standards for the Appointment and Performance of Counsel in Death Penalty Cases. In February 1988, NLADA referred the Standards to SCLAID, which reviewed them and circulated them to appropriate ABA sections and committees. SCLAID incorporated the only substantive concerns expressed (by the Criminal Justice Section) and changed the nomenclature to "Guidelines" as more appropriate than "standards."

The Sections of Criminal Justice and of Litigation joined SCLAID in sponsoring the Guidelines for ABA adoption. The Guidelines were approved by the Association's House of Delegates without change; however, the accompanying resolution recommending adoption by entities providing counsel in death penalty cases was amended to allow for such exceptions to the Guidelines as may be appropriate in the military.

### Guidelines

The Guidelines address eligibility, training, support services, trial preparation, the sentencing phase and appeals. Each black letter guideline is explained by a commentary, with

reference to supporting authorities. "*Should*" is used throughout as a <u>mandatory</u> term and refers to activities which are minimum requirements.

## GUIDELINE 1.1 OBJECTIVE

The objective in providing counsel in cases in which the death penalty is sought should be to ensure that quality legal representation is afforded to defendants eligible for the appointment of counsel during all stages of the case.

## GUIDELINE 2.1 NUMBER OF ATTORNEYS PER CASE

In cases where the death penalty is sought, two qualified trial attorneys should be assigned to represent the defendant. In cases where the death penalty has been imposed, two qualified appellate attorneys should be assigned to represent the defendant. In cases where appellate proceedings have been completed or are not available and the death penalty has been imposed, two qualified post-conviction attorneys should be assigned to represent the defendant.

## GUIDELINE 3.1 THE LEGAL REPRESENTATION PLAN

The legal representation plan for each jurisdiction should include: measures to formalize the process by which attorneys are assigned to represent capital defendants. To accomplish this goal, the plan should designate a body (appointing authority) within the jurisdiction which will be responsible for performing all duties in connection with the appointment of counsel as set forth by these Guidelines. This Guideline envisions two equally acceptable approaches for formalizing the process of appointment:

a.   The authority to recruit and select competent attorneys to provide representation in capital cases may be centralized in the defender office or assigned counsel program of the jurisdiction. The defender office or assigned counsel program should adopt standards and procedures for the appointment of counsel in capital cases consistent with these Guidelines, and perform all duties in connection with the appointment process as set forth in these Guidelines.

b.   In jurisdictions where it is not feasible to centralize the tasks of recruiting and selecting competent counsel for capital cases in a defender office or assigned counsel program, the legal representation plan should provide for a special appointments committee to consist of no fewer than five attorneys who:

i.   are members of the bar admitted to practice in the jurisdiction;

ii.   have practiced law in the field of criminal defense for not less than five years;

iii.   have demonstrated knowledge of the specialized nature of practice involved in capital cases;

iv.   are knowledgeable about criminal defense practitioners in the jurisdiction; and

v.                            are dedicated to quality legal representation in capital cases.

The committee should adopt standards and procedures for the appointment of counsel in capital cases, consistent with these Guidelines, and perform all duties in connection with the appointment process.

## GUIDELINE 4.1 SELECTION OF COUNSEL

A.     The legal representation plan should provide for a systematic and publicized method for distributing assignments in capital cases as widely as possible among qualified members of the bar.

B.     The appointing authority should develop procedures to be used in establishing two rosters of attorneys who are competent and available to represent indigent capital defendants. The first roster should contain the names of attorneys eligible for appointment as lead defense counsel for trial, appeal or post-conviction pursuant to the qualification requirements specified in Guideline 5.1; the second roster should contain the names of attorneys eligible for appointment as assistant defense counsel for trial, appeal or post-conviction pursuant to the qualification requirements specified in the same Guideline.

C.     The appointing authority should review applications from attorneys concerning their placement on the roster of eligible attorneys from which assignments are made, as discussed in subsection (b). The review of an application should include a thorough investigation of the attorney's background, experience, and training, and an assessment of whether the attorney is competent to provide quality legal representation to the client pursuant to the qualification requirements specified in Guideline 5.1 and the performance standards established pursuant to Guidelines 11.1 and 11.2. An attorney's name should be placed on either roster upon a majority vote of the committee.

D.     Assignments should then be made in the sequence that the names appear on the roster of eligible attorneys. Departures from the practice of strict rotation of assignments may be made when such departure will protect the best interests of the client. A lawyer should never be assigned for reasons personal to the committee members making assignments.

In jurisdictions where a defender office or other entity by law receives a specific portion of or all assignments, the procedures in (b) through (d) above should be followed for cases which the defender office or other entity cannot accept due to conflicts of interest or other reasons.

## GUIDELINE 5.1 ATTORNEY ELIGIBILITY

The appointing authority should distribute assignments to attorneys who qualify under

either of the alternative procedures detailed below in paragraphs I. TRIAL, II. APPEAL, and III. POST-CONVICTION.

## 1.    TRIAL

A.    Lead trial counsel assignments should be distributed to attorneys who:

i.        are members of the bar  admitted to practice in the jurisdiction or admitted to practice pro hac vice; and

ii.       are experienced and active trial practitioners with at least five years litigation experience in the field of criminal defense; and

iii.      have prior experience as lead counsel in no fewer than nine jury trials of serious and complex cases which were tried to completion, as well as prior experience as lead counsel or co-counsel in at least one case in which the death penalty was sought.  In addition, of the nine jury trials which were tried to completion, the attorney should have been lead counsel in at least three cases in which the charge was murder or aggravated murder; or alternatively, of the nine jury trials, at least one was a murder or aggravated murder trial and an additional five were felony jury trials; and

iv.      are familiar with the practice and procedure of the criminal courts of the jurisdiction; and

v.       are familiar with and experienced in the utilization of expert witnesses and evidence, including, but not limited to, psychiatric and forensic evidence; and

vi.      have attended and successfully completed, within one year of their appointment, a training or educational program on criminal advocacy which focused on the trial of cases in which the death penalty is sought; and

vii.     have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases.

B.    Trial co-counsel assignments should be distributed to attorneys who:

i.        are members of the bar admitted to practice in the jurisdiction or admitted to practice pro hac vice; and

ii.       who qualify as lead counsel under paragraph (A) of this Guideline or meet the following requirements:

a.       are experienced and active trial practitioners with at least three years litigation experience in the field of criminal defense; and

b.       have prior experience as lead counsel or co-counsel in no fewer than three jury trials of serious and complex cases which were tried to completion, at least two of which were trials in which the charge was murder or aggravated murder; or alternatively, of the three jury trials, at least one was a murder or aggravated murder trial and one was a felony jury trial; and

Page 4 of  102

    c.        are familiar with the practice and procedure of the criminal courts of the jurisdiction; and

    d.        have completed within one year of their appointment at least one training or educational program on criminal advocacy which focused on the trial of cases in which the death penalty is sought; and

    e.        have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases.

C.      Alternate Procedures: Appointments for lead and co-counsel assignments may also be distributed to persons with extensive criminal trial experience or extensive civil litigation experience, if it is clearly demonstrated to the appointing authority that competent representation will be provided to the capitally charged indigent defendant. Lawyers appointed under this paragraph shall meet one or more of the following qualifications:

i.         Experience in the trial of death penalty cases which does not meet the levels detailed in paragraphs A or B above;

ii.        Specialized post-graduate training in the defense of persons accused of capital crimes;

iii.       The availability of ongoing consultation support from experienced death penalty counsel.

        Attorneys appointed under this paragraph should be pre-screened by a panel of experienced death penalty attorneys (see Guideline 3.1) to ensure that they will provide competent representation.

## II.    APPEAL

A.      Lead appellate counsel assignments should be distributed to attorneys who:

i.         are members of the bar admitted to practice in the jurisdiction or admitted to practice pro hac vice: and

ii.        are experienced and active trial or appellate practitioners with at least three years experience in the field of criminal defense; and

iii.       have prior experience within the last three years as lead counsel or co-counsel in the appeal of at least one case where a sentence of death was imposed, as well as prior experience within the last three years as lead counsel in the appeal of no fewer than three felony convictions in federal or state court, at least one of which was an appeal of murder or aggravated murder conviction; or alternatively, have prior experience within the last three years as lead counsel in the appeal of no fewer than six felony convictions in federal or state court, at least two of which were appeals of a murder or aggravated murder conviction; and

iv.        are familiar with the practice and procedure of the appellate courts of the jurisdiction; and

v.               have attended and successfully completed, within one year prior to their appointment, a training or educational program on criminal advocacy which focused on the appeal of cases in which a sentence of death was imposed; and

vi.             have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases.

B.     Appellate co-counsel assignments may be distributed to attorneys who have less experience than attorneys who qualify as lead appellate counsel. At a minimum, however, appellate co-counsel candidates must demonstrate to the satisfaction of the appointing authority that they:

i.               are members of the bar admitted to practice in the jurisdiction or admitted to practice pro hac vice; and

ii.             have demonstrated adequate proficiency in appellate advocacy in the field of felony defense; and

iii.           are familiar with the practice and procedure of the appellate courts of the jurisdiction; and

iv.           have attended and successfully completed within two years of their appointment a training or educational program on criminal appellate advocacy.

C.     Alternate Procedures: Appointments for lead and co-counsel assignments may also be distributed to persons with extensive criminal  trial and/or appellate experience or extensive civil litigation and/or appellate experience, if it is clearly demonstrated to the appointing authority that competent representation will be provided to the capitally charged indigent defendant. Lawyers appointed under this paragraph shall meet one or more of the following qualifications:

i.               Experience in the trial and/or appeal of death penalty cases which does not meet the levels detailed in paragraphs A or B above;

ii.             Specialized post-graduate training in the defense of persons accused of capital crimes;

iii.           The availability of ongoing consultation support from experienced death penalty counsel.

Attorneys appointed under this paragraph should be pre-screened by a panel of experienced death penalty attorneys (see Guideline 3.1) to ensure that they will provide competent representation.

## III.    POST-CONVICTION

A.     Assignments to represent indigents in post-conviction proceedings in capital cases should be distributed to attorneys who:

i.               are members of the bar admitted to practice in the jurisdiction or admitted to

|     |     |
| --- | --- |
|     | practice pro hac vice; and |
| ii. | are experienced and active trial practitioners with at least three years litigation experience in the field of criminal defense; and |
| iii. | have prior experience as counsel in no fewer than five jury or bench trials of serious and complex cases which were tried to completion, as well as prior experience as post-conviction counsel in at least three cases in state or federal court.   In addition, of the five jury or bench trials which were tried to completion, the attorney should have been counsel in at least three cases in which the charge was murder or aggravated murder; or alternatively, of the five trials, at least one was a murder or aggravated murder trial and an additional three were felony jury trials; and |
| iv. | are familiar with the practice and procedure of the appropriate courts of the jurisdiction; and |
| v. | have attended and successfully completed, within one year prior to their appointment, a training or educational program on criminal advocacy which focused on the post-conviction phase of a criminal case, or alternatively, a program which focused on the trial of cases in which the death penalty is sought; and |
| vi. | have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases. |

In addition to the experience level detailed above, it is desirable that at least one of the two post-conviction counsel also possesses appellate experience at the level described in 11.B. above (relating to appellate co-counsel).

B.      Alternate Procedures: Appointments for lead and co-counsel assignments may also be distributed to persons with extensive criminal   trial, appellate and/or post-conviction experience or extensive civil litigation and/or appellate experience, if it is clearly demonstrated to the appointing authority that competent representation will be provided to the capitally charged indigent defendant. Lawyers appointed under this paragraph shall meet one or more of the following qualifications:

|     |     |
| --- | --- |
| i. | Experience in trial, appeal and/or post-conviction representation in death penalty cases which does not meet the levels detailed in paragraph A above; |
| ii. | Specialized post-graduate training in the defense of persons accused of capital crimes; |
| iii. | The availability of ongoing consultation support from experienced death penalty counsel. |

Attorneys appointed under this paragraph should be pre-screened by a panel of experienced death penalty attorneys (see Guideline 3.1) to ensure that they will provide competent representation.

### GUIDELINE 6.1 WORKLOAD

Attorneys accepting appointments pursuant to these Guidelines should provide each client with quality representation in accordance with constitutional and professional standards. Capital counsel should not accept workloads which, by reason of their excessive size, interfere with the rendering of quality representation or lead to the breach of professional obligations.

### GUIDELINE 7.1 MONITORING; REMOVAL

A.    The appointing authority should monitor the performance of assigned counsel to ensure that the client is receiving quality representation.  Where there is compelling evidence that an attorney has inexcusably ignored basic responsibilities of an effective lawyer, resulting in prejudice to the client's case, the attorney should not receive additional appointments.  Where there is compelling evidence that an unalterable systemic defect in a defender office has caused a default in the basic responsibilities of an effective lawyer, resulting in prejudice to a client's case, the office should not receive additional appointments.  The appointing authority shall establish a procedure which gives written notice to counsel or a defender office whose removal is being sought, and an opportunity for counsel or the defender office to respond in writing.

B.    In fulfilling its monitoring function, however, the appointing authority should not attempt to interfere with the conduct of particular cases.  Representation of an accused establishes an inviolable attorney-client relationship.  In the context of a particular case, removal of counsel from representation should not occur over the objection of the client.

C.    No attorney or defender office should be readmitted to the appointment roster after removal under (a) above unless such removal is shown to have been erroneous or it is established by clear and convincing evidence that the cause of the failure to meet basic responsibilities has been identified and corrected.

### GUIDELINE 8.1 SUPPORTING SERVICES

The legal representation plan for each jurisdiction should provide counsel appointed pursuant to these Guidelines with investigative, expert, and other services necessary to prepare and present an adequate defense.  These should include not only those services and facilities needed for an effective defense at trial, but also those that are required for effective defense representation at every stage of the proceedings, including the sentencing phase.

### GUIDELINE 9.1 TRAINING

Attorneys seeking eligibility to receive appointments pursuant to these Guidelines should have completed the training requirements specified in Guideline 5.1.  Attorneys seeking

to remain on the roster of attorneys from which assignments are made should continue, on a periodic basis, to attend and successfully complete training or educational programs which focus on advocacy in death penalty cases.  The legal representation plan for each jurisdiction should include sufficient funding to enable adequate and frequent training programs to be conducted for counsel in capital cases and counsel who wish to be placed on the roster.

## GUIDELINE 10.1 COMPENSATION

A.      Capital counsel should be compensated for actual time and service performed.  The objective should be to provide a reasonable rate of hourly compensation which is commensurate with the provision of effective assistance of counsel and which reflects the extraordinary responsibilities inherent in death penalty litigation.

B.      Capital counsel should also be fully reimbursed for reasonable incidental expenses.

C.      Periodic billing and payment during the course of counsel's representation should be provided for in the representation plan.

## GUIDELINE 11.1 ESTABLISHMENT OF PERFORMANCE STANDARDS

A.      The appointing authority should establish standards of performance for counsel appointed in death penalty cases.

B.      The standards of performance should include, but should not be limited to, the specific standards set out in Guidelines 11.3 through 11.9.

C.      The appointing authority should refer to the standards of performance when assessing the

qualification of attorneys seeking to be placed on the roster from which appointments in death penalty cases are to be made (Guideline 4.1) and in monitoring the performance of attorneys to determine their continuing eligibility to remain on the roster (Guideline 7.1).

## GUIDELINE 11.2 MINIMUM STANDARDS NOT SUFFICIENT

A.      Minimum standards that have been promulgated concerning representation of defendants in criminal cases generally, and the level of adherence to such standards required for non-

capital cases, should not be adopted as sufficient for death penalty cases.

B.      Counsel in death penalty cases should be required to perform at the level of an attorney reasonably skilled in the specialized practice of capital representation, zealously committed to the capital case, who has had adequate time and resources for preparation.

## GUIDELINE 11.3 DETERMINING THAT DEATH PENALTY IS BEING SOUGHT

Counsel appointed in any case in which the death penalty is a possible punishment should, even if the prosecutor has not indicated that the death penalty will be sought, begin preparation for the case as one in which the death penalty will be sought while employing strategies to have the case designated by the prosecution as a non-capital one.

## GUIDELINE 11.4.1 INVESTIGATION

A.     Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial.  Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.

B.     The investigation for preparation of the guilt/innocence phase of the trial should be conducted regardless of any admission or statement by the client concerning facts constituting guilt.

C.     The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.

D.     Sources of investigative information may include the following:

1.          Charging Documents: Copies of all charging documents in the case should be obtained and examined in the context of the applicable statues and precedents, to identify (inter alia):

     A.     the elements of the charged offense(s), including the element(s) alleged to make the death penalty applicable;

     B.     the defenses, ordinary and affirmative, that may be available to the substantive charge and to the applicability of the death penalty;

     C.     any issues, constitutional or otherwise, (such as statutes of limitations or double Jeopardy) which can be raised to attack the charging documents.

2.     The Accused: An interview of the client should be conducted within 24 hours of counsel's entry into the case, unless there is a good reason for counsel to postpone this interview.  In that event, the interview should be conducted as soon as possible after counsel's appointment.  As soon as is appropriate, counsel should cover A-

E below (if this is not possible during the initial interview, these steps should be accomplished as soon as possible thereafter):

A.    seek information concerning the incident or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affects the client's rights;

B.    explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any mitigating factors;

C.    Collect information relevant to the sentencing phase of trial including, but not limited to: medical history, (mental and physical illness or injury of alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior) special educational needs including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and Juvenile record; prior correctional experience (including conduct or supervision and in the institution/education or training/clinical services); and religious and cultural influences.

D.    seek necessary releases for securing confidential records relating to any of the relevant histories.

E.    Obtain names of collateral persons or sources to verify, corroborate, explain and expand upon information obtained in 'C' above.

3.    Potential Witnesses: Counsel should consider interviewing potential witnesses, including:

A.    eyewitnesses or other witnesses having purported knowledge of events surrounding the offense itself;

B.    witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death;

C.    members of the victim's family opposed to having the client killed. Counsel should attempt to conduct interviews of potential witnesses in the presence of a third person who will be available, if necessary, to testify as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews.

4.    The Police and Prosecution: Counsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports. Where necessary, counsel should pursue such efforts through

formal and informal discovery unless a sound tactical reason exists for not doing so.

5. Physical Evidence: Where appropriate, counsel should make a prompt request to the police or investigative agency for any physical evidence or expert reports relevant to the offense or sentencing.

6. The Scene: Where appropriate, counsel should attempt to view the scene of the alleged offense. This should be done under circumstances as similar as possible to those existing at the time of the alleged incident (e.g. weather, time of day, and lighting conditions).

7. Expert Assistance: Counsel should secure the assistance of experts where it is necessary or appropriate for:

A. preparation of the defense;

B. adequate understanding of the prosecution's case;

C. rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial;

D. presentation of mitigation. Experts assisting in investigation and other preparation of the defense should be independent and their work product should be confidential to the extent allowed by law.

Counsel and support staff should use all available avenues including signed releases, subpoenas, and Freedom of Information Acts, to obtain all necessary information.

## GUIDELINE 11.4.2 CLIENT CONTACT

Trial counsel should maintain close contact with the client throughout preparation of the case, discussing (inter alia) the investigation, potential legal issues that exist or develop, and the development of a defense theory.

## GUIDELINE 11.5.1 THE DECISION TO FILE PRETRIAL MOTIONS

A. Counsel should consider filing a pretrial: notion whenever there exists reason to believe that applicable law may entitle the client to relief or that legal and/or policy arguments can be made that the law should provide the requested relief.

B. Counsel should consider all pretrial motions potentially available, and should evaluate them in light of the unique circumstances of a capital case, including the potential impact of any pretrial motion or ruling on the strategy for the sentencing phase, and the likelihood that all available avenues of appellate and post-conviction relief will be sought in the event of conviction and imposition of a death sentence. Among the issues that counsel should consider addressing in a pretrial motion are:

1. the pretrial custody of the accused;

2.    the constitutionality of the implicated statute or statutes;

3.    the potential defects in the charging process;

4.    the sufficiency of the charging document;

5.    the propriety and prejudice of any joinder of charges or defendants in the charging document;

6.    the discovery obligations of the prosecution including disclosure of aggravating factors to be used in seeking the death penalty, and any reciprocal discovery obligations of the defense;

7.    the suppression of evidence gathered as the result of violations of the Fourth, Fifth or Sixth Amendments to the United States Constitution, including:

    a.    the fruits of illegal searches or seizures;

    b.    involuntary statements or confessions; statements or confessions obtained in violation of the accused's right to counsel, or privilege against self-incrimination;

    c.    unreliable identification testimony which would give rise to a substantial likelihood of irreparable misidentification;

8.    suppression of evidence gathered in violation of any right, duty or privilege arising out of state or local law;

9.    access to resources which may be denied to the client because of indigency and which may be necessary in the case, including independent and confidential investigative resources, jury selection assistance, and expert witnesses concerning not only the charged offense(s) and the client's mental condition, but also the criminal justice system itself;

10.    the defendant's right to a speedy trial;

11.    the defendant's right to a continuance in order to adequately prepare his or her case;

12.    matters of evidence or procedure at either the guilt/innocence or penalty phase of trial which may be appropriately litigated by means of a pretrial motion in limine. including requests for sequestre, individual voir dire as to the death qualification of jurors and any challenges to overly restrictive rules or procedures;

13.    matters of trial or courtroom procedure;

14.    change of venue;

15.    abuse of prosecutorial discretion in seeking the death penalty; and

16.    challenges to the process of establishing the jury venire.

## GUIDELINE 11.6.1 THE PLEA NEGOTIATION PROCESS

A.    Counsel should explore with the client the possibility and desirability of reaching a negotiated disposition of the charges rather than proceeding to a trial.  In so doing, counsel should fully explain the rights that would be waived by a decision to enter a plea instead of

proceeding to trial, and should explain the legal and/or factual considerations that bear on the potential results of going to trial.

B.      Counsel should ordinarily obtain the consent of the client before entering into any plea negotiations.

C.      Counsel should keep the client fully informed of any continued plea discussion or negotiations, convey to the client any offers made by the prosecution for a negotiated settlement and discuss with the client possible strategies for obtaining an offer from the prosecution.

D.      Counsel should not accept any plea agreement without the client's express authorization.

E.      The existence of ongoing plea negotiations with the prosecution does not relieve counsel of the obligation to take steps necessary to prepare a defense. If a negotiated disposition would be in the best interest of the client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate.

## GUIDELINE 11.6.2 THE CONTENTS OF PLEA NEGOTIATIONS

A.      In order co develop an overall negotiation plan, counsel should be fully aware of and make sure the client is fully aware of:
   1.      the maximum penalty that may be imposed for the charged offense(s) and any possible lesser included offenses;
   2.      where applicable, any collateral consequences of potential penalties less than death, such as forfeiture of assets, deportation and civil liabilities, as well as direct consequences of potential penalties less than death, such as the possibility and likelihood of parole, place of confinement and good-time credits;
   3.      the general range of sentences for similar offenses committed by defendants with similar backgrounds, and the impact of any applicable sentencing guidelines or mandatory sentencing requirements.

B.      In developing a negotiation strategy, counsel should be completely familiar with, inter alia:
   I.          concessions that the client might offer, such as:
      a.      an agreement not to proceed to trial on the merits of the charges;
      b.      an agreement not to assert or further litigate particular legal issues;
      c.      an agreement to provide the prosecution with assistance in investigating or prosecuting the present case or other alleged criminal activity;
      d.      an agreement to engage in or refrain from any other conduct, appropriate

Page 14 of  102

to the case.

2.    benefits the client might obtain from a negotiated settlement, including inter alia:

a.    a guarantee that the death penalty will not be imposed;

b.    an agreement that the defendant will receive, with the assent of the court, a specified sentence;

c.    an agreement that. the prosecutor will not advocate a certain sentence, will not present certain information to the court, or will engage in or refrain from engaging in other actions with regard to sentencing;

d.    an agreement that one or more of multiple charges will be reduced or dismissed;

e.    an agreement that the client will not be subject to further investigation or prosecution for uncharged alleged or suspected criminal conduct;

f.    an agreement that the client may enter a conditional plea to preserve the right to further contest certain issues affecting the validity of the conviction.

C.    In conducting plea negotiations, counsel should be familiar with:

1.    the types of pleas that may be agreed to, such as a plea of guilty, a conditional plea of guilty, or a plea of nolo contendre or other plea which does not require the client to personally acknowledge guilt;

2.    the advantages and disadvantages of each available plea according to the circumstances of the case;

3.    whether a plea agreement can be made binding on the court and on penal/parole authorities.

D.    In conducting plea negotiations, counsel should attempt to become familiar with the practice and policies of the particular jurisdiction, the judge and prosecuting authority, the family of the alleged victim and any other persons or entities which may affect the content and likely results of plea negotiations.

## GUIDELINE 11.6.3 THE DECISION TO ENTER A PLEA OF GUILTY

A.    Counsel should inform the client of any tentative negotiated agreement reached with the prosecution, and explain to the client the full content of the agreement along with the advantages,

disadvantages and potential consequences of the agreement.

B.    The decision to enter or to not enter a plea of guilty should be based solely on the client's best interest.

## GUIDELINE 11.6.4 ENTRY OF THE PLEA BEFORE THE COURT

A.   Prior to the entry of the plea, counsel should:

1.   make certain that the client understands the rights he or she will waive by entering the plea and that the client's decision to waive those rights is knowing, voluntary and intelligent;

2.   make certain that the client fully and completely understands the conditions and limits of the plea agreement and the maximum punishment, sanctions and other consequences the accused will be exposed to by entering a plea;

3.   explain to the client the nature of the plea hearing and prepare the client for the role he or she will play in the hearing, including answering questions from the judge and providing a statement concerning the offense.

B.   During entry of the plea, counsel should make sure that the full content and conditions of the plea agreement are placed on the record before the court.

## GUIDELINE 11.7.1 GENERAL TRIAL PREPARATION

A.   As the investigations mandated by Guideline 11.4.1 produce information, counsel should formulate a defense theory.  In doing so, counsel should consider both the guilt/innocence phase and the penalty phase, and seek a theory that will be effective through both phases.

B.   If inconsistencies between guilt/innocence and penalty phase defenses arise, counsel should seek to minimize them by procedural or substantive tactics.

## GUIDELINE 11.7.2 VOIR DIRE AND JURY SELECTION

A.   Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case, whether any procedures have been instituted for selection of juries in capital cases that present potential legal bases for challenge.

B.   Counsel should be familiar with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding "death qualification" concerning any potential juror's beliefs about the death penalty.  Counsel should be familiar with techniques for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable.

## GUIDELINE 11.7.3 OBJECTION TO ERROR AND PRESERVATION OF ISSUES FOR POST-JUDGMENT REVIEW

Counsel should consider, when deciding whether to object to legal error and whether to

assert on the record a position regarding any procedure or ruling, that post judgment review in the event of conviction and sentence is likely, and counsel should take steps where appropriate to preserve, on all applicable state and Federal grounds, any given question for review.

## GUIDELINE 11.8.1  OBLIGATION OF COUNSEL AT THE SENTENCING PHASE OF DEATH PENALTY CASES

Counsel should be aware that the sentencing phase of a death penalty trial is constitutionally different from sentencing proceedings in other criminal cases.

## GUIDELINE 11.8.2  DUTIES OF COUNSEL REGARDING SENTENCING OPTIONS. CONSEQUENCES AND PROCEDURES

A.     Counsel should be familiar with the procedures for capital sentencing in the given jurisdiction, with the prosecutor's practice in preparing for and presenting the prosecution's case at the sentencing phase, and with the case law and rules regarding what information may be presented to the sentencing entity or entities, and how that information may be presented. Counsel should insist that the prosecutor adhere to the applicable evidentiary rules unless a valid strategic reason exists for counsel not to insist.

B.     If the client has chosen not to proceed to trial and a plea of guilty or its equivalent has been

negotiated and entered by counsel in accordance with Guidelines 11.6.1 through 11.6.4, counsel should seek to ensure compliance with all portions of the plea agreement beneficial to the client.

C.     Counsel should seek to ensure that the client is not harmed by improper, inaccurate or misleading information being considered by the sentencing entity or entities in determining the sentence to be imposed. Counsel should ensure that all reasonably available mitigating and favorable information consistent with the defense sentencing theory is presented to the sentencing entity or entities in the most effective possible way.

## GUIDELINE 11.8.3 PREPARATION FOR THE SENTENCING PHASE

A.     As set out in Guideline 11.4.1, preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case.  Counsel should seek information to present to the sentencing entity or entities in mitigation or explanation of the offense and to rebut the prosecution's sentencing case.

B.     Counsel should discuss with the client early in the case the sentencing alternatives available, and the relationship between strategy for the sentencing phase and for the guilt/ innocence phase.

C.    Prior to the sentencing phase, counsel should discuss with the client the specific sentencing phase procedures of the jurisdiction and advise the client of steps being taken in preparation for sentencing. Counsel should discuss with the client the accuracy of any information known to counsel that will he presented to the sentencing entity or entities, and the strategy for meeting the prosecution's case.

D.    If the client will be interviewed by anyone other than people working with defense counsel,

counsel should prepare the client for such interview(s).  Counsel should discuss with the client the

possible impact on the sentence and later potential proceedings (such as appeal, subsequent retrial or re-sentencing) of statements the client may give in the interviews.

E.    Counsel should consider, and discuss with the client, the possible consequences of having the client testify or make a statement to the sentencing entity or entities.

F.    In deciding which witnesses and evidence to prepare for presentation at the sentencing phase, counsel should consider the following:

1.        Witnesses familiar with and evidence relating to the client's life and development, from birth to the time of sentencing, who would be favorable to the client, explicative of the offense(s) for which the client is being sentenced, or would contravene evidence presented by the prosecutor;

2.        Expert witnesses to provide medical, psychological, sociological or other explanations for the offense(s) for which the client is being sentenced, to give a favorable opinion as to the client's capacity for rehabilitation, etc. and/or to rebut expert testimony presented by the prosecutor;

3.        Witnesses with knowledge and opinions about the lack of effectiveness of the death penalty itself;

4.        Witnesses drawn from the victim's family or intimates who are willing to speak against killing the client.

## GUIDELINE 11.8.4 THE OFFICIAL PRE-SENTENCE REPORT

A.    If an official pre-sentence report or similar document may or will be presented to the court at any time, counsel should consider:

1.        The strategic implications of requesting that an optional report be prepared;

2.        The value of providing to the report preparer information favorable to the client.

B.    Counsel should review any completed report and take appropriate steps to ensure that improper, incorrect or misleading information that may harm the client is deleted from the

Page 18 of  102

report.

C.    Counsel should take steps to preserve and protect the client's interest regarding material that has been challenged by the defense as improper, inaccurate or misleading.

D.    Counsel should consider whether the client should speak with the person preparing the report and, if so, whether counsel should be present.

## GUIDELINE 11.8.5 THE PROSECUTOR'S CASE AT THE SENTENCING PHASE.

A.    Counsel should attempt to determine at the earliest possible time what aggravating factors the prosecution will rely on in seeking the death penalty and what evidence will be offered in support thereof (Guideline 11.3). If the Jurisdiction has rules regarding notification of these factors, counsel should object to any non-compliance, and if such rules are inadequate, should consider challenging the adequacy of the rules.

B.    If counsel determines that the prosecutor plans to rely on or offer arguably improper, inaccurate or misleading evidence in support of the request for the death penalty, counsel should consider appropriate pretrial or trial strategies in response.

## GUIDELINE 11.8.6 THE DEFENSE CASE AT THE SENTENCING PHASE

A.    Counsel should present to the sentencing entity or entities all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence.

B.    Among the topics counsel should consider presenting are;
   1.    Medical history (including mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays);
   2.    Educational history (including achievement, performance and behavior, special educational needs including cognitive limitations and learning disabilities) and opportunity or lack thereof;
   3.    Military service, (including length and type of service, conduct, and special training);
   4.    Employment and training history (including skills and performance, and barriers to employability);
   5.    Family, and social history (including physical, sexual or emotional abuse, neighborhood surroundings and peer influence); and other cultural or religion influence, professional intervention (by medical personnel, social workers, law enforcement personnel, clergy or others) or lack thereof; prior correctional experience (including conduct on supervision and in institutions, education or training, and clinical services);
   6.    Rehabilitative potential of the client.
   7.    Record of prior offenses (adult and juvenile), especially where there is no record, a short record, or a record of non-violent offenses.
   8.    Expert testimony concerning any of the above and the resulting impact on the client, relating to the offense and to the client's potential at the time of sentencing.

C.    Counsel should consider all potential methods for offering mitigating evidence to the

sentencing entity or entities, including witnesses, affidavits, reports (including, if appropriate, a defense pre-sentence report which could include challenges to inaccurate, misleading or incomplete information contained in the official pre-sentence report and/or offered by the prosecution, as well as information favorable to the client), letters and public records.

D.    Counsel may consider having the client testify or speak during the closing argument of the
sentencing phase.

## GUIDELINE 11.9.1 DUTIES OF TRIAL COUNSEL IN POST JUDGMENT PROCEEDINGS

A.    Counsel should he familiar with all state and federal post judgment options available to the client. Counsel should consider and discuss with the client the post judgment procedures that will or may follow imposition of the death sentence.

B.    Counsel should take whatever action, such as filing a claim or notice of appeal, is necessary to preserve the client's right to post judgment review of the conviction and sentence. Counsel should consider what other post judgment action, if any, counsel could take to maximize the client's opportunity to seek appellate and post-conviction relief.

C.    Trial counsel should not cease acting on the client's behalf until subsequent counsel has entered the case or trial counsel s representation has been formally terminated.

D.    Trial counsel should cooperate with subsequent counsel concerning information regarding trial-level proceedings and strategies.

## GUIDELINE 11.9.2 DUTIES OF APPELLATE COUNSEL

A.    Appellate counsel should be familiar with all state and federal appellate and post-conviction
options available to the client, and should consider how any tactical decision might affect later options.

B.    Appellate counsel should interview the client, and trial counsel if possible, about the case,
including any relevant matters that do not appear in the record.  Counsel should consider whether any potential off-record matters should have an impact on how the appeal is pursued, and whether an investigation of any matter is warranted.

C.    Appellate counsel should communicate with the client concerning both the substance and

procedural status of the appeal.

D.    Appellate counsel should seek, when perfecting the appeal, to present all arguably meritorious issues, including challenges to any overly restrictive appellate rules.

E.    Appellate counsel should cooperate with any subsequent counsel concerning information about the appellate proceedings and strategies, and about information obtained by appellate counsel concerning earlier stages of the case.

### GUIDELINE 11.9.3 DUTIES OF POST-CONVICTION COUNSEL

A.    Post-conviction counsel should he familiar with all state and federal post-conviction remedies available to the client.

B.    Post-conviction counsel should interview the client, and previous counsel if possible, about the case. Counsel should consider conducting a full investigation of the case, relating to both the guilt/innocence and sentencing phases. Post-conviction counsel should obtain and review a complete record of all court proceedings relevant to the case. With the consent of the client, post-conviction counsel should obtain and review all prior counsel's file(s).

C.    Post-conviction counsel should seek to present to the appropriate court or courts all arguably meritorious issues, including challenges to overly restrictive rules governing post-conviction proceedings.

### GUIDELINE 11.9.4 DUTIES OF CLEMENCY COUNSEL

A.    Clemency counsel should be familiar with the procedures for and permissible substantive content of a request for clemency.

B.    Clemency counsel should interview the client, and any prior attorneys if possible, and conduct an investigation to discover information relevant to the clemency procedure applicable in the jurisdiction.

C.    Clemency counsel should take appropriate steps to ensure that clemency is sought in as timely and persuasive a manner as possible.

### GUIDELINE 11.9 .5 DUTIES COMMON TO ALL POST JUDGMENT COUNSEL

A.    Counsel representing a capital client at any point after imposition of the death sentence should he familiar with the procedures by which execution dates are set and how notification of that date is made. Counsel should also be familiar with the procedures for seeking a stay of

execution from all courts in which the case may be lodged when an execution date is set.

B.     Counsel should take immediate steps to seek a stay of execution, and to appeal from any denial of a stay, in any and all available courts when an execution date is set.

C.     Counsel should continually monitor the client's mental, physical and emotional condition to determine whether any deterioration in the client's condition warrants legal action.

# GUIDELINES WITH COMMENTARY

## GUIDELINE 1.1 OBJECTIVE

The objective in providing counsel in cases in which the death penalty is sought should be to ensure that quality legal representation is afforded to defendants eligible for the appointment of counsel during all stages of the case.

### Commentary:

In 1932, Mr. Justice Sutherland, writing for the United States Supreme Court in Powell v. Alabama, a death penalty case, said:

"The right to he heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence."[1]

Fifty-five years later, death penalty cases have become so specialized that defense counsel has duties and functions definably different from those of counsel in ordinary criminal cases.[2] The quality of counsel's "guiding hand" in modern capital cases is crucial. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles and rules, and be able to develop strategies applying them in the pressure-filled environment of high-
stakes, complex litigation.

Trial attorneys in death penalty cases must he able to apply sophisticated jury selection techniques, including attempted rehabilitation of venire members who initially state opposition to the death penalty. This is set out infra in Guideline 11.7.2 and accompanying commentary. Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, Guidelines 11.4.1(d)(7), 11.8.6(b)(8), and must be able to zealously challenge the prosecution's evidence and experts through effective cross examination. Utilization of experts has become the rule, rather than the exception, in proper preparation of capital cases.[3]

A capital trial is, in substance, two separate trials -- the guilt/not guilty trial and the

penalty trial.[4] Investigation of and planning for both phases must begin immediately upon counsel's entry into the case, Guideline 11.4.1. Counsel must at that time attempt to obtain the investigative resources necessary to prepare for both phases, Guidelines 11.4.1; 11.5.1(b)(9). Substantial pretrial investigation is a necessary base for intelligent assessment of possibly conflicting options as to the defense. Trial counsel must coordinate and integrate the evidence presented during the guilt phase with the projected evidence supporting an affirmative case for life at the penalty phase. See Guideline 11.7.1 and Guideline 11.8.1. In many capital cases, no credible argument for innocence exists, so that the life or death issue of punishment is the real focus of the entire case.[5] The Constitution requires individualization of the capital sentencing process. A capital defendant has the right to present his or her sentencer with any mitigating evidence that might save his or her life.[6] Counsel should he aware of methods to effectively advocate for the life of the client, and should strive for an effective defense presentation in every case, Guideline 11.8.1 et seq.

Currently, many indigent capital defendants are not receiving the assistance of a lawyer sufficiently skilled in practice to render quality assistance.[7] The facts set out in many published opinions provide graphic examples of inadequate performance by defense lawyers and the need for greater quality control.

In a Mississippi case, counsel's failure to present evidence during the sentencing phase left the jury unaware that the defendant was mentally retarded.[8] In a Florida case, assigned counsel never discussed the defendant's background with him, did not investigate for helpful sentencing phase evidence, and made a closing argument in which he indicated to the jury that he was representing the defendant reluctantly.[9] In a Georgia case, the defendant was procedurally barred from raising a meritorious jury claim based on the discriminatory selection method because his volunteer lawyer failed to raise the issue at trial, on appeal, or in initial post-conviction proceedings.[10] In a California case, counsel's failure to introduce evidence of the defendant's life history, character, and mental condition was compounded by his closing argument characterization of the defendant -- his client -- as a "monster."[11]

Justice Marshall noted when dissenting from denial of a petition for certiorari in one case that the attorney had failed to investigate mitigating circumstances for his client, remaining ignorant of the potential testimony of many favorable witnesses including a city councilman, a former prosecutor, a professional football player, a bank vice-president and several teachers, coaches, friends and family members. Counsel's sole strategy to avoid the death penalty was to seek a bar to its imposition because the state had given only oral notice of the aggravating circumstances upon which it would rely. The notice statute in question did not specify written notice, and no state court had ever required written notice, yet counsel "was content to rest his entire defense, and the fate of his client, on an untried legal theory"[12] which was rejected. The client was sentenced to death.

In a Wyoming case in which defense counsel had competently conducted the guilt phase of a complex and lengthy capital case, Chief Justice Rose noted in a separate opinion in the state Supreme Court that the record revealed a serious problem at the penalty phase. When asked by the trial judge how much time he would need for the sentencing hearing, counsel had

replied: "Two minutes. I m serious. I have been in this position probably more than anybody in this room, multiplied by 5, okay, and there ain't nothing you can say. They (the jury) will do what they want and there is no point.[13]

These and many other examples of poor performance by trial counsel[14] cannot be ignored on the theory that appellate or post-conviction review will cure trial level error; in several instances deficient performance has not led to reversal. Due to the significant burdens placed upon defendants who challenge the adequacy of trial counsel,[15] the reluctance of appellate courts to grant relief based on unfairness in jury selection,[16] and the limits placed on federal courts to review habeas corpus claims of constitutional error,[17] the trial of capital defendants has become "virtually the whole ball game."[18]

While some clients in capital cases do obtain relief on direct appeal and in post-conviction proceedings,[19] the best way to ensure that effective assistance of counsel is being provided is to attain greater quality control at the trial level. Guideline 1.1 therefore mandates quality representation at the trial level of a capital case.

The importance of quality legal representation at the trial phase of a capital case does not, on the other hand, diminish the need for quality representation at the post-judgment level. The Federal Constitution guarantees the right to effective assistance of counsel on an appeal by right,[20] and other post judgment procedures are equally important in capital cases. The guiding hand of counsel must lead the condemned client through all available avenues of review. Decisions of an exceedingly technical nature must he made (e.g. whether to raise all discernible issues or only the strong ones on appeal, see Guideline 11.9.2 and accompanying commentary, or whether to raise an issue of ineffective assistance of trial counsel on the direct appeal or wait until collateral proceedings).[21] Appellate counsel must be familiar with the procedures for post appellate challenges in order to avoid any inadvertent waiver on appeal of issues that should he raised later, Guideline 11.9.2 and commentary.

While the Federal Constitutional right to counsel has not been extended to collateral post-conviction proceedings,[22] the need for quality post-conviction representation is nonetheless vital. Death row inmates who have found counsel to represent them in post-conviction proceedings in the federal courts have secured rulings that their constitutional rights have bean violated in a much higher percentage of cases than is typical of criminal appeals generally.[23] Collateral proceedings present yet another set of obstacles unique to capital cases. In addition to the general, often difficult procedural requirements common to all habeas corpus actions, death penalty cases may be subject to rules that provide less time for preparation than is available in non-capital cases.[24] Substantive pleadings may have to be prepared simultaneously with, or even be delayed for, pleadings to stay the client's execution, Guideline 11.9.5. Only quality legal representation can see a defendant fairly through the maze of post judgment proceedings.

At least one state already provides for the appointment of counsel for collateral proceedings.[25] Capital defendants should not be subject to a "luck of the draw" with respect to counsel following an unsuccessful appeal.[26] Guideline 1.1 mandates quality representation for indigents in a capital case through post-conviction proceedings.

A general statement of high purpose alone will not suffice to ensure high quality representation. Attorney error is often the result of systemic problems, not individual deficiency.  The provision of counsel for indigent capital defendants (where counsel is provided at all) often incorporates the worst features of the universally condemned ad hoc system for assigning counsel, which is at odds with the notion of quality representation.[27] Defender offices generally have the experience and dedication to provide quality representation in capital cases, but some individual defenders and many assigned counsel lack sufficient experience and dedication.  Those attorneys who have adequate experience are often overworked and inadequately funded.[28]  Inexperienced attorneys operating without support or supervision may find themselves "in over their heads", unable to make up with devotion their insufficient training and lack of resources.  The Guidelines that follow address not just the goal of quality representation, but the systematic provision of guidelines and resources to ensure that the goal is reached.  They are intended to apply to defender offices as well as to individual assigned counsel, i.e. to all provision of counsel to indigent capital defendants.

Counsel whose advocacy does not reflect the highest standards of competency at each level of a capital case increases the "risk that the death penalty will be imposed in spite of factors which may call for a lass severe penalty.[29]  On the basis of the above practice norms and constitutional requirements, this Guideline urges each jurisdiction to ensure that quality legal representation is provided to indigent capital defendants at all stages of their cases.

## FOOTNOTES:

1. *Powell v. Alabama*, 287 U.S. 45, 68-69; 53 S. Ct. 55; 77 L. Ed. 158 (1932).
2. See e.g., Marshall, Remarks on the Death Penalty Made At the Judicial Conference of the Second Circuit, 86 Columbia L. Rev. 1 (1986); Hengstler, Attorneys for the Damned, ABA J. 56, 57-59 (January 1, 1987).
3. For example, counsel should obtain an evaluation of the client by a psychiatrist and/or psychologist "for an expert account of who the defendant is and why he or she does what he (or she) does," Dept. of Public Advocacy, KENTUCKY PUBLIC ADVOCATE DEATH PENALTY MANUAL (3d ed.) p. 287.  Counsel must be able to properly prepare the defendant and the expert for the examination and to correctly evaluate the strategic impact of the resulting expert opinion, whether or not the expert actually testifies.
4. See *Bullington v. Missouri*, 451 U.S. 430, 438-446, 101 S. Ct. 1852, 68 L. Ed. 2d 270 (1981).
5. Balske, The Penalty Phase Trial: a Practical Guide, The Champion, (March, 1984) p. 40, reprinted in California Attorneys for Criminal Justice and California Public Defenders Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL, Vol. II, p. H-6 (1986).
6. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944

(1976).

7.   See generally. Marshall, supra note 2.

8.   *Jones v,. Thigpen*, 555 F. Supp. 870, 878-79 (S.D. Miss. 1983), modified, 741 F.2d 805 (5th Cir.1984).

9.   *King v. Strickland*, 748 F.2d 1462, 1464 (11th Cir.  1984), cert. denied, 105 S. Ct. 2020 (1985). The 11th Circuit held this behavior ineffective assistance of counsel under the test of *Strickland v.Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

10.  *Smith v. Kemp*, 715 F.2d 1459 (11th Cir. 1983), cert denied, 464 U.S. 1003, 104 S. Ct.   510 (1983), discussed in Tabak, The Death of Fairness:  The Arbitrary and Capricious Imposition of the Death Penalty in the 1980's. XIV N.Y.U. Rev. L. & Soc. Change 797, 840 (1986). The defendant's wife was convicted for the same offense. The same jury issue was raised on her behalf at initial post-conviction proceedings and was ultimately successful, id.

11.  *People v. Jackson*, 28 Cal. 3d 264, 618 P.2d 149, 168 Cal. Rptr. 603 (1980), cert. denied, 450 U.S.1035 (1981). See also, Note, Effective Assistance of Counsel in Capital Cases, 58 N.Y.U. L. Rev. 299, 303 (1983), wherein the author compares Jackson with a factually similar California case in which the jury spared the defendant's life, and concludes that the difference in results depended upon the performance of counsel, particularly at the penalty phase of the trial.

12.  *Mitchell v. Kemp*, _U.S._, 107 S. Ct. 3248, 97 L. Ed. 2d 774 (1987); (Marshall, J., dissenting from denial of certiorari).

13.  *Hopkinson v. State*, 632 P.2d 79, 197 n. 13 (Wyo. 1981), (Rose, C.J., dissenting in part and concurring in part).

14.  For a more complete listing of cases in which counsel apparently failed to put on a meaningful penalty trial, see Note, Effective Assistance of Counsel in Capital Cases, 58 N.Y.U. L. Rev. 299, n.151(1983).

15.  See *Strickland v. Washington*, supra note 9; *Cronic v. United States*, 466 U.S. 648, 104 S. Ct.2039, 80 L. Ed. 2d 657 (1984).

16.  See Tabak, The Death of Fairness, supra note 10, at 811.

17.  See *Engle v. Issac*, 456 U.S. 107; 102 S. Ct. 1558; 71 L. Ed. 2d 83 (1982); *Wainwright v. Sykes*, 433 U.S. 72; 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977); see also, Catz, Federal Habeas Corpus and the Death Penalty: Need for a Preclusion Doctrine Exception, 18 U.C. Davis L. Rev. 1177, 1180 (1985).

18.  Geimer, Death at Any Cost: A Critique of the Supreme Court's Recent Retreat From Its Death Penalty Standards, 12 Fla. St. U. L. Rev. 737, 779 (1985).

19.  See Tabak, The Death of Fairness, supra note 10, at 829-830.

20.  *Evitts v. Lucey*, 469 U.S. 387; 105 S. Ct 830; 83 L. Ed. 2d 821 (1985).

21.  See e.g. Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 111, p. 8-4 through 8-5 (1985).

22.  *Pennsylvania v. Finley*, 481 U.S.__: 107 S. Ct. 1990; 95 L. Ed. 2d 539 (1987).  In

*Giarratano v.Murray*, _ F. 2d_ (#87-7518, 6/3/88), the U.S. Court of Appeals for the Fourth Circuit en bane, affirmed the finding of the district court that death row inmates in Virginia are entitled to counsel in state post-conviction proceedings. However, both the district court and Fourth Circuit opinions are based on the Fourteenth Amendment right of inmates to meaningful access to the courts as enunciated in Bounds v. Smith, 430 U.S. 817 (1977). The district court and the Fourth Circuit chose to ignore the Sixth Amendment claims raised by Giarratano.

23. Tabak, The Death of Fairness. supra note 10, at 830-831; See also American Bar Association Standing Committee on Legal Aid and Indigent Defendants, Bar Information Program (prepared by The Spangenberg Group), Caseload and Cost Projections for Federal Habeas Corpus Death Penalty Cases in FY 1988 and FY 1989 (1987), Introduction, quoting Judge Godbold of the Eleventh Circuit: "Is this review for constitutional error meaningful? It is. Of the death penalty cases receiving federal court review in this circuit, error of constitutional dimension is found in over half the cases."

24. Tabak, The Death of Fairness, supra note 10, at 835. See also Elvin, Where Are the Lawyers?, Journal of the National Prison Prospect, p. 3, Summer 1987, quoting testimony of capital attorney Jack Boger in the district court proceedings in Giarratano, supra: "A complete knowledge of federal constitutional criminal procedure law and state substantive criminal law is rudimentary for post-conviction counsel (including)... federal habeas corpus procedural law, which is complicated by doctrines of law unique to those proceedings ...(#85-0655-R, E.D. Va. Dec. 1986). See also, American Bar Association Standing Committee on Legal Aid and Indigent Defendants, Bar Information Program (prepared by The Spangenberg Group), Time & Expense Analysis in Post-conviction Death Penalty Cases (February, 1987) p. 22, quoted in part in Criminal Justice Newsletter, Vol. 18, #10, p. 4 (May 15, 1987). One attorney responding to the questionnaire used in that study said: "I have been involved, both as plaintiff's counsel and defense counsel, in major, protracted litigation of several different types, particularly civil rights litigation. No case I have ever handled compares in complexity with my Florida death penalty case. The death penalty jurisprudence is unintelligible; it is inconsistent and, at times, irrational. In addition, it is evolving. It constantly changes. In short, there is nothing more difficult, more time consuming, more expensive, and more emotionally exhausting than handling a death penalty case after conviction."

25. Fla. Stat. Ann. 27.701 et seq., establishing the Office of the Capital Collateral Representative.

26. Tabak, The Death of Fairness, supra note 10, at 830.

27. The call for quality representation in capital cases is consistent with national guidelines which reject the ad hoc or informal assignment of criminal cases because that method frequently results in inexperienced counsel and overall lack of quality control. See American Bar Association, Standards For Criminal Justice (hereinafter ABA Standards), Providing Defense Services, Standard 5-2.1; NLADA National Study

Commission on Defense Services, Guidelines for Legal Defense Systems, 2.3; NLADA, Standards for Defender Services, 1.2(b); National Advisory Commission, Courts 13.5.

28.   Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. Rev. 299, 356 (1983).

29.   *Lockett*, supra note 6, 438 U.S. at 605.

## GUIDELINE 2.1 NUMBER OF ATTORNEYS PER CASE

In cases where the death penalty is sought, two qualified trial attorneys should be assigned to represent the defendant. In cases where the death penalty has been imposed, two qualified appellate attorneys should be assigned to represent the defendant. In cases where appellate proceedings have bean completed or are not available and the death penalty has been imposed, two qualified post-conviction attorneys should be assigned to represent the defendant.

**Commentary:**

The appointment of two attorneys as trial counsel is designed to improve representation of indigent capital defendants and is consistent with the position adopted by the American Bar Association,[1] as well as several states.[2] As discussed in Guideline 1.1 and accompanying commentary, the defendant is constitutionally entitled to legal assistance of sufficient quality so as to prepare an adequate defense at trial and an adequate appeal. In the context of capital litigation, this mandate is difficult to fulfill where the heavy responsibilities of representation are placed in the hands of a single attorney.

As described in the commentary to Guideline 1.1 and in the performance Guidelines of section 11, counsel must be an advocate for life as veil as a defensive tactician. Trial counsel must: obtain the investigative resources necessary to prepare thoroughly for both the guilt and penalty phases of trial, Guidelines 8.1; 11.4.1; and 11.5.1 (b) (9); conduct extensive research in search of precedent helpful to the client; conduct thorough crime and life-history investigations in preparation for both phases of trial, Guideline 11.4.1; integrate the defense theory and strategy used during the guilt phase with the projected affirmative case for life at the penalty phase, Guideline 11.7.1; prepare witnesses for both phases of trial; and present all reasonably available mitigating evidence helpful to the defendant for the purpose of convincing the judge or jury not to impose a sentence of death, Guideline 11.8. Preparation for the penalty phase, as well as the adjudication phase, must begin immediately after counsel has been appointed to represent the defendant.

Because many of the duties of defense counsel in capital cases are definably different from those performed by counsel in criminal cases generally, because there are many rapid developments in the complex body of law affecting death penalty cases, and especially because of the harsh and irrevocable nature of the potential penalty, the responsibilities of trial counsel are sufficiently onerous to require the appointment of two attorneys as trial counsel in order to ensure that the capital defendant receives the best possible representation. The appointment of co-counsel at trial is not only meant to provide lead counsel with assistance in the preparation of both trial and penalty phases of the case, but also to provide lead counsel with different perspectives on the issues inherent in each stage of the proceedings.

The collegial atmosphere of a given defender office should not he viewed as a substitute for formal designation of at least two attorneys (within the office) as counsel in a capital case. Similarly, the need to provide effective assistance of counsel on appeal requires the

Page 31 of  102

appointment of two competent appellate attorneys. The quality of appellate representation provided capital defendants is often in jeopardy where essential duties are borne by a single lawyer. Appellate work in a capital case is time-consuming and difficult: . . . a typical death penalty appeal has a record of 5,000 pages and requires an expenditure of approximately 800-900 hours of attorney time over a two to three year period. A companion habeas corpus petition can add another 50 to 200 hours. The opening brief in a capital appeal can run to 200 pages, or more, and raise a wide variety of guilt and penalty issues. In contrast, the typical non-capital appeal or writ in which the Supreme Court grants hearing involves a much shorter record and focuses on fewer issues. Attorneys with less appellate experience, or with less time available to devote to a case, may therefore wish to seek appointment in a non-capital appeal or writ instead of a capital appeal.[3]

Substantive work must often be done simultaneously with motions to stay the execution, etc., see Guideline 11.9.4, 11.9.5. Two attorneys, whether within an appellate defender office or appointed by the court, are required. While provision of post-conviction counsel to death-sentenced indigent defendants is not yet viewed as a Federal Constitutional requirement,[4] it is essential. The judiciary and the bar are recognizing this practical reality in jurisdictions across the country. See commentary to Guideline 1.1.

Representing a death-sentenced client in post-conviction proceedings is as demanding as -- or, if that is possible, even more demanding than -- the tasks faced by other capital counsel. Especially when a death warrant has been signed, counsel is subjected to demands virtually impossible to meet physically, economically, temporally and emotionally. Seeking to ward off imminent execution while continuing to challenge the validity of the client's conviction and sentence nay require filing pleadings almost simultaneously in several courts (often some distance apart). Investigation of factual issues may be necessary, and consultation with the client will require counsel's time and presence at yet another location.[5] Two attorneys should be provided at this stage.[6] Pursuant to the qualification requirements specified in Guideline 5.1, one of the two attorneys at each stage should be designated and act as the lead counsel, and the other should be designated co-counsel.

**FOOTNOTES:**

1. ABA Criminal Justice Section Wins Approval for Two Resolutions. 36 Crim. L. Rep. (BNA) 2427 (March 6,1985).

2. E.g., 111. Rev. Stat. Ch. 110A Sec. 607 (1978); N.C. Supreme Court Rules Article IV4.9(a)(1986); Rule 65, Qualifications for Eligibility to be Court-Appointed Counsel for Indigent Capital Defendants in the Courts of Ohio. adopted by the Ohio Supreme Court on October 14, 1987.

3. This statement is made by Michael G. Millman, Executive Director of the California Appellate Prospect (CAP), in a standard letter sent to attorneys who are inquiring about appointments from the California Supreme Court in indigent criminal appeals. CAP is a non-profit corporation which assists the court in making appointments of counsel, and

works with counsel -- particularly on death penalty appeals -- to assist in providing the requisite high quality of representation.

4. *Pennsylvania v. Finley*, 481 U.S. : 107 S. Ct. 1990; 95 L. Ed. 2d 539 (1987).

5. See e.g., American Bar Association, Standing Committee on Legal Aid and Indigent Defendants, Bar Information Program (prepared by The Spangenberg Group), Time & Expense Analysis in Post-conviction Death Penalty Cases (February, 1987) p. 21-26.

6. ABA Standing Committee on Legal Aid and Indigent Defendants, Bar Information Program (prepared by The Spangenberg Group), Caseload and Cost Projections for Federal Habeas Corpus Death Penalty Cases in FY 1988 and FY 1989 (1987) p. 74.

## GUIDELINE 3. 1 THE LEGAL REPRESENTATION PLAN

The legal representation plan for each jurisdiction should include: measures to formalize the process by which attorneys are assigned to represent capital defendants. To accomplish this goal, the plan should designate a body (appointing authority) within the Jurisdiction which will be responsible for performing all duties in connection with the appointment of counsel as set forth by these Guidelines. This Guideline envisions two equally acceptable approaches for formalizing the process of appointment:

a.      The authority to recruit and select competent attorneys to provide representation in capital

cases may be centralized in the defender office or assigned counsel program of the jurisdiction. The defender office or assigned counsel program should adopt standards and procedures for the appointment of counsel in capital cases consistent with these Guidelines, and perform all duties in connection with the appointment process as set forth in these Guidelines.

b.      In Jurisdictions where it is not feasible to centralize the tasks of recruiting and selecting competent counsel for capital cases in a defender office or assigned counsel program, the legal representation plan should provide for a special appointments committee to consist of no fewer than five attorneys who:

i.         are members of the bar admitted to practice in the jurisdictions;

ii.        have practiced law in the field of criminal defense for not less than five years;

iii.       have demonstrated knowledge of the specialized nature of practice involved in capital cases;

iv.       are knowledgeable about criminal defense practitioners in the jurisdiction; and

v.        are dedicated to quality legal representation in capital cases.

The committee should adopt standards and procedures for the appointment of counsel in capital cases, consistent with these Guidelines, and perform all duties in connection with the appointment process.

## Commentary:

Each jurisdiction should take effective measures to formalize the process by which attorneys are assigned to represent capital defendants. This Guideline provides two approaches for accomplishing this goal. The appropriateness of either approach depends in large part upon the nature of the legal representation plan for each jurisdiction.

For example, this Guideline acknowledges that effective procedures for the recruitment, appointment, and monitoring of qualified attorneys in capital cases are already in place in some defender offices and assigned counsel programs or could be developed and implemented within these programs. Assuming these pre-existing or newly developed procedures are sufficient to ensure the appointment of qualified attorneys in capital cases, this Guideline -- in jurisdictions where the appointment function is centralized in a defender office or assigned counsel program

-- does not call for the establishment of a special committee as described in subsection (b). This Guideline emphasizes, however, that defender offices and assigned counsel programs entrusted with the task of assigning qualified counsel in capital cases should perform their duties in a manner consistent with these Guidelines, particularly as regards the application of attorney eligibility criteria.  See Guideline 5.1.

This Guideline also acknowledges those jurisdictions where it is not feasible or possible to centralize in a defender office or assigned counsel program the tasks of recruiting and selecting qualified attorneys in capital cases.   The legal representation plan for these jurisdictions should include measures to centralize the authority to make such assignments in a committee composed of knowledgeable attorneys, who should devise standards and procedures for the provision of counsel as well as perform duties relating to the administration of the assignment system.   These administrative tasks include:  the establishment of performance standards, Guidelines 11.1 and 11.2; the collection of names of qualified members of the bar and the assignment of qualified attorneys to individual cases, Guidelines 4.1 and 5.1; the monitoring of attorney performance and workload, Guidelines 6.1 and 7.1; the acquisition of adequate resources for support services and the provision of training programs, Guidelines 8.1 and 9.1; and the approval of compensation vouchers submitted by appointed lawyers, Guideline 10.1.

An important function of the committee is to exercise general supervision over the administration of a program composed of lawyers performing professional work.[1] Accordingly, the members of the committee should also be members of the bar, since this tends "to assure a response to the needs and problems of the program grounded in an understanding of the lawyer's professional function and responsibility."[2]

Similarly, because of the unique specialization of criminal defense practice involved in capital litigation, it is desirable for all of the attorney committee members to have not only a general background in criminal defense, but also a working knowledge of the issues involved in litigating a death penalty case.  Possession of such knowledge has the additional advantage of enabling committee members, if requested by appointed counsel, to provide advice on the handling of specific cases, as well as provide information concerning recent criminal law and procedure developments, written materials on criminal defense, and appropriate training programs.[3]

An effective means of securing professional independence for assigned counsel is to place responsibility for the decisions concerning the assignment of counsel in a committee whose members are themselves free from conflicts-of-interest or partisanship and are able to act in an objective fashion as dictated by their best professional judgment.[4]  Consequently, the membership of the committee on appointments should not include prosecutors or judges.  This restriction is necessary in order to remove any implication that defense attorneys under the system are subject to the control of those who appear as their adversaries or before whom they must appear in the representation of defendants, except as judges are charged with the disciplinary supervision of all members of the bar.[5]  In order to preserve the integrity of the committee and the appointments process, a lawyer should never be assigned for reasons

personal to the committee members making assignments,[6] Guideline 4.1.

However, because most assignments in capital cases are to local counsel, it is desirable for committee members to be familiar with criminal lawyers practicing in the jurisdiction, 7 in order to make more informed decisions regarding an attorney's ability to provide quality representation.
Courtroom observation of a particular attorney, for example, may assist committee members in assessing the attorney's eligibility to represent capital clients pursuant to Guideline 5.1.

Where assignment by the court is made to a defender office, the office must ensure that the individual attorneys designated to handle capital cases are qualified under Guideline 5.1 and that the other Guidelines are adhered to.

## FOOTNOTES:

1.   See ABA Standards, Providing Defense Services, Standard 5-1.3 commentary.
2.   Id.
3.   See ABA Standards,  Providing Defense Services, Standard 5-2.1 commentary
4.   See ABA Standards,  Providing Defense Services, Standard 5-1.3 commentary.
5.   Id. See also, California Standing Committee on Delivery of Legal Services to Criminal defendants, Report on the Independence of the Criminal Defense Bar and Standards Relating to Professional competence of Appointed Counsel, 3-4 (1980).
6.   ABA Standards, Providing Defense Services, Standard 5-2.1.
7.   See North Carolina Supreme Court Rules, article IV 4.2© (1980).

## GUIDELINE 4.1 SELECTION OF COUNSEL

A.     The legal representation plan should provide for a systematic and publicized method for distributing assignments in capital cases as widely as possible among qualified members of the bar.

B.     The appointing authority should develop procedures to be used in establishing two rosters of attorneys who are competent and available to represent indigent capital defendants. The first roster should contain the names of attorneys eligible for appointment as lead defense counsel for trial, appeal or post-conviction pursuant to the qualification requirements specified in Guideline 5.1; the second roster should contain the names of attorneys eligible for appointment as assistant defense counsel for trial, appeal or post-conviction pursuant to the qualification requirements specified in the same Guideline.

C.     The appointing authority should review applications from attorneys concerning their placement on the roster of eligible attorneys from which assignments are made, as discussed in subsection (b). The review of an application should include a thorough investigation of the attorney's background, experience, and training, and an assessment of whether the attorney is competent to provide quality legal representation to the client pursuant to the qualification requirements specified in Guideline 5.1 and the performance standards established pursuant to Guidelines 11.1 and 11.2. An attorney's name should be placed on either roster upon a majority vote of the committee.

D.     Assignments should then be made in the sequence that the names appear on the roster of eligible attorneys. Departures from the practice of strict rotation of assignments may be made when such departure will protect the best interests of the client. A lawyer should never be assigned for reasons personal to the committee members making assignments.

       In jurisdictions where a defender office or other entity by law receives a specific portion of or all assignments, the procedures in (b) through (d) above should be followed for cases which the defender office or other entity cannot accept due to conflicts of interest or other reasons.

**Commentary:**

       The importance of systematically assigning counsel in capital cases has been previously noted in the commentaries to Guidelines 1.1 and 3.1.  Once the legal representation plan has been developed, the procedures for distributing assignments should be placed in writing and be publicized.  Publicity is necessary to dispel doubts concerning the method by which defense of the accused is being achieved and fosters scrutiny of the plan by the bar and public.[1]

       Publication of the terms of the plan ensures that the bar is aware of the process by

which counsel is being provided and promotes public confidence in the defender and assigned counsel programs, which is essential if they are to be financed adequately and operate effectively.[2]

Moreover, since the overall goal of the legal representation plan should be to ensure the presence of sufficient numbers of attorneys capable of providing competent legal services to capital clients, the terms of the plan should be publicized in a manner which attracts participation from the largest possible number of qualified criminal practitioners in the jurisdiction.[3]

The appointing authority is charged with the task of assessing the qualifications of attorneys who wish to represent capital defendants. Consistent with Guideline 2.1, two qualified attorneys should be assigned to each case, one designated as the lead defense counsel and the other co- counsel.

It should be the responsibility of the appointing authority to devise separate lists of attorneys who are able and willing to provide such services. A meaningful review of each request for inclusion on the lists should include a careful matching of the attorney's qualifications with the eligibility criteria listed in Guideline 5.1. In order to make informed decisions on eligibility, the appointing authority should have sufficient flexibility to gather as much relevant information as possible to secure a fair picture of the applicant's ability and experience. The committee should utilize whatever sources of information it deems appropriate, including contact with the applicant, with judges before whom the applicant has appeared, with others who are familiar with the applicant's professional abilities, in-court observations, writing samples and the like.

Reference should be made to the performance standards established pursuant to Guidelines 11.1 and 11.2 when evaluating information received as to the prior performance in a capital case of attorneys seeking to establish eligibility for placement on the roster. The review process should be conducted pursuant to Guideline 5.1 on attorney eligibility in order to ensure that appointments will be made on the basis of ability and not upon unrelated factors.

Simplicity and fairness in the allocation of cases to eligible attorneys are ensured by automatically rotating the names on each roster with limited exceptions for cause. This Guideline's rotation scheme parallels those recommended in other national standards relating to defense services. The ABA's Standards for Providing Defense Services state that "(o)rdinarily, assignments should be made in the sequence that the names appear on the roster of eligible lawyers" in order "to avoid patronage and its appearance, and to ensure fair distribution of assignments among all whose names appear on the roster of eligible lawyers." [4] A similar view is expressed by the National Study Commission on Defense Services: "Although methods of assigning cases may vary with local procedures and conditions, the administrator, in designing the systems and making assignments, should (distribute cases) in an equitable way among the panel members to ensure balanced workloads through a rotating system with allowances for variance when necessary."[5]

Consistent with these recommendations, Guideline 4.1 states that exceptions to strict rotation should be limited to instances where departure would serve the best interests of the

client.

Three of these exceptions bear special mention.  Where the rotational appointment of a designated
lawyer is impossible due to a conflict of interest, the assignment should be distributed to the next
eligible lawyer on the list.[6]

A second exception should allow consideration of a defendant's preference for a particular attorney.  While it is true that the indigent defendant does not enjoy the right to select the private lawyer of his choice,[7] "there is much to be said for allowing the (indigent) defendant, when administratively feasible, the same freedom of action available to the defendant of means.:[8]  Where the desired attorney is otherwise willing and eligible to accept the assignment, there is no reason not to accommodate the defendant's choice when possible.[9] A third exception should permit deviation from the established sequence where the nature of the charges or other circumstances require the appointment of a lawyer possessing special qualifications to serve in the case.[10]

If applicable law provides that a defender office or other entity is to be assigned to a given portion of all indigent capital defendants, the rotation system should be followed to the extent possible.  For example, if a defender office receives half of all assignments, the office name could alternate on the list with other eligible counsel.  The rotation system should be used for all cases which the defender office or other entity cannot accept, subject to the caveats set out above.

## FOOTNOTES:

1.  ABA Standards, Providing Defense Services, Standard 5-2.1 commentary.
2.  ABA Standards, Providing Defense Services, Standard 5-1.2 commentary.
3.  ABA Standards, Providing Defense Services, Standard 5-2.2 commentary; see also, ABA Standards, The Defense Function, Standard 4-1.5 commentary.
4.  ABA Standards, Providing Defense Services, Standard 5-2.3; see also, ABA Standards, Providing Defense Services, Standard 5-2.1.
5.  NLADA, National Study Commission on Defense Services, Guidelines for Legal Defense Systems. 2.16 (1976).
6.  See ABA Standards, Providing Defense Services, Standard 5-2.3 commentary.
7.  Trial judges have absolute discretion in deciding whether to grant the request of an indigent defendant for a particular lawyer. E.g., *Drumgo v. Superior Court,* 8 Cal. 3d 930, 506 P.2d 1007, 106 Cal. Rptr. (1973).
8.  ABA Standards, Providing Defense Services, Standard 5-2.3 commentary.
9.  See NLADA, National Study Commission on Defense Services, Guidelines for Legal Defense Systems, 5.12. (1976).
10.  ABA Standards, Providing Defense Services, Standard 5-2.3.

**GUIDELINE 5.1 ATTORNEY ELIGIBILITY**

The appointing authority should distribute assignments to attorneys who qualify under either of the alternative procedures detailed below in paragraphs I. TRIAL, II. APPEAL, and III. POST-CONVICTION.

**1.     TRIAL**

A.     Lead trial counsel assignments should be distributed to attorneys who:

i.          are members of the bar admitted to practice in the jurisdiction or admitted to practice pro hac vice; and

ii.         are experienced and active trial practitioners with at least five years litigation experience in the field of criminal defense; and

iii.        have prior experience as lead counsel in no fewer than nine jury trials of serious and complex cases which were tried to completion, as well as prior experience as lead counsel or co-counsel in at least one case in which the death penalty was sought.  In addition, of the nine jury trials which were tried to completion, the attorney should have been lead counsel in at least three cases in which the charge was murder or aggravated murder; or alternatively, of the nine jury trials, at least one was a murder or aggravated murder trial and an additional five were felony jury trials; and

iv.        are familiar with the practice and procedure of the criminal courts of the jurisdiction; and

v.         are familiar with and experienced in the utilization of expert witnesses and evidence, including, but not limited to, psychiatric and forensic evidence; and

vi.        have attended and successfully completed, within one year of their appointment, a training or educational program on criminal advocacy which focused on the trial of cases in which the death penalty is sought; and

vii.       have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases.

B.     Trial co-counsel assignments should be distributed to attorneys who:

i.          are members of the bar admitted to practice in the jurisdiction or admitted to practice pro hac vice; and

ii.         who qualify as lead counsel under paragraph (A) of this Guideline or meet the following requirements:

a.         are experienced and active trial practitioners with at least three years litigation experience in the field of criminal defense; and

b.         have prior experience as lead counsel or co-counsel in no fewer than three jury trials of serious and complex cases which were tried to

completion, at least two of which were trials in which the charge was murder or aggravated murder; or alternatively, of the three jury trials, at least one was a murder or aggravated murder trial and one was a felony jury trial; and

c.   are familiar with the practice and procedure of the criminal courts of the jurisdiction; and

d.   have completed within one year of their appointment at least one training or educational program on criminal advocacy which focused on the trial of cases in which the death penalty is sought; and

e.   have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases.

C.   Alternate Procedures: Appointments for lead and co-counsel assignments may also be distributed to persons with extensive criminal trial experience or extensive civil litigation experience, if it is clearly demonstrated to the appointing authority that competent representation will be provided to the capitally charged indigent defendant. Lawyers appointed under this paragraph shall meet one or more of the following qualifications:

i.   Experience in the trial of death penalty cases which does not meet the levels detailed in paragraphs A or B above;

ii.   Specialized post-graduate training in the defense of persons accused of capital crimes;

iii.   The availability of ongoing consultation support from experienced death penalty counsel.

Attorneys appointed under this paragraph should be pre-screened by a panel of experienced death penalty attorneys (see Guideline 3.1) to ensure that they will provide competent representation.

## II.   APPEAL

A.   Lead appellate counsel assignments should be distributed to attorneys who:

i.   are members of the bar admitted to practice in the jurisdiction or admitted to practice pro hac vice: and

ii.   are experienced and active trial or appellate practitioners with at least three years experience in the field of criminal defense; and

iii.   have prior experience within the last three years as lead counsel or co-counsel in the appeal of at least one case where a sentence of death was imposed, as well as prior experience within the last three years as lead counsel in the appeal of no fewer than three felony convictions in federal or state court, at least one of which was an appeal of murder or aggravated murder conviction; or

alternatively, have prior experience within the last three years as lead counsel in the appeal of no fewer than six felony convictions in federal or state court, at least two of which were appeals of a murder or aggravated murder conviction; and

iv.     are familiar with the practice and procedure of the appellate courts of the jurisdiction; and

v.     have attended and successfully completed, within one year prior to their appointment, a training or educational program on criminal advocacy which focused on the appeal of cases in which a sentence of death was imposed; and

vi.     have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases.

B.     Appellate co-counsel assignments may be distributed to attorneys who have less experience than attorneys who qualify as lead appellate counsel. At a minimum, however, appellate co-counsel candidates must demonstrate to the satisfaction of the appointing authority that they:

i.     are members of the bar admitted to practice in the jurisdiction or admitted to practice pro hac vice; and

ii.     have demonstrated adequate proficiency in appellate advocacy in the field of felony defense; and

iii.     are familiar with the practice and procedure of the appellate courts of the jurisdiction; and

iv.     have attended and successfully completed within two years of their appointment a training or educational program on criminal appellate advocacy.

C.     Alternate Procedures: Appointments for lead and co-counsel assignments may also be distributed to persons with extensive criminal  trial and/or appellate experience or extensive civil litigation and/or appellate experience, if it is clearly demonstrated to the appointing authority that competent representation will be provided to the capitally charged indigent defendant. Lawyers appointed under this paragraph shall meet one or more of the following qualifications:

i.     Experience in the trial and/or appeal of death penalty cases which does not meet the levels detailed in paragraphs A or B above;

ii.     Specialized post-graduate training in the defense of persons accused of capital crimes;

iii.     The availability of ongoing consultation support from experienced death penalty counsel.

Attorneys appointed under this paragraph should be pre-screened by a panel of experienced death penalty attorneys (see Guideline 3.1) to ensure that they will provide

competent representation.

## III.    POST-CONVICTION

A.     Assignments to represent indigents in post-conviction proceedings in capital cases should be distributed to attorneys who:

i.          are members of the bar admitted to practice in the jurisdiction or admitted to practice pro hac vice; and

ii.         are experienced and active trial practitioners with at least three years litigation experience in the field of criminal defense; and

iii.        have prior experience as counsel in no fewer than five jury or bench trials of serious and complex cases which were tried to completion, as well as prior experience as post-conviction counsel in at least three cases in state or federal court.   In addition, of the five jury or bench trials which were tried to completion, the attorney should have been counsel in at least three cases in which the charge was murder or aggravated murder; or alternatively, of the five trials, at least one was a murder or aggravated murder trial and an additional three were felony jury trials; and

iv.        are familiar with the practice and procedure of the appropriate courts of the jurisdiction; and

v.         have attended and successfully completed, within one year prior to their appointment, a training or educational program on criminal advocacy which focused on the post-conviction phase of a criminal case, or alternatively, a program which focused on the trial of cases in which the death penalty is sought; and

vi.        have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases.

In addition to the experience level detailed above, it is desirable that at least one of the two post-conviction counsel also possesses appellate experience at the level described in 11.B. above (relating to appellate co-counsel).

B.     Alternate Procedures: Appointments for lead and co-counsel assignments may also be distributed to persons with extensive criminal    trial, appellate and/or post-conviction experience or extensive civil litigation and/or appellate experience, if it is clearly demonstrated to the appointing authority that competent representation will be provided to the capitally charged indigent defendant. Lawyers appointed under this paragraph shall meet one or more of the following qualifications:

i.          Experience in trial, appeal and/or post-conviction representation in death penalty cases which does not meet the levels detailed in paragraph A above;

ii.         Specialized post-graduate training in the defense of persons accused of capital

iii.    crimes;
      The availability of ongoing consultation support from experienced death penalty counsel.

  Attorneys appointed under this paragraph should be pre-screened by a panel of experienced death penalty attorneys (see Guideline 3.1) to ensure that they will provide competent representation.

**<u>Commentary</u>:**

  Eligibility requirements for capital counsel are aimed at providing highly qualified and dedicated attorneys to defendants who face the most serious of consequences -death. Consequently, the appointing authority should adopt eligibility standards which reflect at least seven essential quality control criteria necessary for the selection of able counsel at all levels in capital cases:

i.    license or permission to practice in the jurisdiction;
ii.   general background in criminal defense work;
iii.   demonstrated experience in felony practice at the appropriate level (trial, appeals, post-conviction);
iv.   demonstrated experience in death penalty litigations;
v.    familiarity with the requisite court system(s);
vi.   significant and continuous training in death penalty litigation; and
vii.   demonstrated proficiency and commitment to quality representation.

  Additionally, eligibility standards should require trial counsel to have demonstrated experience with expert witnesses and evidence. Drafters of local eligibility standards are encouraged to consider additional criteria which will enhance the quality of representation provided. See Guideline 11.1 et seq. and accompanying commentary. Once the standards have been developed, the objective of effective representation requires consistent and continuous application of the quality control criteria in order to ensure that defendants facing the prospect of death are not receiving inadequate representation.

  The importance of distributing assignments to experienced attorneys possessing a substantial background in criminal defense practice has been previously noted. See commentaries to Guidelines 1.1, 2.1, and to the performance Guidelines in section 11. As in all criminal cases, it is elemental that assigned counsel be familiar with the practice and procedure of the courts where the client's case will be heard.[1]

  As discussed in Guidelines 1.1, 11.4.1, 11.7.2 and 11.8, verdicts and sentencing decisions in capital cases often turn upon the submission by both the prosecution and defense of evidence from expert witnesses. Eligible trial attorneys should therefore be adept at using expert evidence to the advantage of the client, and at cross-examining prosecution witnesses.

  All assigned counsel should be required to receive relevant training on a periodic basis

in order to enhance their advocacy skills; the changing nature of capital jurisprudence requires capital counsel to keep abreast of constantly changing legal developments relating to death penalty matters. At all levels of capital representation, counsel should have the necessary skill and knowledge to provide quality representation.

This Guideline recognizes that fulfillment of the experiential criteria or its equivalent is a necessary, but not a sufficient, prerequisite for attorney eligibility. There may be instances where an attorney's background objectively satisfies the experiential criteria, but his or her past performance did not represent the level of proficiency or commitment necessary for the adequate representation of a client in a capital case. Such an attorney should be excluded from the roster list. Consequently, before placing an attorney's name on a roster list, the appointing authority should make an initial determination regarding the attorney's ability to satisfy the experiential criteria. The appointing authority should then make a second determination that the attorney's past performance exemplifies the quality of representation appropriate to capital cases, utilizing the Guidelines established by the authority pursuant to Guideline 11.1.

The application of this two-pronged eligibility test will help prevent the mechanical assignment of cases to experientially qualified attorneys who have not demonstrated the requisite skill, dedication, or commitment necessary for capital cases.

This Guideline acknowledges that there are many attorneys who do not possess the experiential criteria detailed in the Guideline, but who should receive appointments because they will provide competent representation at trial, appeal and/or post-conviction. Such attorneys may have criminal law experience which does not meet the experiential criteria, may have attended training in death penalty defense representation or may have substantial experience in civil practice. These attorneys should receive appointments if the appointing authority is satisfied the defendant or inmate will be provided with the same quality of representation as clients represented by attorneys who met the experiential criteria.

Attorneys who are appointed under the "Alternate Procedures" clauses of this Guideline obviously have an obligation to consult with other attorneys who are expert in death penalty defense, to attend specialized training and to do whatever else is necessary to allow them to provide competent representation to their clients. Where the appointment of counsel is to a defender office, the appointing authority may permit both lead and co-counsel to be designated by the office, but should determine that these Guidelines are being used in making that designation.

The resources and experience of an office as a whole may be considered as one factor in determining the qualification of the individual attorneys within that office, but cannot substitute for the personal qualifications of the individual attorneys actually handling death penalty cases. For example, the resources and experience of the office might justify allowing an otherwise qualified attorney within that office to act as lead counsel after somewhat less than five years of personal litigation experience (Guideline 5.1.1.A (ii)) but could not justify allowing an attorney within that office to act as death penalty counsel after only minimal personal criminal litigation experience.

## FOOTNOTES:

I.     ABA Standards, Providing Defense Services, Standard 5-2.2 commentary. See e.g., the quote of a capital postconviction attorney describing death penalty jurisprudence as "unintelligible," "inconsistent and at times, irrational" as well as "evolving... constantly chang(ing)." American Bar Association, Standing Committee on Legal Aid and Indigent Defendants, Bar Information Program (prepared by The Spangenberg Group), Time & Expense Analysis in Post-conviction Death Penalty Cases (February, 1987) p. 22, quoted in part in Criminal Justice Newsletter, Vol. 18, #10, p. 4 (May 15, 1987).

## GUIDELINE 6.1 WORKLOAD

Attorneys accepting appointments pursuant to these Guidelines should provide each client with quality representation in accordance with constitutional and professional standards. Capital counsel should not accept workloads which, by reason of their excessive size, interfere with the rendering of quality representation or lead to the breach of professional obligations.

**Commentary:**

The goal in providing defense services in capital cases should be to ensure high quality legal representation to persons unable to afford counsel. See Guideline 1.1. The caseload of an attorney receiving assignments pursuant to these Guidelines should, therefore, permit him or her to provide each client with the time and effort necessary to ensure effective representation. As the American Bar Association has noted: One of the single most important impediments to the furnishing of quality defense services for the poor is the presence of excessive caseloads.

All too often in defender organizations, attorneys are asked to provide representation in too many cases. Unfortunately, not even the most able and industrious lawyers can provide quality representation when their workloads are unmanageable. Excessive workloads, moreover, lead to attorney frustration, disillusionment by clients, and weakening of the adversary system.[1]

Assignments should be distributed in light of each attorney's duties under the Code of Professional Responsibility not to accept "employment... when he is unable to render competent service..."[2] or to handle cases "without preparation adequate in the circumstances."[3] Similarly, counsel -- including defender offices -- should be admonished not to accept more assignments than they can reasonably discharge[4] or to accept a client where the representation will be materially limited by the attorney's responsibilities to another client or to a third person.[5]

In accordance with these principles, the appointing authority is urged to assess the non-capital workload (including private practice, if any) as well as death penalty workloads of eligible attorneys to determine whether the workloads are excessive. To assist in assessing workloads, some defender offices have established caseload guidelines which are useful in determining whether the workload of a particular attorney is excessive.[6] These guidelines may be consulted as one measure of appropriate workloads. Assignments per attorney should be limited to an appropriate level consistent with the lawyer's ability to provide each client with quality representation in accordance with constitutional and professional standards. This limitation is applicable to defender offices as well as to members of the private bar.

As stated in Guideline 4.1, exceptions to the practice of strict rotation of assignments should be permitted in instances where departure would serve the best interests of the client. This may require that some attorneys receive more assignments than other attorneys. The instant Guideline, therefore, should not be read as requiring identical caseloads among the attorneys who are qualified to receive appointments. Where a particular attorney is receiving

additional assignments, the appointing authority should be especially diligent in ensuring that the caseload is consistent with the lawyer's ability to provide quality representation to each client.

## FOOTNOTES:

1. ABA Standards, Providing Defense Services, Standard 5-4.3 commentary.
2. ABA Model Code of Professional Responsibility EC 2-30; accord, ABA Model Rules of Professional Conduct, Rule 1.3 comment.    "A lawyer's workload should be controlled so that each matter can he handled adequately."
3. ABA Model Code of Professional Responsibility, DR 6-101(A)(2).
4. ABA Standards, The Defense Function, Standard 4-1.2(d).
5. ABA Model Rules of Professional Conduct, Rule 1.7(b). The comment to that Rule says that "a lawyer's need for income should not lead the lawyer to undertake matters that cannot be handled competently." See also NLADA, Performance Guidelines for Criminal Defense Representation (Draft Guideline 1.3 (a)).
6. In determining maximum effective workloads for its staff attorneys, the District of Columbia Public Defender Service considers the following factors: quality of representation, speed of turnover of cases, percentage of cases tried, extent of support services available to staff attorneys, court procedures, and other activities or complex litigation. An Exemplary Prospect, 1 Law Enforcement Assistance Administration. 13-14 (1974). See NLADA, National Study Commission on Defense Services, Guidelines for Legal Defense Systems, 5.1-5.3; NLADA Standards for Defender Services. IV.1; National Advisory Commission, Court 13.12. These standards all acknowledge the need to determine acceptable workloads, and all acknowledge within the standards themselves or in commentary the myriad factors that must be considered in weighing workload.   Only the National Advisory Commission sets forth suggested numerical maximums for caseloads; those numbers are provided with the caveat "that particular local conditions -- such as travel time -- may mean that lower limits are essential." The NAC standard does not address death penalty workloads.

## GUIDELINE 7.1 MONITORING; REMOVAL

A.     The appointing authority should monitor the performance of assigned counsel to ensure that the client is receiving quality representation.  Where there is compelling evidence that an attorney has inexcusably ignored basic responsibilities of an effective lawyer, resulting in prejudice to the client's case, the attorney should not receive additional appointments.  Where there is compelling evidence that an unalterable systemic defect in a defender office has caused a default in the basic responsibilities of an effective lawyer, resulting in prejudice to a client's case, the office should not receive additional appointments.  The appointing authority shall establish a procedure which gives written notice to counsel or a defender office whose removal is being sought, and an opportunity for counsel or the defender office to respond in writing.

B.     In fulfilling its monitoring function, however, the appointing authority should not attempt to interfere with the conduct of particular cases.  Representation of an accused establishes an inviolable attorney-client relationship.  In the context of a particular case, removal of counsel from representation should not occur over the objection of the client.

C.     No attorney or defender office should be readmitted to the appointment roster after removal under (a) above unless such removal is shown to have been erroneous or it is established by clear and convincing evidence that the cause of the failure to meet basic responsibilities has been identified and corrected.

## Commentary:

        Consistent with its duty to ensure that quality legal assistance is afforded to indigent capital defendants, the appointing authority should make an effort to monitor the performance of assigned counsel, including defender offices.  "Admittedly, this is not an easy task and there obviously are difficulties present in having third parties scrutinize the judgments of private counsel.  On the other hand, the difficulty of the task should not be an excuse to do nothing".[1]
        While the appointing authority, at a minimum, should investigate and keep track of any complaints made against assigned counsel by judges, clients and other attorneys,[2] an effective attorney-monitoring program in the context of life and death matters should go considerably beyond these activities.  The professional performance of each assigned lawyer should be subject to systematic review based upon publicized standards (see section 11) and procedures.  Removal of an attorney's name from the list of attorneys eligible to receive appointments should not occur simply because members of the committee on appointments might have represented the client differently had they been assigned to the case.  Rather, this Guideline adopts the position that counsel should be removed from the roster of eligible attorneys where, in the context of a particular case, counsel's inexcusable dereliction of duty has resulted in prejudice to the client's case.  This test for removal is consistent with Guideline 5.1 which precludes assignments to experientially qualified attorneys who fail to demonstrate the

sufficient skill, dedication, and commitment which exemplify the quality of representation appropriate to capital cases.[3]

In fulfilling its monitoring function, the appointing authority should not assume the task of overseeing the content of assigned counsel's work.[4] In order to preserve the nature of the attorney-client relationship, counsel for the accused must have total freedom to represent their clients as they deem professionally appropriate. Clients, moreover, should have the right to continue satisfactory relationships with their appointed lawyers in whom they have reposed their confidence and trust.

Removal of counsel from representation therefore should not occur unless the client agrees to a substitute counsel.[5] Where the assigned lawyer is unable to provide affective representation due to a mental or physical impairment,[6] the Court may be forced to intervene, on its own motion or at the request of the client (in propria persona or through the appointing authority). In such cases, the Court's sole objective must be to protect the interests of the client.

Where cases are assigned to a defender office rather than an individual attorney, the appointing authority is not excused from the monitoring function. Procedures should be established for preventing a recurrence of any noted dereliction of duty. If the defender office administration is acting as the appointing authority or is permitted by the appointing authority to designate individual attorneys within the office as counsel for the death penalty cases assigned to the office, the individual attorneys within the office should be subject to removal from eligibility just as private attorneys are.

Where a dereliction of duty is noted following the appointment of a defender office, the appointing authority may act in ways short of removing the office as a whole from the appointment roster, if other steps are taken to ensure that there is no recurrence of the problem. If an office policy, the office workload, or other systemic problem has led to a dereliction of duty and is not corrected, the appointing authority should remove the office from the appointment roster.

Because of the unique and irrevocable nature of the death penalty, counsel who have been removed from the appointment roster should be readmitted only upon exceptional assurances that no further dereliction of duty will occur. Readmission to the roster should not be granted until the appointing authority determines that removal from the roster was improper, or determines by clear and convincing evidence that the cause of the dereliction of duty which led to the removal has bean identified and corrected.

Readmission may be conditioned on specific actions (e.g., proof of reduction in workload, proof of additional training and/or experience, substance abuse counseling, or correction of systemic defects in an office).

**FOOTNOTES:**

1.     ABA Standards, Providing Defense Services, Standard 5-2.2 commentary
2.     See Id.

3.  The standard for denying additional appointments to death penalty lawyers should be more stringent than the standard for denying additional appointments in non-capital cases. The standard in non-capital criminal cases is that "where there is compelling evidence that an attorney consistently has ignored basic responsibilities . . . additional appointments to the panel member ought not be made by the assigned-counsel program." ABA Standards, Providing Defense Services, Standard 5-2.2 commentary (emphasis added). As has been made plain throughout these Guidelines, the incompetent representation of capital defendants may have irrevocable life-or-death consequences. Accordingly, the appointing authority should not wait for an attorney to "consistently ignore basic responsibilities" or otherwise display a pattern of incompetence before denying additional appointments to that attorney.

4.  ABA Standards, Providing Defense Services, 5-1.3 commentary; see also ABA Standards, Providing Defense Services, 5-5.3 and commentary.

5.  Id. 5-5.3.

6.  It cannot always be safely assumed that counsel who has been determined to be qualified based on past performance will represent current or future clients satisfactorily. Circumstances can change. For example, the attorney may begin suffering from illness, chemical dependency or other handicap unknown to the appointing authority, the court or the client. A Georgia man was executed despite the post-conviction discovery that his trial counsel, who had failed to offer important mitigating evidence at the penalty phase, had been on drugs during the trial. Tabak, The Death of Fairness: The Arbitrary and Capricious Imposition of the Death Penalty, XIV N.Y.U. Rev. L & Soc. Change 797, 841 (1986), discussing *Young v. Kemp*, 758 F.2d 514 (11th Cir. 1985).

## GUIDELINE 8.1 SUPPORTING SERVICES

The legal representation plan for each jurisdiction should provide counsel appointed pursuant to these Guidelines with investigative, expert, and other services necessary to prepare and present an adequate defense. These should include not only those services and facilities needed for an effective defense at trial, but also those that are required for effective defense representation at every stage of the proceedings, including the sentencing phase.

**Commentary:**

In a capital case reaffirming that fundamental fairness entitles indigent defendants to the "basic tools of an adequate defense," the United States Supreme Court stated that: We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.[1]

The Court reiterates the proposition adopted by other national standards on defense services[2] that quality representation cannot be rendered by assigned counsel unless the lawyers have available for their use adequate supporting services. These services include: ...expert witnesses capable of testifying at trial and at other proceedings, personnel skilled in social work and related disciplines to provide assistance at pretrial release hearings and at sentencing, and trained investigators to interview witnesses and to assemble demonstrative evidence.[3]

As set out in the following Guidelines and/or commentary -- 1.1, 11.4.1, 11.5.1, 11.7.2 and 11.8, experts and other supporting services are frequently vital in capital cases.

Counsel assigned to represent defendants in capital cases must engage in ongoing research in order to keep abreast of the rapidly changing legal developments in the complex body of law surrounding death penalty issues. In order to make use of sophisticated jury selection techniques (discussed in commentaries to Guidelines 1.1 and 11.7.2), for example, the defense requires access to social scientists and other experts who can assist in voir dire questioning and the profiling of prospective jurors. Since pretrial investigation and preparation are fundamental to attorney competence at trial.[4]   (Guideline 11.4.1 and accompanying commentary), assigned counsel requires the services of trial assistants such as investigators to gather evidence and witnesses favorable to the client and to enable counsel to intelligently assess conflicting options. An adequate defense also requires the services of expert witnesses to testify on behalf of the client and to prepare defense counsel to effectively cross-examine the state's experts.[5]   Additionally, counsel in a capital case is obligated to conduct a thorough investigation of the defendant's life history and background and, if it is in the best interest of the client, to present mitigating evidence uncovered during the course of that investigation at the penalty phase of the trial (Guideline 11.8.6). Counsel, whether practicing privately or within a defender office, cannot adequately perform these and other crucial penalty phase tasks without the assistance of investigators and other assistants.

It is critical, therefore, for each jurisdiction to authorize sufficient funds to enable counsel in capital cases to conduct a thorough investigation for trial, sentencing, appeal and postconviction and to procure the necessary expert witnesses and documentary evidence.[6] Assigned attorneys involved in capital cases are typically provided with few, if any, resources to fund this aspect of case preparation.[7]

According to one source, the funds which states and counties provide for defense counsel are far below the amounts that would be needed even if capital trials had only one phase.[8] Furthermore, funds available to appointed defense counsel are substantially below those available to the prosecution.[9] This inequity is unconscionable.

## FOOTNOTES:

1. *Ake v. Oklahoma*, 470 U.S. 68; 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).
2. ABA Standards, Providing Defense Services, 5-1.4; National Advisory Commission, Courts, 13.14; NLADA, National Study Commission on Defense Services, Guidelines for Legal Defense Systems, 3.1, 3.4; NLADA, Standards for Defender Services 4.3. See also ABA Standards The Defense Function, Standard 4-4.1, 4-8.1.
3. ABA Standards, Providing Defense Services, Standard 5-1.4 commentary.
4. Goodpaster, Effective Assistance of Counsel in Capital Cases, 58 N.Y.U. L. Rev. 299, 344-5 (1983).
5. See Dept. of Public Advocacy, KENTUCKY PUBLIC ADVOCATE DEATH PENALTY MANUAL. Chapter XI, "Using Psychological Evidence in a Capital Case" (1983); Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 111, p. 10.5-2 through10.5-3 (1985).
6. See ABA Standards, Providing Defense Services, Standard 5-1.4 commentary.
7. Goodpaster, Effective Assistance of Counsel, supra note 4, at 356; see also Tabak, The Death of Fairness: The Arbitrary and Capricious Imposition of the Death Penalty in the 1980's, XIV N.Y.U. Rev.L. & Soc. Change 797, 801 (1986) (defense counsel are not generally provided sufficient funds or staff to conduct investigations).
8. Tabak, The Death of Fairness, supra, note 7, at 804.
9. See e.g. Comment, The Cost of Taking a Life: Dollars and Sense of the Death Penalty, 18 U.C.Davis L. Rev. 1221, 1254 fn. 158 (1985).

**GUIDELINE 9.1 TRAINING**

Attorneys seeking eligibility to receive appointments pursuant to these Guidelines should have completed the training requirements specified in Guideline 5.1. Attorneys seeking to remain on the roster of attorneys from which assignments are made should continue, on a periodic basis, to attend and successfully complete training or educational programs which focus on advocacy in death penalty cases.

The legal representation plan for each jurisdiction should include sufficient funding to enable adequate and frequent training programs to be conducted for counsel in capital cases and counsel who wish to be placed on the roster.

**Commentary:**

Criminal law in general is a complex and difficult legal area. The skills involved in death penalty litigation are even more highly specialized and must be carefully developed. Moreover, the consequences of mistakes by defense counsel in capital cases may be irrevocable, including wrongful conviction and the loss of life.[1] It is critical that each jurisdiction ensure that comprehensive training programs which focus on advocacy in capital cases be regularly offered to attorneys (including private counsel and defender office staff) who are eligible to receive appointments pursuant to these Guidelines or who are seeking to become eligible.[2] Many jurisdictions are not now providing the necessary training for local counsel.[3]

In addition to training within the jurisdiction, counsel's attendance at regional and national training programs should also be encouraged, if not required.[4] In recent years, intensive training for lawyers involved in capital cases has been provided by several different groups.[5]

This Guideline assumes that counsel seeking to maintain eligibility for appointment in death penalty cases will also work to hone general criminal defense skills by attending seminars on other aspects of criminal law and procedure.

**FOOTNOTES:**

1.   McNally, Death is Different: Your Approach to a Capital Case Must be Different Too, The Champion (March 1984) p. 10, reprinted in California Attorneys for Criminal Justice & California Public Defenders Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL. Vol. 1, p. A29, A-30 (1986).
2.   See ABA Standards, Providing Defense Services, Standard 5-1.4 and commentary.
3.   Supreme Court Justice Thurgood Marshall recently urged bar associations to establish additional training programs for death penalty lawyers. See Marshall, Remarks on the Death Penalty Made at the Judicial Conference of the Second Circuit 86 Columbia L. Rev. 1 (1986).
4.   Without specifying the location of training, the standards approved by the Indiana State

Bar Association's Board of Managers and House of Delegates require attendance prior to trial at a "death penalty seminar." Res Gestae magazine (January 1985) p. 373.

5.      E.g., NAACP Legal Defense and Educational Fund, Inc.; the California Public Defenders Association and California Attorneys For Criminal Justice; the Kentucky Department of Public Advocacy; and the Southern Poverty Law Center.

## GUIDELINE 10.1. COMPENSATION

A.      Capital counsel should be compensated for actual time and service performed.  The objective should be to provide a reasonable rate of hourly compensation which is commensurate with the provision of effective assistance of counsel and which reflects the extraordinary responsibilities inherent in death penalty litigation.

B.      Capital counsel should also be fully reimbursed for reasonable incidental expenses.

C.      Periodic billing and payment during the course of counsel's representation should be provided for in the representation plan.

## **Commentary:**

This Guideline is rooted in the constitutional obligation of government to provide effective representation for poor people charged with crimes.[1]  In order to fulfill that obligation, government is required to adequately compensate court-appointed counsel for the representation they provide.  As the Florida Supreme Court has noted, the defendant's right to effective representation is "inextricably interlinked" with the attorney's right to fair compensation.[2]

Low fees make it economically unattractive for competent attorneys to seek assignments and to expend the time and effort a case may require.  As of 1985, Virginia was paying defense lawyers in capital cases an average of $687.00 per case -- an amount representing an hourly wage of $1.00 in some cases.[3]  Such token compensation is plainly insufficient to cover even overhead expenses of an attorney assigned to a capital case, much less to adequately reimburse the attorney for his or her time and skill.

Florida's compensation scheme (permitting a maximum payment of $3,500.00 per case as of 1985), while somewhat higher than Virginia's, must still be described as inadequate since there have been instances where the effective rate counsel received was close to the Federal minimum wage.[4]  These are but two examples of drastic underfunding of capital representation.

In such situations, the temptation is too great for a lawyer to shortchange the client because he or she is not adequately being compensated for his or her time.  For example, a study conducted by the National Legal Aid & Defender Association documents that in 1985, 36% of the assigned counsel in Massachusetts who responded to a survey on the issue admitted

they omitted some appropriate defense activity because of inadequate compensation.[5]  Specific types of activities omitted included: interviewing the client; a full investigation of the facts; interviewing witnesses or the police; filing pretrial motions; and adequate research of the law.[6]  Omissions of such critical activities, shocking in any case, would be unconscionable in cases involving defendants who face the prospect of death.  For this reason alone, counsel in capital cases ought to receive adequate reimbursement for their services.

Unreasonably low fees not only deny the defendant the right to effective representation, however.  They also place an unfair burden on skilled criminal defense lawyers, especially those skilled in the highly specialized capital area.  These attorneys are forced to work for next to nothing after assuming the responsibility of representing someone who faces a possible sentence of death.  Failure to provide appropriate compensation discourages experienced criminal defense practitioners from accepting assignments in capital cases (which require counsel to expend substantial amounts of time and effort).[7]

This Guideline provides for "reasonable" compensation, which should be distinguished from "token" compensation.  In the words of one court: "The statute (imposing a fee cap upon attorney compensation in capital cases) as applied to many of today's cases, provides for only token compensation.  The availability of effective counsel is therefore called into question in those cases when it is needed most."[8]  The court concluded that attorney fees which are set at "confiscatory rates" in capital cases impermissibly interfere with the Sixth Amendment right to counsel.[9]

Some courts have argued that criminal defense lawyers have a pro bono obligation to provide free (or almost free, where fees are low) services to poor defendants. [10]  This argument ignores the government's responsibility to provide effective, adequately funded representation in these cases.[11]  Furthermore, prosecutors and judges are not required or asked to work for nothing or next to nothing.  It is unconscionable to impose such a burden on defense lawyers.[12]

No citizen can be expected to perform civilian services for the government when to do so is clearly confiscatory of his time, energy and skills, his public service is inadequately compensated and his industry is unrewarded.  "I do not believe that good public conscience approves such shoddy, tawdry treatment of an attorney called upon by the courts to represent an indigent defendant in a capital case."[13]  (Emphasis added).

It should be the responsibility of each jurisdiction to develop flexible standards for compensation which take into consideration the number of hours  expended plus the effort, efficiency, and skill of capital counsel.[14]  Among the criteria might be the role and experience of the attorney; less experienced co-counsel might be compensated at a lower rate than lead defense attorneys.[15]  See Guidelines 4.1 and 5.1.  Flat payment rates or arbitrary ceilings should be discouraged since they impact adversely upon vigorous defense.[16]  Rather, assigned counsel should be provided a rate of hourly compensation which reflects the extraordinary responsibilities and commitment required of counsel in death penalty cases.  It is also important that the compensation plan provide for extra payments to counsel when representation is provided in unusually protracted or extraordinary cases.[17]

Periodic billing and payment -- for example, monthly -- should be available to avoid

hardship to sole practitioners, small firms and any other appointed counsel.[18]   As the commentary to Guideline 1.1 and the Guidelines in section 11 make clear, extensive preparation and long hours characterize capital representation.  Office overhead, the need for reimbursement for expenses incurred, and for compensation for time already worked do not stop during a capital case.  Financial hardship imposed by a long delay before payment for time worked and expenses incurred may impact adversely upon counsel's ability to provide quality representation.

This Guideline acknowledges the strong tension which exists between the public treasury and the obligation to fund the often high cost of providing defense in capital cases, but asserts that the obligation to provide adequate and effective representation cannot be ignored or diminished.  In order to safeguard the defendant's right to effective representation, "it is our duty to firmly and unhesitatingly resolve any conflicts between the treasury and the fundamental constitutional rights in favor of the latter."[19]

## FOOTNOTES:

1.  See *Gideon v. Wainwright*, 372 U.S. 335; 83 S. Ct. 792; 9 L. Ed. 2d 799 (1963); *Powell v. Alabama*, 287 U.S. 45; 53 S. Ct. 55; 77 L. Ed. 158 (1932).

2.  *Makemson v. Martin County*, 491 So. 2d 1109, 1112 (Fla. 1986), cert. denied __U.S.__;107 S.Ct. 908: 93 L. Ed. 2d 857 (1987).

3.  Tabak, The Death of Fairness:  The Arbitrary and Capricious Imposition of the Death Penalty in the 1980's, XIV N.Y.U. Rev. L. & Soc. Change, 797, 801 (1986).

4.  Id. at 802.

5.  NLADA, Statewide Evaluation of the Massachusetts Bar Advocate Program (1986), at 33.

6.  Id. at 34.

7.  The substantial amount of time required for postconviction representation alone is documented in American Bar Association Standing Committee on Legal Aid and Indigent Defendants, Bar Information Program (prepared by The Spangenberg Group), Time & Expense Analysis in Postconviction Death Penalty Cases (February 1987) p. 9.

8.  *Makemson v. Martin County*, supra, note 2.

9.  Id. at p. 1115.

10.  See e.g., *State ex rel. Wolff v. Ruddy*, 617 S.W.2d 64 (Mo. 1981); *People v. Harflinger*, 359 N.E.2d 861 (111. 1977).

11.  See cases cited supra note 1.  The ABA has rejected the view that lawyers are required to provide pro bono legal services in criminal cases. See ABA Standards,  Providing Defense Services, Standard 5-2.4 commentary.

12.  ABA Standards, Providing Defense Services, Standard 5-2.4 commentary.

13.  *MacKensie v. Hillsborough County*, 288 So. 2d 200, 202 (Fla. 1973)(dissenting opinion), quoted in Makemson v. Martin County, supra note 2, at p. 1114. See also. DeLisio v. Alaska Superior Court, 740 P.2d 437 (Alaska 1987).

14.    ABA Standards, Providing Defense Services, Standard 5-2.4 commentary.
15.    Id.
16.    Id.
17.    See *Makemson v. Martin County*, supra note 2.
18.    See American Bar Association Standing Committee on Legal Aid and Indigent Defendants, Bar Information Program (Prepared by The Spangenberg Group), Caseload and Cost. 1: projections for Federal Habeas Corpus Death Penalty Cases in FY 1988 and FY 1989 (Sept. 1987) p. 74
19.    See *Makemson v. Martin County*, supra, note 2.

## GUIDELINE 11.1 ESTABLISHMENT OF PERFORMANCE STANDARDS

A.    The appointing authority should establish standards of performance for counsel appointed in death penalty cases.

B.    The standards of performance should include, but should not be limited to, the specific standards set out in Guidelines 11.3 through 11.9.

C.    The appointing authority should refer to the standards of performance when assessing the qualification of attorneys seeking to be placed on the roster from which appointments in death penalty cases are to be made (Guideline 4.1) and in monitoring the performance of attorneys to determine their continuing eligibility to remain on the roster (Guideline 7.1).

**Commentary:**

As set out in Guideline 5.1 and accompanying commentary, the appointing authority must determine whether attorneys seeking eligibility for appointment in death penalty cases have demonstrated the quality of representation appropriate to those cases. Written standards of attorney performance are intended to assist the appointing authority in making that determination, and to assist counsel in achieving and maintaining eligibility. The specific performance standards of this section address in addition to areas common to all criminal defense representation, those areas of representation in which death penalty cases differ from other types of criminal cases, as discussed in the Commentary to Guideline 1.1. These standards, which are enacted as minimal levels of performance in death penalty cases, are, where relevant, equally applicable to all areas of criminal practice. Standards relating to attorney functions common to both capital and non-capital cases should also be included in the standards established by the appointing authority, with the understanding that in capital cases the level of adherence to such standards must be higher (see Guideline 11.2).

Page 58 of 102

# GUIDELINE 11.2 MINIMUM STANDARDS NOT SUFFICIENT

A.    Minimum standards that have been promulgated concerning representation of defendants in criminal cases generally, and the level of adherence to such standards required for non-capital cases, should not be adopted as sufficient for death penalty cases.

B.    Counsel in death penalty cases should be required to perform at the level of an attorney reasonably skilled in the specialized practice of capital representation, zealously committed to the capital case, who has had adequate time and resources for preparation.

## Commentary:

"Death is different",[1] and all rules established for the protection of the capital defendant should be strictly enforced. The defense of death penalty cases is an evolving practice and counsel should refer to state and federal death penalty training and practice manuals for preparation and trial of death penalty cases. When the courts are not likely to provide the proper enforcement of the rules sua sponte, attorneys must seek to enforce the rules, or their clients will die. The minimal level of attorney competence that may be accepted as sufficient in some jurisdictions in non-capital cases can be fatally inadequate in death penalty cases.

For example, attorney ignorance or oversight will not constitute cause for failure to meet the exhaustion requirements of federal habeas corpus, unless the attorney's failures have been so egregious as to meet the current standard of constitutionally ineffective assistance of counsel.[2] Under this rule, otherwise reversible error will be ignored by the court; the capital client, rather than serving an improperly imposed but unreviewable prison term because of counsel's error, will die. To ensure that indigent defendants will not die for, and their attorneys will not have to live with, such error, the standards of performance established by the appointing authority under Guideline 11.1 should include requirements that all aspects of representation be intensified in a capital case.[3]

Some national standards have been established concerning certain aspects of general representation of criminal defendants.[4] A set of complete standards is in the draft stage.[5] The appointing authority may wish to refer to existing standards when establishing the standards of performance for representation in death penalty cases, but should not limit itself thereto. The standards to be established by the appointing authority should be defense standards, not minimum standards which the prosecution or even the courts might be willing to accept.[6]

Establishment of standards is intended to assist the appointing authority and counsel seeking to establish and maintain eligibility. Compliance with such standards is not intended to be used as the sole criteria for assessing questions of effective assistance of counsel in a particular case.[7]

The education, training and experience necessary for counsel to represent a capital client are inherent in the eligibility requirements of Guideline 5.1 and are not repeated in this section. For general standards regarding education, training and experience of criminal

defense counsel, see NLADA, Performance Guidelines for Criminal Defense Representation, Draft Guideline 1.2. Other general standards contained in those Guidelines which may be relevant for consideration include:

> Role of Defense Counsel (Draft Guideline 1.1)
> General Duties of Defense Counsel (Draft Guideline 1.3)
> Preliminary Proceedings (Draft Guidelines 3.1 through 3.3)
> Discovery (Draft Guideline 4.2)
> Opening Statement (Draft Guideline 7.3)
> Confronting the Prosecutor's Case (Draft Guideline 7.4)
> Closing Argument (Draft Guideline 7.6)
> Jury Instructions (Draft Guideline 7.7).

## FOOTNOTES:

1.  See e.g. *Gardner v. Florida*, 430 U.S. 349, 357-358; 97 S. Ct. 1197, 1204; 51 L. Ed. 2d 393, 402 (1977) (plurality opinion).

2.  Current minimum standards, according to capital attorney David Bruck, have been met if a mirror held under counsel's nose clouds up, For U.S. Death-Row Inmates, a Lawyer Often Isn't Enough, Los Angeles Daily Journal, 9/30/86. (Discussing the test for effective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668; 104 S. Ct. 2052; 80 L.Ed. 2d 674 (1984)). See also, Tabak, The Death of Fairness: The Arbitrary and Capricious Imposition of the Death Penalty in the 1980s, XIV N.Y.U. Rev. L. a Soc. Change 797, 805-807 (1986). *Murray v. Carrier*, 477 U.S.__; 106 S. Ct. 2639; 91 L.Ed. 2d 397 (1986) holds that ignorance or oversight of attorney does not equal "cause" unless external factors such as interference by government officials intervened in the defense, or unless counsel's representation amounted to constitutionally ineffective assistance.

3.  The appointing authority should not limit itself to the view of those courts which state that while death is different, the same legal principles govern ineffective assistance of counsel claims in capital and non-capital cases, see e.g., *Stanley v. Zant*, 697 F.2d 955, 962-963 (11th Cir. 1983). The standards established by the appointing authority should clearly state that more is expected of capital counsel. Review by the appointing authority should likewise be intensified, compared to the scrutiny that might be given under a system to appoint counsel in non-capital cases. The instant Guidelines follow the logic of at least one court which recognized that courts "must strictly scrutinize counsel's conduct" in death penalty cases, *Voyles v. Watkins*, 489 F. Supp. 901, 910 (N.D. Miss. 1980), cited in *Blake v. Want*, 513 F. Supp. 772 (S.D. Ga. 1981); contra. *Washington v. Watkins*, 655 F.2d 1346, 1356-1357 (5th Cir. 1981).

4.  ABA Standards, The Defense Function; ABA Standards, Providing Defense Services; NADA, Guidelines for Defender Services; National Study Commission on Defense Services, Guidelines for Legal Defense Systems in the United States.

5.  NLADA Grant Award from the Bar Information Program of the ABA Standing

Committee on Legal Aid and Indigent Defendants, August 22, 1985.

6. As noted above, some courts have held that the standard for ineffective assistance of counsel is not different in capital than in non-capital cases, *Washington v. Watkins*. 655 F.2d 1346, 1356-1357 (5ᵗʰ Cir. 1981).

7. For an example of standards for defense counsel that are intended for use in determining eligibility but not as the sole basis for examining claims of ineffective assistance of counsel, see Rule 65, Qualifications for Eligibility to be Court-Appointed Counsel for Indigent Capital Defendant in the Courts of Ohio, adopted by the Supreme Court of Ohio October 14, 1987, Subcommittee Comments to section l.

## GUIDELINE 11.3 DETERMINING THAT DEATH PENALTY IS BEING SOUGHT

Counsel appointed in any case in which the death penalty is a possible punishment should, even if the prosecutor has not indicated that the death penalty will be sought, begin preparation for the case as one in which the death penalty will he sought while applying strategies to have the case designated by the prosecution as a non-capital one.

### Commentary:

Jurisdictions may vary in how and when the prosecutor makes the determination of whether to request the death penalty. Jurisdictions vary significantly as to when the defense must be notified of the specific aggravating factors upon which the prosecution will rely in seeking the death penalty.[1] If there is any possibility that the death penalty will be sought, counsel should proceed as if it will be sought. As is set out in Guideline 11.4, early investigation is a necessity, and should not be put off on some possibility that the death penalty will not be requested, or that the request will be dropped at a later point.[2]

If required notice has not been given, counsel is "under no duty to invite a death penalty prosecution."[3] While preparing for a capital case when notice has not been given, counsel should also prepare to challenge at the sentencing phase any prosecution efforts that should be barred for failure to give notice.[4]

### FOOTNOTES:

l. A list of cases from jurisdictions requiring specific aggravating factors to be disclosed prior to the guilt/innocence trial and from Jurisdictions with no such requirement is found in *Williams v. State*, 445 So. 2d 798, 804-85 (Miss. 1984) cert. den. Sub nom *Williams v. Mississippi*, 469 U.S. 1117; 105 S. Ct. 803; 83 L. Ed. 2d 795 (1985). One of the cases cited is *Sireci v. State*, 399 So. 24 964 (Fla. 1981). In rejecting the defendant's claim that aggravating circumstances had to be listed in the indictment, the court said that "when one is charged with murder in the first degree, he is well aware of the fact that it is a capital felony punishable by a maximum sentence of death...," 399 So. 2d at 970. Sireci has been cited in a later decision precluding the trial court

from ruling prior to the guilt/innocence phase on the propriety of the case being pursued as a death penalty case, *State v. Bloom*, 497 So. 2d 2, 3 (Fla. 1986).

2. California Attorneys for Criminal Justice & California Public Defenders Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL, Vol. 1, pg A-13 et seq. (1986), citing inter alia *Leo v. Superior Court*, 179 Cal. App. 3d 274; 225 Cal. Rptr. 15 (1986) review denied 6/20/86. In Leo, the court found no bar to the prosecution pursuing the death penalty despite having initially told the defense (almost four months earlier) that death would not be sought, so long as the case was still in the pretrial stage.

3. Dept. of Public Advocacy, KENTUCKY PUBLIC ADVOCATE DEATH PENALTY MANUAL, p. 290 (1983).

4. Id.

## GUIDELINE 11.4.1 INVESTIGATION

A.    Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial.  Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.

B.    The investigation for preparation of the guilt/innocence phase of the trial should be conducted regardless of any admission or statement by the client concerning facts constituting guilt.

C.    The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered.  This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.

D.    Sources of investigative information may include the following:

1.        Charging Documents: Copies of all charging documents in the case should be obtained and examined in the context of the applicable statues and precedents, to identify (inter alia):
    
    A.    the elements of the charged offense(s), including the element(s) alleged to make the death penalty applicable;

    B.    the defenses, ordinary and affirmative, that may be available to the substantive charge and to the applicability of the death penalty;

    C.    any issues, constitutional or otherwise, (such as statutes of limitations or double Jeopardy) which can be raised to attack the charging documents.

2.        The Accused: An interview of the client should be conducted within 24 hours of counsel's entry into the case, unless there is a good reason for counsel to postpone this interview.  In that event, the interview should be conducted as soon as possible after counsel's appointment.  As soon as is appropriate, counsel should cover A-
E below (if this is not possible during the initial interview, these steps should be accomplished as soon as possible thereafter):

    A.    seek information concerning the incident or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affects the client's rights;

    B.    explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and any

mitigating factors;

C.   Collect information relevant to the sentencing phase of trial including, but not limited to: medical history, (mental and physical illness or injury of alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior) special educational needs including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and Juvenile record; prior correctional experience (including conduct or supervision and in the institution/education or training/clinical services); and religious and cultural influences.

D.   seek necessary releases for securing confidential records relating to any of the relevant histories.

E.   Obtain names of collateral persons or sources to verify, corroborate, explain and expand upon information obtained in © above.

3.   Potential Witnesses: Counsel should consider interviewing potential witnesses, including:

D.   eyewitnesses or other witnesses having purported knowledge of events surrounding the offense itself;

E.   witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death;

F.   members of the victim's family opposed to having the client killed. Counsel should attempt to conduct interviews of potential witnesses in the presence of a third person who will be available, if necessary, to testify as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews.

4.   The Police and Prosecution: Counsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports. Where necessary, counsel should pursue such efforts through formal and informal discovery unless a sound tactical reason exists for not doing so.

5.   Physical Evidence: Where appropriate, counsel should make a prompt request to the police or investigative agency for any physical evidence or expert reports relevant to the offense or sentencing.

6.   The Scene: Where appropriate, counsel should attempt to view the scene of the

alleged offense. This should be done under circumstances as similar as possible to those existing at the time of the alleged incident (e.g. weather, time of day, and lighting conditions).

7.    Expert Assistance: Counsel should secure the assistance of experts where it is necessary or appropriate for:

A.    preparation of the defense;

B.    adequate understanding of the prosecution's case;

C.    rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial;

D.    presentation of mitigation. Experts assisting in investigation and other preparation of the defense should be independent and their work product should be confidential to the extent allowed by law.

Counsel and support staff should use all available avenues including signed releases, subpoenas, and Freedom of Information Acts, to obtain all necessary information.

## Commentary:

Counsel has a duty to investigate the case before recommending that a guilty plea be taken (or sought) or proceeding to trial.[1] This duty is intensified (as are many duties) by the unique nature of the death penalty[2] and is broadened by the bifurcation of capital trials into two phases.[3] The need for a standard mandating investigation for the sentencing phase is underscored by cases in which counsel failed to recognize the importance of this aspect of death penalty litigation. Inexperienced counsel -- and even counsel experienced in non-capital cases -- "may underestimate the importance of developing meaningful sources of mitigating evidence..."[4] See Guideline 11.8 and commentary.

Counsel's duty to investigate is not negated by the expressed desires of a client. Nor may counsel "sit idly by, thinking that investigation would be futile".[5] The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each.[6] Without investigation, counsel's evaluation and advice amount to little more than a guess.

Resources that counsel needs to pursue a proper investigation should be sought early in the case. The type and amount of assistance that can or will be made available varies from jurisdiction to jurisdiction; counsel should demand on behalf of the client all necessary experts for preparation of both phases of trial.[7] Individuals assisting in investigation should be within the confidences of the client and defense counsel, and should not be required to disclose information discovered during the investigation except at the direction of counsel.[8] Immediate contact with the client is necessary not only to gain information needed to secure evidence and crucial witnesses, but to try to prevent un-counseled confessions.[9] or admissions.

Don't forget, the defendant is a part of this team. From the initial interview forward the bond you develop with the defendant is important in how you are able to handle the case. Your initial interview will often, by necessity, be hasty. Strongly admonish your client to talk

or write to no one regarding the case.  A former client of this author is sitting on death row in part because of devastatingly harmful letters that client wrote after the appointment of counsel. This admonition should be renewed regularly during trial, after conviction, and throughout the appellate process.

In the event of a retrial, damaging post-trial statements may crucify your client.  As soon as time permits arrange for an in-depth interview with your client with an eye toward both developing the necessary trust and eliciting as many facts as you can to start you on the road to formulating your defense.[10]

Client interviews are vital for establishing the trust between attorney and client necessary to allow the attorney to learn the facts.  Counsel cannot frame an adequate defense without knowing what is likely to develop at trial, including information that is or that appears to be incriminating.[11]

## FOOTNOTES:

1.  ABA Standards, The Defense Function, Standards 4-4.1 and 4-6.1; NLADA, Performance Guidelines For Criminal Defense Representation (Draft Guideline 4.1).

2.  *Strickland v. Washington*, 466 U.S. 668, 706; 104 S. Ct. 2052; 80 L. Ed.  2d 674 (1984) (Brennan, J., dissenting in part, concurring in part).

3.  See Streib, Execution Under the Post-Furman Capital Punishment Statutes: the Halting Progress from "Let's Do It" to "Hey, There Ain't No Point in Pulling So Tight", 15 Rutgers L. J. 443, 446 (1984).

4.  Devine, et al, Special Project: The Constitutionality of the Death Penalty in New Jersey, 15 Rutgers L.J. 261, 293 (1984).

5.  *Voyles v. Watkins*, 489 F. Supp. 901, 910 (N.D. Miss.  1980). *People v. Ledesma*, 43 Cal. 3d 171, 200-204, 207-209, 221-223; 238 Cal. Rptr.404; 729 P.2d 839 (1987).

6.  *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir.  1986), citing inter alia, *Gray v. Lucas*, 677 F.2d 1986, 1093-1094 (5th Cir.  1982).  Despite its recognition of the need for investigation, the Thompson court cited *Strickland v. Washington*, supra, note 2, and declined to reverse where the attorney had failed to investigate the co-defendant's background, and had not contacted for sentencing purposes the psychiatrists who had previously examined the defendant.

7.  The Supreme Court has recognized that indigent defendants are entitled to some forms of expert assistance, see *Ake v. Oklahoma*, 470 U.S. 68; 105 S. Ct. 1087; 84 L. Ed. 2d 53 (1985). Some states provide funds by statute for preparation of a capital case, e.g. California Penal Code sec. 987.9.

8.  The California statute providing funds for defense investigation in capital cases shields even the request for assistance from the prosecutor, Cal. Penal Code sec. 987.9; see *People v. Corenevskv*, 36 Cal. 3d 307, 321; 204 Cal. Rptr. 165; 682 P. 360 (1984).

9.  See Gradess, "The Road Prom Scottsboro," Vol. 2, #2 Criminal Justice, (Magazine of the ABA Section on Criminal Justice), p. 1, 45 (Summer 1987).

10.   Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 1, pg 1.1-6 (1985).

11.   ABA Standards, The Defense Function, Standard 4-3.2 commentary.

## GUIDELINE 11.4. 2 CLIENT CONTACT

Trial counsel should maintain close contact with the client throughout preparation of the case, discussing (inter alia) the investigation, potential legal issues that exist or develop, and the development of a defense theory.

**Commentary:**

Counsel always has a duty to interview the client,[1] to keep the client informed of developments and progress in the case,[2] and to consult with the client on strategic and tactical matters. Some decisions require the client's knowledge and agreement; others, which may be made by counsel, require full consultation with the client beforehand.[3] Certainly, full consultation during the process of plea negotiation in a capital case is crucial, Guideline 11.6.1, 11.6.3 and accompanying commentary.

One hurried interview with the client will not reveal to counsel all the facts counsel needs in order to prepare for a capital trial, appeal, or postconviction review, as discussed in the commentary to Guideline 11.4.1. Any reluctance on the part of the client to disclose needed information must be overcome,[4] not a quick or easy task.

Ongoing client contact is therefore important both practically and ethically. In preparing for trial, the client must be involved: You must maintain enough client control to prevent him or her from blundering, yet give your client enough freedom of expression to feel a part of the defense team. There are two important reasons for this in a death case: (1) it is, after all, the defendant's life you are trying to save, and (2) you're going to have to humanize the defendant before the jury, and having the defendant actively involved in all phases of the case is a giant step in that direction.[5] The rapport built up between counsel and the client during the preparation of the case is a vital part of being able to present the best possible case in mitigation at the sentencing phase.[6] Post judgment counsel must not only consult with the client but monitor the client's personal condition for potential legal consequences, Guideline 11.9.1, Guideline 11.9.5 and accompanying commentary.

Counsel's general duty to maintain client contact is compounded in a capital case. The complexity and unique nature of the legal proceedings, stemming from their potentially lethal outcome, mandate careful consultation with the person who may be killed. Furthermore, counsel may have to try to keep the client from making suicidal choices about the case. Capital counsel frequently "must not only struggle against the public and prosecution but against the self-destructive behavior of the client as well.[7]

While involving the client in preparation of the case is no guarantee that the client will not make a selfdestructive choice during the preparation of his or her case, such involvement may greatly reduce the potential for a self-destructive choice.

**FOOTNOTES:**

1.    ABA Standards, The Defense Function, Standard 4-3.2.

2.    ABA Standards, The Defense Function, Standard 4-3.8.

3.    ABA Standards, The Defense Function, Standard 4-5.2.

4.    See ABA Standards, The Defense Function, Standard 4-3.2 commentary.

5.    Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 1, pg 1.1-6 (1985).

6.    McNally, Death is Different:  Your Approach to a Capital Case Must Be Different, Too, The Champion (March 1984) p. 26, 35, reprinted in California Attorneys for Criminal Justice & California Public Defenders Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL, Vol. 1, p. A29, A-35 (1986).

7.    McNally, supra note 6, giving examples of defendants who (over their attorneys' advice) actively sought death at the sentencing phase.

## GUIDELINE 11.5.1 THE DECISION TO FILE PRETRIAL M0TIONS

A.     Counsel should consider filing a pretrial: notion whenever there exists reason to believe that applicable law may entitle the client to relief or that legal and/or policy arguments can be made that the law should provide the requested relief.

B.     Counsel should consider all pretrial motions potentially available, and should evaluate them in light of the unique circumstances of a capital case, including the potential impact of any pretrial motion or ruling on the strategy for the sentencing phase, and the likelihood that all available avenues of appellate and post-conviction relief will be sought in the event of conviction and imposition of a death sentence.  Among the issues that counsel should consider addressing in a pretrial motion are:

1.        the pretrial custody of the accused;
2.        the constitutionality of the implicated statute or statutes;
3.        the potential defects in the charging process;
4.        the sufficiency of the charging document;
5.        the propriety and prejudice of any joinder of charges or defendants in the charging document;
6.        the discovery obligations of the prosecution including disclosure of aggravating factors to be used in seeking the death penalty, and any reciprocal discovery obligations of the defense;
7.        the suppression of evidence gathered as the result of violations of the Fourth, Fifth or Sixth Amendments to the United States Constitution, including:
a.        the fruits of illegal searches or seizures;
b.        involuntary statements or confessions; statements or confessions obtained in violation of the accused's right to counsel, or privilege against self-incrimination;
c.        Unreliable identification testimony which would give rise to a substantial likelihood of irreparable misidentification.
8.        suppression of evidence gathered in violation of any right, duty or privilege arising out of state or local law;
9.        access to resources which may be denied to the client because of indigency and which may be necessary in the case, including independent and confidential investigative resources, jury selection assistance, and expert witnesses concerning not only the charged offense(s) and the client's mental condition, but also the criminal justice system itself;
10.        the defendant's right to a speedy trial;
11.        the defendant's right to a continuance in order to adequately prepare his or her case;
12.        matters of evidence or procedure at either the guilt/innocence or penalty phase of trial which may be appropriately litigated by means of a pretrial motion in

limine. including requests for sequesture, individual voir dire as to the death qualification of jurors and any challenges to overly restrictive rules or procedures;

13.      matters of trial or courtroom procedure;

14.      change of venue;

15.      abuse of prosecutorial discretion in seeking the death penalty; and

16.      challenges to the process of establishing the jury venire.

## Commentary:

Counsel in a death penalty case must be especially aware at all trial level stages not only of strategies for winning at that level but also of the need to fully preserve issues for later review. Whether raising a pretrial issue specific to a capital case (such as requesting individual, sequestered voir dire on deathqualification of the jury) or a more common motion shaped by the  capital aspect of the case (such as requesting a change of venue because of publicity), counsel should be sure to litigate both the legal basis and factual need for the request.[1] This will increase the likelihood that the request will be granted and will also fully preserve the issue for post judgment review in the event the motion is denied.

Some jurisdictions have strict contemporaneous objection rules that will forestall post judgment relief if an issue was not litigated at the first opportunity.[2] (See also the commentary accompanying Guideline 11.2.)

The possibility that the client will be sentenced to death increases the need to litigate potential issues at all levels. With the client's life hanging in the balance, trial counsel's perception that the effort needed to bring the notion probably outweighs the chances of the motion being granted should not alone preclude filing of the motion.[3] Similarly, "law reform" issues calling for a change in existing precedent, which might not be litigated in a less-serious case when they arise, should be considered in capital cases, especially where the likelihood of conviction is high. Systemic issues alone cannot be relied upon to stave off executions.[4] but still offer an opportunity to seek reversal of the conviction and/or sentence.

There has been a recent "speed-up" of capital cases through the post judgment courts.[5] Law reform and other pretrial issues should be litigated as fully as possible in the trial court so that later courts can be quickly apprized of the merits of the issue, thereby increasing the chance that a stay of execution will be granted to allow thorough consideration.

Appropriate pretrial motions, filed and zealously pursued, may provide a basis for not only appeal but for plea bargaining.[6] The Washington Supreme Court has recently held that a defendant can validly waive the right to appeal as part of a plea bargain.[7] At least in death penalty jurisdictions following the Washington rule, a prosecutor who is concerned that issues raised prior to trial threaten the finality of any conviction obtained thereafter may become more willing to forego the opportunity to seek the client's death in exchange for a waiver of those pretrial issues.

## FOOTNOTES:

1.  Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL Vol. 1, p. 2-1 et seq. (1985).

2.  Tennessee Association of Criminal Defense Lawyers, THE TACDL DEATH PENALTY DEFENSE MANUAL: TOOLS FOR THE ULTIMATE TRIAL., section IV, Trial Considerations, (1985), reprinted in INDIANA DEATH PENALTY DEFENSE MANUAL, supra note 1, Vol. 11, p. 6-1.1 and 6-1.10 through 6-1.12.

3.  Some courts may still adhere to the idea that questions arising in capital cases must be given more careful scrutiny, increasing the chance of eventually winning a motion issue, e.g., *People v. Martinez*, 29 Cal. 3d 574, 585; 174 Cal. Rptr.  701; 629 P.2d 502 (1981) (when a defendant's life is at stake, particular significance is imparted to the rule that doubts about changing venue should be resolved in favor of the change).

4.  "Systemic issues kill.  If you rely on a systemic issue for your client, your client will be gone." Capital attorney Millard Farmer, speaking at a March 14, 1987 Oregon seminar, quoted in V111, #3 The Oregon Defense Attorney, p. 5 (April/May, 1987).

5.  Tabak, The Death of Fairness:  The Arbitrary and Capricious Imposition of the Death Penalty in the 1980s, XIV N.Y.U. Rev. L. & Soc. Change 797, 834-838(1986) citing, inter alia, *Barefoot v. Estelle*, 463 U.S. 880; 103 S. Ct. 3383; 77 L. Ed.  2d 1090 (1983) and 3rd Cir. Rule 29 (3) (b) and 5th Cir. Rule 8.

6.  Balske, New Strategies for the Defense of Capital Cases, 13 Akron L. Rev.  331, 335-337 (1979).

7.  *State v. Perkins*, 108 Wash.2nd 212; 737 P.2d 250 (1987).

## GUIDELINE 11.6.1 THE PLEA NEGOTIATION PROCESS

A.     Counsel should explore with the client the possibility and desirability of reaching a negotiated disposition of the charges rather than proceeding to a trial.  In so doing, counsel should fully explain the rights that would be waived by a decision to enter a plea instead of proceeding to trial, and should explain the legal and/or factual considerations that bear on the potential results of going to trial.

B.     Counsel should ordinarily obtain the consent of the client before entering into any plea negotiations.

C.     Counsel should keep the client fully informed of any continued plea discussion or negotiations, convey to the client any offers made by the prosecution for a negotiated settlement and discuss with the client possible strategies for obtaining an offer from the prosecution.

D.     Counsel should not accept any plea agreement without the client's express authorization.

E.     The existence of ongoing plea negotiations with the prosecution does not relieve counsel of the obligation to take steps necessary to prepare a defense.  If a negotiated disposition would be in the best interest of the client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate.

**Commentary**:

Where the prosecution has chosen to seek the death penalty against the client, evidence of the client's guilt is frequently strong.[1]  In such cases, the benefits to the client of a negotiated settlement precluding imposition of the death penalty are great, and the prosecution's inclination to offer a plea bargain probably small.  One practitioner has stated that "Death is different because avoiding execution is, in many capital cases, the best and only realistic result possible" and that as a result, plea bargains in capital cases are not usually "offered" but instead must be "pursued and won."[2]

If the possibility of a negotiated disposition is rejected by either the prosecution or the client when a settlement appears to counsel to be in the client's best interest, counsel should continue efforts to negotiate a plea agreement.  while also continuing to prepare for trial as set out in Guidelines 11.4.1 through 11.7.1. If it is counsel's perception that the death penalty is being sought primarily to allow selection of a death-qualified (and therefore conviction-prone) jury, counsel should seek not only through plea negotiations but through pretrial motions (Guideline 11.5.1 (b) (3)) to change the charge to a non-capital one, while continuing preparation for a capital trial.[3]

Where the client faces execution upon conviction, counsel should not let belief in the strength of the defense case, in his or her own ability as an advocate, or even in the client's innocence foreclose exploration of a negotiated settlement.[4]

## FOOTNOTES:

1. Dees, Communication with State Urged in Death Penalty Case, reprinted courtesy of Southern Law Poverty Center in California Attorneys for Criminal Justice and California Public Defenders Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL, Vol. 1, p. A-50 (1986).

2. McNally, Death is Different:  Your Approach to a Capital Case Must be Different, Too. The Champion (March 1984) reprinted in CALIFORNIA DEATH PENALTY DEFENSE MANUAL, supra note 1, p. A-36.

3. Butler, excerpt of article in OHIO DEATH PENALTY MANUAL, reprinted in Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 1, p. 1.3-1 through 1.3-3 (1985).

4. Id., noting that there is precedent for an accused who protests innocence to still plead to life rather than risk death, citing North Carolina v.  Alford, 400 U.S. 25; 91 S. Ct. 160; 27 L. Ed. 2d 162 (1970); see also McNally, supra, note 2.

## GUIDELINE 11.6.2 THE CONTENTS OF PLEA NEGOTIATIONS

A.    In order co develop an overall negotiation plan, counsel should be fully aware of and make sure the client is fully aware of:

> 4.    the maximum penalty that may be imposed for the charged offense(s) and any possible lesser included offenses;
>
> 5.    where applicable, any collateral consequences of potential penalties less than death, such as forfeiture of assets, deportation and civil liabilities, as well as direct consequences of potential penalties less than death, such as the possibility and likelihood of parole, place of confinement and good-time credits;
>
> 6.    the general range of sentences for similar offenses committed by defendants with similar backgrounds, and the impact of any applicable sentencing guidelines or mandatory sentencing requirements.

B.    In developing a negotiation strategy, counsel should be completely familiar with, inter alia:

> 1.    concessions that the client might offer, such as:
>
>> a.    an agreement not to proceed to trial on the merits of the charges;
>>
>> b.    an agreement not to assert or further litigate particular legal issues;
>>
>> c.    an agreement to provide the prosecution with assistance in investigating or prosecuting the present case or other alleged criminal activity;
>>
>> d.    an agreement to engage in or refrain from any other conduct, appropriate to the case.
>
> 2.    benefits the client might obtain from a negotiated settlement, including inter alia:
>
>> a.    a guarantee that the death penalty will not be imposed;
>>
>> b.    an agreement that the defendant will receive, with the assent of the court, a specified sentence;
>>
>> c.    an agreement that. the prosecutor will not advocate a certain sentence, will not present certain information to the court, or will engage in or refrain from engaging in other actions with regard to sentencing;
>>
>> d.    an agreement that one or more of multiple charges will be reduced or dismissed;
>>
>> e.    an agreement that the client will not be subject to further investigation or prosecution for uncharged alleged or suspected criminal conduct;
>>
>> f.    an agreement that the client may enter a conditional plea to preserve the right to further contest certain issues affecting the validity of the conviction.

C.    In conducting plea negotiations, counsel should be familiar with:

1.   the types of pleas that may be agreed to, such as a plea of guilty, a conditional plea of guilty, or a plea of nolo contendre or other plea which does not require the client to personally acknowledge guilt;

2.   the advantages and disadvantages of each available plea according to the circumstances of the case;

3.   whether a plea agreement can be made binding on the court and on penal/parole authorities.

D.  In conducting plea negotiations, counsel should attempt to become familiar with the practice and policies of the particular jurisdiction, the judge and prosecuting authority, the family of the alleged victim and any other persons or entities which may affect the content and likely results of plea negotiations.

**Commentary:**

  Plea negotiations in any type of case are difficult to describe, much less standardize. A multitude of factual and legal considerations must be weighed, many of which cannot be set out in a checklist.[1] When the death penalty is being sought by the prosecution, more than a new topic for negotiation is added. Emotional and political pressures are created that affect the substance and form of bargaining.

  For example, prosecutors who are normally open to informal hallway discussions may demand formal conferences or assert that negotiations are out of the question completely; outrage from the family of the alleged victim or the media may cause the prosecutor to renege on, or the court to refuse, a bargain once made. Many bases for bargaining in non-capital cases (questions concerning pre-trial or pre-sentence release, probation, or even parole) will be, in most capital cases, irrelevant. Considerations such as potential forfeiture of assets or amount of restitution which might be of great importance in a noncapital case dim in the glare of a potential execution, and a client's offer to help solve several open robbery cases, normally a strong bargaining point, may not interest police or a prosecutor bent on having that client executed as a notorious murderer.

  Counsel should insist that no plea to an offense for which the death penalty can be imposed will be considered without a written guarantee, binding on the court or other final sentencer, that death will not be imposed.[2] Whatever plea agreement is made should be placed fully on the record, Guideline 11.6.4.

  A very difficult but important part of capital plea negotiation is contact with the family of the alleged victim.[3] The family's acquiescence can yield a settlement,[4] and even if the approach is unsuccessful, the defense has sought to demonstrate that it is not responsible for an unreasonable failure to settle the case.[5]

**FOOTNOTES:**

1.  Since disposition by plea is mutually advantageous in many circumstances, plea discussions are a Significant part of the duty of defense counsel.  Courts and prosecutors have developed criteria that guide the exercise of their discretion.  These standards and rules of thumb are not to be found in codes, case reports, and other sources of law, but a working understanding of them is part of the accumulated skill and experience of the defense lawyer. Ignorance of the prevailing practices and attitudes of the prosecutor and the court as to plea discussions may be as much a handicap to effective representation as is unfamiliarity with the facts or law related to the case; hence it is imperative that the defense lawyer be aware of them.  If the defense lawyer lacks sufficient personal experience, he or she should consult experienced colleagues. The staff of defender offices also serves as a repository of such information, to which all members of the bar may turn."  ABA Standards, The Defense Function, Standard 4-6.1 commentary, pg 4-72.

2.  "On two occasions to date, counsel in Kentucky capital murder cases have pled their clients guilty, and subsequently put on a penalty hearing in front of the trial court. Both cases resulted in death sentences. *Commonwealth v. Bowling*, (Rowan Co. Ind. No. 80-CR-043); *Commonwealth v. Bevins*, (Floyd Co. Ind. No. 82-CR-016).  It is suggested that this is an effective strategy only when the attorney knows without any doubt that no death sentence will result. Any other "strategy" for entering a guilty plea is ill-advised and should be abandoned."Dept. of Public Advocacy, KENTUCKY PUBLIC ADVOCATE DEATH PENALTY MANUAL, p. 328-333 (1983) .

3.  McNally, Death is Different: Your Approach to a Capital Case Must be Different, Too. The Champion (March 1984) p. 15 and Dees, Communication with State Urged in Death Case, both reprinted in California Attorneys for Criminal Justice and California Public Defenders Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL, Vol. 1, p. A-29 et seq. and A-50 et seq.

4.  Id.

5.  Butler, excerpt of article in OHIO DEATH PENALTY MANUAL.  Reprinted in Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 1, p. 1.3-3, (1985).

## GUIDELINE 11.6.3 THE DECISION TO ENTER A PLEA OF GUILTY

A.     Counsel should inform the client of any tentative negotiated agreement reached with the prosecution, and explain to the client the full content of the agreement along with the advantages,
disadvantages and potential consequences of the agreement.

B.     The decision to enter or to not enter a plea of guilty should be based solely on the client's best interest.

### Commentary:

In non-capital cases, the decision to enter a plea of guilty rests solely with the client.[1] When the decision to plead guilty is likely to result in the client's death, however, counsel's position is unique.  If no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights.   In California at least, a defendant cannot plead guilty over the objection of the attorney,[2] giving counsel a tremendous responsibility for the client's life.

In other words, counsel must strive to convince a client to overcome natural emotional resistance to the idea of standing in open court and admitting guilt of what was charged as a capital offense if that will save the client's life.[3]  Conversely, counsel must strive to prevent a (perhaps depressed or suicidal) client from pleading guilty where there is a likelihood that such a plea will result in a death sentence.

### FOOTNOTES:

1.     NLADA, Performance Guidelines For Criminal Defense Representation (Draft Guideline 6.3 (b)); ABA Standards, The Defense Function, Standard 4-5.2 (a) (i).

2.     *People v. Chadd*, 28 Cal. 3d 739; 170 Cal. Rptr. 798; 621 P.2d 837 (1981); Cal. Penal Code 1018.

3.     Butler, excerpt from an article in the OHIO DEATH PENALTY MANUAL, reprinted in Indiana Public Defender Counsel, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 1, p. 1.3-1, 1.3-3 (1985).

**GUIDELINE 11.6.4 ENTRY OF THE PLEA BEFORE THE COURT**

A.      Prior to the entry of the plea, counsel should:

1.              make certain that the client understands the rights he or she will waive by entering the plea and that the client's decision to waive those rights is knowing, voluntary and intelligent;

2.              make certain that the client fully and completely understands the conditions and limits of the plea agreement and the maximum punishment, sanctions and other consequences the accused will be exposed to by entering a plea;

3.              explain to the client the nature of the plea hearing and prepare the client for the role he or she will play in the hearing, including answering questions from the judge and providing a statement concerning the offense.

B.      During entry of the plea, counsel should make sure that the full content and conditions of the plea agreement are placed on the record before the court.

**Commentary:**

        This Guideline is taken verbatim from a draft of general defense attorney performance guidelines.[1] However, a requirement that counsel be prepared to address the question of release pending sentencing has been omitted, as it would he a rare capital case in which this option would he available. When the plea being offered would allow a reasonable argument for pre-sentence release, of course, counsel should be prepared to make that argument. Similarly, no guideline regarding advocacy for pretrial release has been included.[2] The conditions of any negotiated settlement should be set forth as clearly as possible on the record, to avoid later interpretations disadvantageous to the client.[3]

**FOOTNOTES:**

1.      NLADA, Performance Guidelines For Criminal Defense Representation (Draft Guideline 6.4).

2.      See NLADA, Performance Guidelines, supra note 1, (Draft Guideline 2.3).

3.      In *Ricketts v. Adamson*, 483 U.S.__: 107 S.Ct.__ ; 97 LEd. 2d 1 (1987) a defendant had pled guilty to second degree murder in exchange for testifying against his co-defendants. He later asserted that he had met the conditions of the bargain by testifying at the co-defendants' original trial, and refused to testify at retrial following reversal of the co-defendants' convictions. The defendant's own conviction and prison sentence were then vacated, he was tried for capital murder and sentenced to death.

## GUIDELINE 11.7.1 GENERAL TRIAL PREPARATION

A.    As the investigations mandated by Guideline 11.4.1 produce information, counsel should
formulate a defense theory. In doing so, counsel should consider both the guilt/innocence phase and the penalty phase, and seek a theory that will he effective through both phases.

B.    If inconsistencies between guilt/innocence and penalty phase defenses arise, counsel should seek to minimize them by procedural or substantive tactics.

### Commentary:

Formulation of and adherence to a defense theory are vital in any criminal case.[1] In the bifurcated proceedings of a capital trial, the defense theory is especially important.[2] Counsel should discuss the theory and strategy for both phases with the client throughout trial preparation to maintain an effective defense through both phases. While some steps can be attempted to alleviate the harm of inconsistent defenses,[3] it is important that counsel consider throughout the guilt/innocence phase how new developments and information may impact on the sentencing phase theory, and adjust accordingly.[4]

### FOOTNOTES:

1.    See e.g. Bailey and Rothblatt, INVESTIGATION AND PREPARATION OF CRIMINAL CASES, (2d ed.) sec. 1:3.

2.    See Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 11, p. 7.4-42 (1985); Dept. of Public Advocacy, KENTUCKY PUBLIC ADVOCATE DEATH PENALTY MANUAL, p. 286-289 (1983).

3.    Counsel may, for instance, seek a different jury for sentencing in jurisdictions where sentencing is done by the jury. See, Tabak, The Death of Fairness: The Arbitrary and Capricious Imposition of the Death Penalty in the 1980s, XIV N.Y.U. Rev. L. a Soc. Change, 797, 808 n. 72 (1986). There is no guarantee that a separate sentencing jury will be empaneled, see State v. Shields, 15 Ohio App. 112; 472 N.E. 2d 1110 (1984) (bifurcated trial using the same jury not improper even though defense counsel must choose between defenses).

4.    INDIANA DEATH PENALTY DEFENSE MANUAL, supra note 2, p. 6-1.4.

## GUIDELINE 11.7.2 VOIR DIRE AND JURY SELECTION

A.      Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case, whether any procedures have been instituted for selection of juries in capital cases that present potential legal bases for challenge.

B.      Counsel should be familiar with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding "death qualification" concerning any potential juror's beliefs about the death penalty.  Counsel should be familiar with techniques for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable.

## Commentary:

One singular aspect of capital cases is the problem of "death qualified" juries, which result from exclusion of potential jurors whose opposition to capital punishment effectively skews the jury pool not only as to imposition of the death penalty but as to conviction.[1] Caselaw stemming from the landmark *Witherspoon* decision is extensive,[2] and has resulted in a highly specialized and technical procedure.[3]

The importance of seeking to rehabilitate prospective jurors who have indicated opposition to the death penalty is exemplified in a recent United States Supreme Court decision, in which a plurality of the Court noted as to potential jurors who stated they were opposed to the death penalty". . .despite their initial responses, the venire members might have clarified their positions upon further questioning and revealed that their concerns about the death penalty were weaker than they originally stated..."[4]

The important and complex nature of jury selection is demonstrated by the lengthy guideline drafted by NLADA concerning the process for all criminal cases.[5]  The intricacy of the process has led to the creation of specialists in the field.[6]  Determining what invisible but lethal currents of prejudice may exist in the jury pool and how to avoid letting the client be trapped therein may require sociological data, psychological expertise, skillful questioning and intuition.[7]  Since capital cases demand an even more expansive voir dire than general criminal cases,[8] counsel should consider obtaining the assistance of such a specialist.

## FOOTNOTES:

1.      Evidence that death qualified juries are more inclined to return a guilty verdict was offered in *Hovey v. Superior Court*, 28 Cal. 3d 1; 168 Cal. Rptr. 128; 616 P. 2d 1301 (1980) but was rejected as inconclusive by the California Supreme Court.  Defendants are not foreclosed from offering (on independent state grounds) further evidence to show that death qualification does produce convictionprone juries, California Attorneys

for Criminal Justice & California Public Defenders Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL, Vol. 1, pg 87E-18 through 87E-20 (1987 supplement).

2. *Witherspoon v. Illinois*, 391 U.S. 510; 88 S.Ct: 1770; 20 L. Ed. 2d 776 (1968); see also *Wainwright v. Witt*, 469 U.S. 412; 105 S.Ct. 844; 83 L. Ed. 2d 841 (1983) and *Lockhart v. McCree*, 476 U.S.__; 106 S. Ct. 1758; 90 L. Ed. 2d 137 (1986).

3. An entire issue of Law and Human Behavior was dedicated to death qualification in 1984, 8(No. 1 & 2) Law and Human Behavior (June 1984); see also Balske, Now You See it, Now You Don't: The Demise of the Witherspoon Test and Other Important Developments in Death Penalty Defense, The Champion (April 1985) p. 22, reprinted in CALIFORNIA DEATH PENALTY DEFENSE MANUAL, supra note 1, Vol. 1, p. E-165.

4. *Gray v. Mississippi*, 481 U.S. 107 S. Ct. 2045 95 L. Ed. 2d 622 (1987). (BNA) 3197 (5/20/87). Gray involved a trial court's refusal to excuse for cause some jurors who stated opposition to the death penalty, because the court believed venire members were simply trying to get off the jury, followed by the court's improper excusal for cause (because the prosecutor had exhausted his peremptories) of a juror whose initial statements of opposition to the death penalty were followed by comments that she could vote to impose a death sentence.

5. NLADA, Performance Guidelines For Criminal Defense Representation, (Draft Guideline 7.2); see also ABA Standards. The Defense Function, Standard 4-7.2, commentary. pg 4-82. For an example of an important and complex voir dire issue not limited to capital cases, see *Batson v. Kentucky*, 476 U.S. 79; 106 S. Ct. 1712; 90 L. Ed. 2d 69 (1986) and its progeny, concerning the use of peremptory challenges to include potential jurors because of their race.

6. E.g., National Jury Project, JURYWORK: SYSTEMATIC TECHNIQUES (1979).

7. See Nelson, The Stinson Case: A Lawyer's Approach to the Penalty Phase, July 1982, from CALIFORNIA DEATH PENALTY DEFENSE MANUAL, supra note 1, Vol. 11, p. H-25.

8. *State v. Milligan*, 708 P. 2d 289, 293 (Nev. 1985).

## GUIDELINE 11.7.3 OBJECTION TO ERROR AND PRESERVATION OF ISSUES FOR POST JUDGMENT REVIEW

Counsel should consider, when deciding whether to object to legal error and whether to assert on the record a position regarding any procedure or ruling, that post judgment review in the event of conviction and sentence is likely, and counsel should take steps where appropriate to preserve, on all applicable state and Federal grounds, any given question for review.

### Commentary:

While precedent does exist in some jurisdictions stating that contemporaneous objection rules may be relaxed in capital cases,[1] cases also abound in which capital defendants have been denied review because of trial counsel's failure to preserve an issue.[2] Guidelines 11.5.1 and 11.9.1 and accompanying commentary also address the need to preserve error for review.

Counsel should not refrain from objecting to or otherwise bringing to the attention of the court a perceived injustice not addressed by existing law. Counsel should not hesitate to try and change the law, or at least its application in the client's case.[3]

### FOOTNOTES:

1. E.g., *Williams v. State*, 445 So. 2d 798, 810 (Miss. 1984); *Stynchcombe v. Floyd*, 311 S.E.2d 828 (Ga. 1984) (as to instructions at the penalty phase only); Ice v. Commonwealth, 667 S.W.2d 671, 674 (Ky. 1984).
2. Ellmann, Instructions on Death: Guiding the Jury's Sentencing Discretion in Capital Cases, The Champion (April 1986) p. 20, 21: "While the decisions about whether and how vigorously to press for particular instructions are delicate ones, sad experience suggests that counsel should at least think very carefully before not raising any available legal claim."
3. California Attorneys for Criminal Justice, and California Public Defender Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL, Vol. 1, Introduction (1986).

## GUIDELINE 11.8.1 OBLIGATION OF COUNSEL AT THE SENTENCING PHASE OF DEATH PENALTY CASES

Counsel should be aware that the sentencing phase of a death penalty trial is constitutionally different from sentencing proceedings in other criminal cases.

**Commentary:**

All commentary concerning sentencing is found after Guideline 11.8.6, the last Guideline in subsection 11.8.

## GUIDELINE 11.8.2 DUTIES OF COUNSEL REGARDING SENTENCING OPTIONS, CONSEQUENCES AND PROCEDURES

A.     Counsel should be familiar with the procedures for capital sentencing in the given jurisdiction, with the prosecutor's practice in preparing for and presenting the prosecution's case at the sentencing phase, and with the case law and rules regarding what information may be presented to the sentencing entity or entities, and how that information may be presented. Counsel should insist that the prosecutor adhere to the applicable evidentiary rules unless a valid strategic reason exists for counsel not to insist.

4.     If the client has chosen not to proceed to trial and a plea of guilty or its equivalent has been

negotiated and entered by counsel in accordance with Guidelines 11.6.1 through 11.6.4, counsel should seek to ensure compliance with all portions of the plea agreement beneficial to the client.

C.     Counsel should seek to ensure that the client is not harmed by improper, inaccurate or misleading information being considered by the sentencing entity or entities in determining the sentence to be imposed. Counsel should ensure that all reasonably available mitigating and favorable information consistent with the defense sentencing theory is presented to the sentencing entity or entities in the most effective possible way.

**Commentary:**

All commentary concerning sentencing is found after Guideline 11.8.6, the last Guideline in subsection 11.8.

## GUIDELINE 11.8.3 PREPARATION FOR THE SENTENCING PHASE

A.     As set out in Guideline 11.4.1, preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case.  Counsel should seek information to present to the sentencing entity or entities in mitigation or explanation of the offense and to rebut the prosecution's sentencing case.

B.     Counsel should discuss with the client early in the case the sentencing alternatives available, and the relationship between strategy for the sentencing phase and for the guilt/ innocence phase.

C.     Prior to the sentencing phase, counsel should discuss with the client the specific sentencing phase procedures of the jurisdiction and advise the client of steps being taken in preparation for sentencing. Counsel should discuss with the client the accuracy of any information known to counsel that will he presented to the sentencing entity or entities, and the strategy for meeting the prosecution's case.

D.     If the client will be interviewed by anyone other than people working with defense counsel, counsel should prepare the client for such interview(s).  Counsel should discuss with the client the possible impact on the sentence and later potential proceedings (such as appeal, subsequent retrial or re-sentencing) of statements the client may give in the interviews.

E.     Counsel should consider, and discuss with the client, the possible consequences of having the client testify or make a statement to the sentencing entity or entities.

F.     In deciding which witnesses and evidence to prepare for presentation at the sentencing phase, counsel should consider the following:

1.          Witnesses familiar with and evidence relating to the client's life and development, from birth to the time of sentencing, who would be favorable to the client, explicative of the offense(s) for which the client is being sentenced, or would contravene evidence presented by the prosecutor;

2.          Expert witnesses to provide medical, psychological, sociological or other explanations for the offense(s) for which the client is being sentenced, to give a favorable opinion as to the client's capacity for rehabilitation, etc. and/or to rebut expert testimony presented by the prosecutor;

3.          Witnesses with knowledge and opinions about the lack of effectiveness of the death penalty itself;

4.          Witnesses drawn from the victim's family or intimates who are willing to speak

against killing the client. As set Out in Guideline 11.4.1, preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case. Counsel should seek information to present to the sentencing entity or entities in mitigation or explanation of the offense and to rebut the prosecution's sentencing case.

**Commentary:**

All commentary concerning sentencing is found after Guideline 11.8.6, the last Guideline in subsection 11.8.

## GUIDELINE 11.8.4 THE OFFICIAL PRE-SENTENCE REPORT

If an official pre-sentence report or similar document may or will be presented to the court at any time, counsel should consider:

A.    The strategic implications of requesting that an optional report be prepared;

B.    The value of providing to the report preparer information favorable to the client.

C.    Counsel should review any completed report and take appropriate steps to ensure that improper, incorrect or misleading information that may harm the client is deleted from the report.

D.    Counsel should take steps to preserve and protect the client's interest regarding material that has been challenged by the defense as improper, inaccurate or misleading.

E.    Counsel should consider whether the client should speak with the person preparing the report and, if so, whether counsel should be present.

**Commentary:**

All commentary concerning sentencing is found after Guideline 11.8.6, the last Guideline in subsection 11.8.

## GUIDELINE 11.8.5 THE PROSECUTOR'S CASE AT THE SENTENCING PHASE.

A.    Counsel should attempt to determine at the earliest possible tine what aggravating factors the prosecution will rely on in seeking the death penalty and what evidence will be offered in support thereof (Guideline 11.3). If the jurisdiction has rules regarding notification of these factors, counsel should object to any non-compliance, and if such rules are inadequate,

should consider challenging the adequacy of the rules.

B.    If counsel determines that the prosecutor plans to rely on or offer arguably improper, inaccurate or misleading evidence in support of the request for the death penalty, counsel should consider appropriate pretrial or trial strategies in response.

**Commentary:**

    All commentary concerning sentencing is found after Guideline 11.8.6, the last Guideline in subsection 11.8.

## GUIDELINE 11.8.6 THE DEFENSE CASE AT THE SENTENCING PHASE

A.    Counsel should present to the sentencing entity or entities all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence.

B.    Among the topics counsel should consider presenting are:
1.    Medical history (including mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays);
2.    Educational history (including achievement, performance and behavior), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof;
3.    Military service, (including length and type of service, conduct, and special training);
4.    Employment and training history (including skills and performance, and barriers to employability);
5.    Family, and social history (including physical, sexual or emotional abuse, neighborhood surroundings and peer influence); and other cultural or religion influence, professional intervention (by medical personnel, social workers, law enforcement personnel, clergy or others) or lack thereof; prior correctional experience (including conduct on supervision and in institutions, education or training, and clinical services);
6.    Rehabilitative potential of the client.
7.    Record of prior offenses (adult and juvenile), especially where there is no record, a short record or a record, of non-violent offenses.
8.    Expert testimony concerning any of the above and the resulting impact on the client, relating to the offense and to the client's potential at the time of sentencing.

C.    Counsel should consider all potential methods for offering mitigating evidence to the sentencing entity or entities, including witnesses, affidavits, reports (including, if appropriate,

a defense pre-sentence report which could include challenges to inaccurate, misleading or incomplete information contained in the official pre-sentence report and/or offered by the prosecution, as well as information favorable to the client), letters and public records.

D.     Counsel may consider having the client testify or speak during the closing argument of the

sentencing phase.

**Commentary:**

Sentencing proceedings in a capital case resemble a separate trial more than they resemble non-capital sentencing proceedings.[1]  The Constitutional due process right to present evidence, as well as the right to counsel, to confront the witnesses against the defendant, and to not be placed twice in jeopardy, adhere to capital sentencing proceedings.[2]  Experienced criminal counsel familiar with sentencing practices in non-capital cases may not recognize the different form of advocacy required at a death penalty sentencing trial.[3]

The evidence to be presented by the defense -- indeed, the whole theory of proceeding -- at the sentencing phase stands outside normal criminal trial practice.  Attorneys skilled in narrowing the focus of trial to exclude irrelevant references to the life and character of a client may find themselves unprepared for the sentencing phase of a capital case where the life and character of the client may have to be revealed in detail.  The assistance of one or more experts (e.g. social worker, psychologist, psychiatrist, investigator, etc.) may be determinative as to outcome,[4]  as set out in Guideline 11.4.1(a)and 11.4.1(7).[5]  Unless a plea bargain has resulted in a guarantee on the record that the death penalty will not he imposed, full preparation for a sentencing trial must be made in every case.

Counsel should consider contacting the victim's family concerning the sentencing phase.   The 1987 Supplement to the CALIFORNIA DEATH PENALTY DEFENSE MANUAL discussed the power of testimony by a victim's relatives that they do not want the defendant killed.  It also discusses the fact that the legal basis for such testimony is not yet clearly established.[6]  Along the same lines, counsel may consider seeking testimony from witnesses familiar with the actual process of an execution or having some expertise on the low deterrent value of capital punishment.[7]

The legal basis for such testimony is also not yet clearly established.[8]  But while counsel cannot be required to offer evidence held inadmissible by prevailing case law, counsel should consider whether such evidence might have value in a given case and whether (if it is barred by current case law in the jurisdiction) the question of admissibility should be preserved for appeal.

Obviously, the uniqueness of every client makes guidelines as to the sentencing phase a starting point, not a checklist.[9]  However, counsel in every capital case should consider strategies offered by other attorneys, discussed in the literature or otherwise available for consideration. Counsel may not choose, without investigation and preparation, to sit back and do nothing at

sentencing.[10]  Even the client may not be able to mandate that counsel present no mitigation, for courts have found that public policy should not allow state-assisted suicide.[11]

Because the scope of evidence admissible in mitigation is generally broader than that admissible in aggravation,[12] counsel may be seeking to adduce evidence of a type prohibited to the prosecution. Counsel should be prepared to object to inadmissible evidence proffered by the prosecutor.  Counsel should also be prepared to object to information regarding the client that might be admissible in a noncapital sentencing proceeding but would constitute a denial of due process in the ratified atmosphere of a death penalty case.[13]  Assertions that the client has engaged in unadjudicated criminal conduct have been held to deny due process in at least some death penalty cases,[14] while information regarding uncharged crimes may be admissible in the less formal sentencing proceedings occurring in non-capital cases.

The goal at the sentencing phase is to help the jury see the client as someone they do not want to kill. The decision as to whether to have the client testify can be crucial.  Especially if the client is not to testify for some strategic reason, counsel may consider having the client speaking during the closing argument or to otherwise speak in the jury's presence.[15]

## FOOTNOTES:

1. *Bullington v. Missouri*, 451 U.S. 430, 438-446; 101 S. Ct. 1852; 68 L. Ed. 2d 270 (1981).
2. Id.; *Specht v. Patterson*, 386 U.S. 605; 87 S. Ct. 1209; 18 L. Ed. 2d 326 (1967); *Lockett v. Ohio*, 438 U.S. 586, 604; 98 S. Ct. 2945, 2981; 57 L. Ed. 2d 973 (1978). There is, however, no constitutional right to have a jury decide the sentence, *Spanziano v. Florida* 468 U.S. 447; 104 S. Ct. 3154:  82 L. Ed.2d 340 (1984).
3. Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.  L. Rev. 274 (1983), cited in Weinheimer and Millman, Legal Issues Unique to the Penalty Trial, The Champion, p. 33, reprinted in California Attorneys for Criminal Justice & California Public Defenders Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL, Vol 11, pg H-14 (1986).
4. *Stebbins and Kenny*, Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial.  The Champion (Aug 1986) reprinted in CALIFORNIA DEATH PENALTY DEFENSE MANUAL, supra note 3, Vol. 11, p. 87H-37 et seq. (1987 Supp.).
5. Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 11, p. 6-1 (1985).
6. CALIFORNIA DEATH PENALTY DEFENSE MANUAL, supra note 4, Vol. 11, p. 87 H-89 (1987 Supplement); see also *Robison v. Maynard*, 829 F.2nd 1501 (10th Cir. 1987), disallowing such testimony. Roy Persons, whose wife Carol was murdered, said in a letter to the St: Petersburg (Florida) Times that he would have been "willing to testify in court that I or Carol would not have wanted (the defendant) to be sent to his death" but that his understanding was that such testimony "would not have been legal." Taken from "The Victims Speak", a pamphlet printed by the Institute for Southern

Studies.

7.     Balske, New Strategies for The Defense of Capital Cases, 13 Akron Law Rev.  331, 358, 359 (1979) reprinted in the CALIFORNIA DEATH PENALTY DEFENSE MANUAL, supra note 3.

8.     *People v. Harris*, 28 Cal.  3d 935, 962; 171 Cal. Rptr. 679; 623 P.2d 240 (1981) (trial court properly excluded testimony about how the death penalty is carried out).  *State v. Jenkins*, 15 Ohio St.3d 164; 473 N.E.2d 264, 289 ( 1984) (testimony on non-deterrent value of the death penalty not admissible).  See cases cited in Dept. of Public Advocacy, KENTUCKY PUBLIC ADVOCATE DEATH PENALTY MANUAL, p. 328-333 (1983).

9.     CALIFORNIA DEATH PENALTY DEFENSE MANUAL, supra note 3, Vol. 11, p. H-4.

10.    *Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir. 1983).

11.    *People v. Deere*, 41 Cal. 3d 353, 365; 222 Cal. Rptr. 13; 710 P.2d 925 (1985).

12.    See e.g.  *Green v. Georgia*, 442 U.S. 95; 99 S. Ct. 2150; 60 L. Ed. 2d 738 (1979) (hearsay offered by the defendant can come in where there were indicia of reliability, as a matter of due process).

13.    The United States Supreme Court recently held that victim impact statements relating to the effect of a killing on the victim's family may not be used by the prosecution at the sentencing phase of a death penalty case.  The Court specifically distinguished death cases from all others, *Booth v. Maryland*, 482 U.S.__; 107 S. Ct. 2529; 96 L. Ed. 24 440 (1987).

14.    *State v. McCormick*, 22 Ind. 272; 397 N.E.2d 276 (1979): but see *Milton v. Procunier*, 744 F.2d1091 (5th Cir. 1984).

15.    See e.g. Balske, Putting It All Together: The Penalty-Phase Closing Argument. The Champion, (March, 1984) p. 47, reprinted in the CALIFORNIA DEATH PENALTY DEFENSE MANUAL, supra note 3, p. H-227.

## GUIDELINE 11.9.1 DUTIES OF TRIAL COUNSEL IN POST JUDGMENT PROCEEDINGS

A.     Counsel should be familiar with all state and federal post judgment options available to the client. Counsel should consider and discuss with the client the post judgment procedures that will or may follow imposition of the death sentence.

B.     Counsel should take whatever action, such as filing a claim or notice of appeal, is necessary to preserve the client's right to post judgment review of the conviction and sentence. Counsel should consider what other post judgment action, if any, counsel could take to maximize the client's opportunity to seek appellate and post-conviction relief.

C.     Trial counsel should not cease acting on the client's behalf until subsequent counsel has entered the case or trial counsel's representation has been formally terminated.

D.     Trial counsel should cooperate with subsequent counsel concerning information regarding trial level proceedings and strategies.

### Commentary:

Post judgment procedures, and therefore the duties of counsel, vary among jurisdictions. 1  Whatever he procedures, the client should be advised of what will happen following the imposition of sentence and potential legal consequences of the client's anticipated actions.  For example, if the client will be given any psychological examination or will otherwise be interviewed by prison personnel or others following the court's imposition of sentence, the client should be prepared for that interview and advised of the potential legal impact of any statements the client might make there. 2  The client should also be advised of all automatic and potential judicial review 3  and what the client must do (if trial counsel is not going to act) to secure review. 4

Trial counsel should not cease acting on the client's behalf until subsequent counsel has entered the case.  Not only must the client's post judgment rights he protected by filing any necessary documents to preserve the right to appeal or other necessary pleadings, 5  but the client's personal condition must be monitored for potential legal consequences, as set out in Guideline 11.9.5 (c).  If the client's mental condition deteriorates on death row, the client may as a result inappropriately decide to cease efforts to secure review, or may even become legally ineligible for execution. 6  The "guiding hand" of counsel 7 should not be removed at this time, absent formal notice to the client and the court, coupled with efforts to secure replacement counsel.

### FOOTNOTES:

I.     E.g., trial counsel in California is given, by statute, certain post judgment duties and must remain on the case until the record is certified, Cal.   Penal Code Sec. 1240.1(a)(4).   In Ohio, new standards for appointment of counsel in capital cases indicate that two appellate attorneys must be appointed "where trial counsel has been granted leave to withdraw or supplemental counsel is being appointed."   Rule 65, Qualifications for Eligibility to be Court-Appointed Counsel for Indigent Capital Defendant in the Courts of Ohio, adopted by the Supreme Court of Ohio October 14, 1987, section 1 B (1).   This language implies that trial counsel is expected to act beyond the entry of judgment.

2.     California Attorneys for Criminal Justice and California Public Defenders Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL, Vol. 11, p. 1-38 through 1-40 (1986).

3.     Several death penalty states provide for automatic review, e.g., Alabama Code 13A-5-55; California Penal Code 1239 (b).

4.     This comports with the requirements for counsel in all criminal cases, see NADA, Performance Guidelines for Criminal Defense Representation (Draft Guideline 9.2(a) and (b).

5.     See NLADA, Performance Guidelines, supra note 4, (Draft Guideline 9.1(b)(2); 9.2).

6.     Insane persons may not be executed, *Ford v. Wainwright*, U.S.__; 106 S. Ct. 2595; 91 L. Ed. 2d 335 (1986).

7.     *Powell v. Alabama*, 287 U.S. 45, 69; 53 S. Ct. 55; 77 L. Ed. 158 (1932).

Page 92 of  102

## GUIDELINE 11.9.2 DUTIES OF APPELLATE COUNSEL

A.     Appellate counsel should be familiar with all state and federal appellate and post-conviction
options available to the client, and should consider how any tactical decision might affect later options.

B.     Appellate counsel should interview the client, and trial counsel if possible, about the case,
including any relevant matters that do not appear in the record.  Counsel should consider whether any potential off-record matters should have an impact on how the appeal is pursued, and whether an investigation of any matter is warranted.

C.     Appellate counsel should communicate with the client concerning both the substance and
procedural status of the appeal.

D.     Appellate counsel should seek, when perfecting the appeal, to present all arguably meritorious issues, including challenges to any overly restrictive appellate rules.

E.     Appellate counsel should cooperate with any subsequent counsel concerning information about the appellate proceedings and strategies, and about information obtained by appellate counsel concerning earlier stages of the case.

### Commentary:

        Practice varies among jurisdictions as to the limits of the appellate process and the relationship between direct appeals and collateral post-conviction challenges to a conviction or sentence.  Issues that are only partially or minimally reflected by the record, or that are outside the record, should be explored by appellate counsel even if such issues will not -- for procedural or tactical reasons -- be raised until later.[1]  Such issues may affect the manner in which appellate issues are raised.  For example, if a strong ineffective assistance of trial counsel issue exists off the record, appellate counsel might consider that a factor in deciding how to present to the appellate courts a very novel issue preserved on the record.[2]
        Maintaining contact with the client during the direct appeal is important. All attorneys, of course, have a duty to keep their clients informed of case developments, but counsel in a death penalty case must also monitor the client's personal situation for possible legal consequences as set out in Guideline 11- 9.5C and the Commentary to Guideline 11.9.1.[3]
        Traditional theories of appellate practice notwithstanding, appellate counsel in a capital case should not raise only the best of several potential issues.[4]  Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot

necessarily be reclaimed later.  When a client will be killed if the case is lost, counsel (and the courts) should not let any possible ground for relief go unexplored or unexploited.

## FOOTNOTES:

1. Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 11, p. 8-3 et. seq. (1985).
2. ABA Standards, The Defense Function, Standard 4-3.8.
3. See also, INDIANA DEATH PENALTY DEFENSE MANUAL, supra note 1, p. 8-1, 8-2.4. "... Chief Justice Burger argues that '(t) here can hardly be any question about the importance of having the appellate advocate examine the record... to select (only) the most promising issues for review...'  *Jones v Barnes*, 103 S. Ct.  3308, 3314 (1983).  This is truly bad advice in capital cases -- at any level.  If the past few years teach us anything, it is to raise 'em all.  Remember, the Chief Justice also told us that '(t)he signals from this Court have not... been easy to decipher. '  *Lockett v Ohio*, 438 U.S. 586, 603 (1978)."  McNally, Death is Different:  Your Approach to a Capital Case Must be Different, Too, The Champion (March 1984), p. 8, 12, reprinted in California Attorneys for Criminal Justice & California Public Defenders Association, CALIFORNIA DEATH PENALTY DEFENSE MANUAL, Vol. 1, p. A-33(1986). THE INDIANA DEATH   PENALTY DEFENSE MANUAL supra note 1, recommends that counsel approach the traditional "winnowing process" with extreme caution, Vol. 111, p. 8-7.

### GUIDELINE 11.9.3 DUTIES OF POST-CONVICTION COUNSEL

A.    Post-conviction counsel should be familiar with all state and federal post-conviction remedies available to the client.

B.    Post-conviction counsel should interview the client, and previous counsel if possible, about the case.  Counsel should consider conducting a full investigation of the case, relating to both the guilt/innocence and sentencing phases.  Post-conviction counsel should obtain and review a complete record of all court proceedings relevant to the case.  With the consent of the client, post-conviction counsel should obtain and review all prior counsel's files.

C.    Post-conviction counsel should seek to present to the appropriate court or courts all arguably meritorious issues, including challenges to overly restrictive rules governing post-conviction proceedings.

### Commentary:

Post-conviction proceedings, perceived as a "second (or third) bite at the apple", have been under attack by courts seeking to limit them[1]  and by legislators seeking to limit or abolish them.[2]  Yet, the high percentage of defendants who receive relief when represented by counsel in post-conviction proceedings[3]  indicates that substantial error is not being prevented or cured at earlier stages, sea commentary accompanying Guideline 1.1.   Condemned defendants later shown to be innocent have been saved from death by post-conviction relief after direct appeal had failed.[4]   post-conviction counsel could be called a condemned defendant's last best hope.[5]

Capital post-conviction work requires enormous amounts of time, energy and knowledge to do an adequate job.[6]  The changing nature of post-conviction work, along with the varied rules in the different jurisdictions, mandate the rather general nature of these Guidelines.[7]  Counsel representing a capital client must become familiar with the procedures of the given jurisdiction and act accordingly.

Post-conviction counsel should review the entire case.  The record of all preliminary hearings, pretrial motions, post trial motions and any other court proceedings should be reviewed along with the guilt and penalty phases of the trial, as well as the appellate record. Issues that have developed in the wake of changing law may be evident to post-conviction counsel even though they were not apparent to prior counsel. 8  Possible deficiencies in the performance of prior counsel can be evaluated only after review of the record, the files of prior counsel and discussion with the client.

Any change in the availability of post-conviction relief may itself provide an issue for further litigation. This is especially true if the change occurred after the case was begun and could be argued to have affected strategic decisions along the way.

## FOOTNOTES:

1.  See Tabak, The Death of Fairness:  The Arbitrary and Capricious Imposition of the Death Penalty in the 1980s. XIV N.Y.U. Rev. L. & Soc. Change, 797, 838 et seq. (1986).

2.  For example, an Illinois state legislator announced plans to introduce a bill "calling for a 'statute of limitations on the filing of post-conviction appeals" ' as part of his scheme to expedite the execution of defendants sentenced to death, Illinois Coalition Against the Death Penalty, Bulletin, April 16, 1987 p. 2.

3.  Tabak, The Death of Fairness, supra note 1, at p. 830-831.

4.  Shabaka Sundiati Waqlimi, formerly known as Joseph Green Brown, served fourteen years on Florida's death row before obtaining post-conviction relief.  The 11th Circuit overturned his conviction on the ground of prosecutorial misconduct.  The prosecutor had allowed the Co-defendant who inculpated Waqlimi to testify that he (the co-defendant) had not been given a deal in exchange for his testimony, even though a deal had been made.  The prosecutor then argued the absence of a deal to the jury in an attempt to enhance the co-defendant's credibility.  Even though the 11th Circuit did not reach other issues, evidence concealed from the jury by the prosecution showed that the bullet that killed the victim could not have been fired from Waqlimi's gun, and that the semen found in the victim came from a man with a blood type different from that of Waqlimi.  A year after the 11th Circuit overturned the conviction, all charges against Waqlimi were dropped, Innocent Man Released After 14 Years on Death Row, Vol. 14 Southern Coalition Report (Spring 1987).

5.  The phrase "last, best hope" is taken from Abraham Lincoln's Annual message to Congress, 1862, Kerner, A Treasury of Lincoln Quotations, p. 91 (1965):  "In giving freedom to the slave, we assure freedom to the free--honorable alike in what we give and what we preserve.  We shall nobly save or meanly lose the last, best hope of earth."

6.  See American Bar Association, Standing Committee on Legal Aid and Indigent Defense Bar Information Program: (prepared by The Spangenberg Group), Time and Expense Analysis in Post-Conviction Death Penalty Cases (February, 1987) p. 22.

7.  Because there is no recognized federal constitutional right to post-conviction counsel, even  the minimal guidance offered by federal ineffective assistance of counsel caselaw is lacking in this area, See *Pennsylvania v. Finley*, 481 __U.S.__; 107 S. Ct. 1990; 95 L. Ed. 2d 539 (1987). (no federal constitutional right to counsel for collateral attack on conviction; where state provided appointed counsel, no federal constitutional right to have Anders procedures followed when that attorney finds no basis to proceed).

8.  An example is the case of Warren McCleskey.  His conviction and death sentence were affirmed by the Supreme Court in *McCleskey v. Kemp*, __U.S.__; 107 S.Ct. 1756; 95 L. Ed. 2d 262 (1987). Shortly thereafter, a liberalization of Georgia's open records law allowed McCleskey's attorney to examine files in the city attorney's office.  The

information obtained led to a stay of execution, Death Row Inmate Prevails--Finally, National Law J, January 11, 1988, at 24.   Subsequently, McCleskey's petition for a writ of habeas corpus was granted, based on the information received as a result of the open records law change, McCleskey Murder Conviction Overturned Again, The Atlanta Constitution, December 24, 1987, at 1 and after; see, McCleskey v. Kemp, #C87-1517A (N.D. Ga. December 23, 1987).

**GUIDELINE 11.9.4 DUTIES OF CLEMENCY COUNSEL**

A.     Clemency counsel should be familiar with the procedures for and permissible substantive content of a request for clemency.

B.     Clemency counsel should interview the client, and any prior attorneys if possible, and conduct an investigation to discover information relevant to the clemency procedure applicable in the jurisdiction.

C.     Clemency counsel should take appropriate steps to ensure that clemency is sought in as timely and persuasive a manner as possible.

**Commentary:**

        Whether new counsel is appointed or counsel representing the client in other post judgment procedures handles the request for clemency,[1]  the manner in which clemency is dispensed in the jurisdiction will control what should be done.[2]  Counsel should be familiar with the governor [3]  or other clemency dispenser, and with the factors the clemency-dispenser has historically found persuasive.  If doubts about the fairness of the judicial proceedings that produced the death sentence have led to clemency in other cases, counsel should consider whether particular instances of procedural unfairness can be set out as to the client's, case (requiring a familiarity with the legal history of the case).  If personal characteristics of the condemned have proven helpful in past clemency proceedings, then counsel should mobilize an especially detailed investigation to discover and demonstrate examples of the client's similar characteristics to the extent possible.

**FOOTNOTES:**

1.     The Florida Office of the Capital Collateral Representative, created by statute to represent indigents in post-conviction proceedings in capital cases, is empowered to represent such clients in courts, Fla. Stat. Ann. 27.702, not in clemency proceedings.

2.     For example in Georgia, the Board of Pardon and Parole handles all requests for clemency, Ga. Const. 1983, art. 4, sec. 2, par. 2.  In Florida, the governor may commute punishment or grant pardons only with the approval of three members of the Cabinet, Fla. Stat. Ann. 940.01 (1).    In Indiana, the parole board makes recommendations to the governor, Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 111, p. 8-36 (1985).

3.     See generally, Dept. of Public Advocacy, KENTUCKY PUBLIC ADVOCATE DEATH PENALTY MANUAL, p. 533-537.

**GUIDELINE 11.9.5 DUTIES COMMON TO ALL POST JUDGMENT COUNSEL**

A.      Counsel representing a capital client at any point after imposition of the death sentence should be familiar with the procedures by which execution dates are set and how notification of that date is made. Counsel should also be familiar with the procedures for seeking a stay of execution from all courts in which the case may he lodged when an execution date is set.

B.      Counsel should take immediate steps to seek a stay of execution, and to appeal from any denial of a stay, in any and all available courts when an execution date is set.

C.      Counsel should continually monitor the client's mental, physical and emotional condition to determine whether any deterioration in the client's condition warrants legal action.

**Commentary:**

        In non-capital cases, appellate and post-conviction counsel may experience pressure to file pleadings so that a defendant will not serve several undeserved years in prison before the case is resolved.  If a defendant is free on appeal bond, there may even be pressure to file pleadings on the last possible day. Only in capital cases does counsel face the possibility that a pleading may be dismissed as moot following the client's execution.[1]  When too-short periods of time for filing substantive post judgment [2]  pleadings compete with the need to stay the execution so that substantive pleadings will be considered, the result is last-minute requests for stays.[3]  Counsel cannot obviate an insane system; developing familiarity with the procedures in question prior to accepting a capital case so that stays can be sought as efficiently as possible is the only ameliorative step counsel can take.  (It is assumed that, given time, counsel would also litigate the
unfairness of any overly-restrictive constraints on filing of substantive pleadings and/or stays). As described in the commentary to Guideline 11.9.1, a deterioration in the client's mental condition may directly affect the legal posture of the case.  For example, insane persons cannot he executed.[4]

**FOOTNOTES:**

1.      Sloan, Death Row Clerks, The New Republic (February 16, 1987).
2.      Tabak, The Death of Fairness: The Arbitrary and Capricious Imposition of The Death Penalty in the 1980s, XIV N.Y.U. Rev. L. & Soc. Change 797, 834 (1986).
3.      When a capital case enters a phase of being "under warrant" -- i.e., when a death warrant has been signed -- time commitments for counsel increase, "due in large part to the necessary duplication of effort in the preparation of several petitions which might have to be filed simultaneously in different courts." American Bar Association, Standing Committee on Legal Aid and Indigent Defense, Bar Information Program,

Time & Expense Analysis in Postconviction Death Penalty Cases, (February, 1987), p. 10. See Indiana Public Defender Council, INDIANA DEATH PENALTY DEFENSE MANUAL, Vol. 111, p. 8-2 through 8-3, 8-11, 8-16, and 8-27 through 8-29 (1985), setting out the various stages at which a stay may need to be sought.  Counsel should be aware prior to the setting of an execution date of the procedures of the particular courts from which stays may be requested.

4.    Ford v. Wainwright, ___U.S.___; 106 S. Ct. 2595; 91 L. Ed. 2d 335 (1986).

# EXHIBIT 21

Trial Record of Testimony of Juanita Trevino DeLeon

1                          JUANITA DeLEON,

2    the witness, after first being duly cautioned and sworn to

3    tell the truth, the whole truth, and nothing but the truth,

4    testified upon oath as follows:

5                          DIRECT EXAMINATION

6    BY MR. TREVINO:

7    Q      Ma'am, please state your name.

8    A      Juanita DeLeon.

9    Q      What is your relationship to Carlos Trevino?

10   A      I'm his aunt.

11   Q      How long have you known Carlos?

12   A      All his life.

13   Q      All his life?  Where is Carlos' mother?

14   A      She has an alcohol problem right now.

15   Q      Excuse me?

16   A      She has an alcohol problem.

17   Q      So where is she?

18   A      In Elgin.

19                              THE COURT:  Where?

20                              WITNESS:  Elgin.

21                              THE COURT:  Elgin?

22                              WITNESS:  Uh-huh.

23   BY MR. TREVINO:

24   Q      So she couldn't make it.  I don't know him.  Where is

25          Carlos' father?

HOLLY DIETERT RHODES, CSR    ***    290TH JUDICIAL DISTRICT COURT    135

1   A       I don't know him.

2   Q       How old is Carlos' mother?

3   A       39.

4   Q       Where did Carlos go to school?

5   A       He went with me to (inaudible) and then he went to

6           Harlandale.  And Sam Houston I think was the last

7           one.

8   Q       How did he do in school?

9   A       He did okay.

10  Q       Did you go to school with him?

11  A       Yeah.

12  Q       Did you have any classes together?

13  A       No.

14  Q       Did he belong to any school clubs or anything like

15          that while he was there?

16  A       No.

17  Q       Pretty much on his own?

18  A       Yeah.

19  Q       How would you describe the family's finances?  How

20          much money do they have?

21  A       What?

22  Q       How much money was available?

23  A       I don't know.

24  Q       Was he on welfare?

25  A       Yeah, my sister was.

1   Q   The whole family?

2   A   Yeah.

3   Q   How many brothers and sisters does he have?

4   A   One brother and one sister.

5   Q   Why did he drop out?

6   A   I don't know.

7   Q   But you do know he did.  Right?

8   A   Yeah.

9   Q   What did he do after that?

10  A   He started working with Ruben.

11  Q   Who is Ruben?

12  A   My sister's ex-boyfriend.

13  Q   What kind of work did he do?

14  A   Roofing.

15  Q   Where was he living during this time?

16  A   With Janet.

17  Q   Who is Janet?

18  A   His girlfriend.

19  Q   When did he meet Janet?

20  A   I think when he had got out of school or when he was

21      in school.  I don't remember.

22  Q   How old do you think he was?

23  A   Like about 17 or 18.

24  Q   Who is Janet?

25  A   His girlfriend.

1  Q      Is she more than his girlfriend?

2  A      Well, they were living together, yeah.

3  Q      Do they have any children together?

4  A      Yes.  One.

5  Q      How old is he or she?

6  A      He's five.

7  Q      Now.  You said Carlos lived with you?

8  A      Uh-huh.

9  Q      Do you have children of your own?

10  A      Yes.  I have two girls.

11  Q      Did he ever take care of your children?

12  A      Yeah.  He would always take care of them for me.

13         When I would go to work, when there was no job with

14         Ruben, he would stay home and take care of them for

15         me.

16  Q      How is he around children?

17  A      Well, my girls loved him.  They were attached to him.

18         When he would go to the store, they would want to go

19         with him.

20  Q      How did he get along with other people in the family?

21  A      He got along with everybody.

22  Q      How long did he work as a roofer?

23  A      For a long time.

24  Q      When Carlos was around you, how would you describe

25         Carlos?  Was he a violent guy?  A nice guy?

```
 1   A     No.

 2   Q     How is he?

 3   A     He's real easy to get along with.  I would always

 4         tell him my problems.  He would always give me

 5         advice.

 6   Q     How old are you?

 7   A     I'm 23.

 8   Q     And how old is Carlos?

 9   A     22.

10   Q     22?

11   A     Yes.

12   Q     You used to live with your father?

13   A     Uh-huh.

14   Q     When he was in school, did he ever play any games?

15   A     Well, when we used to -- after school we used to go

16         to the park normal like a recreation and we would

17         play games there.

18   Q     What kinds of stuff did y'all do?

19   A     Basketball, checkers.  They had a lot of games there.

20   Q     So Carlos has been on his own most of his life?

21   A     Yeah.

22   Q     Now, you know that Carlos has been found guilty of

23         capital murder.  Right?

24   A     Yeah.

25   Q     In your opinion is he the kind of person that would
```

1     do something like that?

2  A   No.  Huh-uh.  I know he didn't do it.  He's not the

3     type that would do something like that.  I don't care

4     what anybody says.  I know he didn't do it.

5  Q   Is there anything else you would like to tell the

6     Jury?

7  A   That he's not the type of person that would do

8     anything like that.  Y'all have to know him.  People

9     make him sound like he's real mean and everything and

10    he's not.  I mean, my daughters loved him.  He would

11    never do anything to anybody.

12  Q   He went up to prison for stealing a car.  Right?

13  A   Yeah.

14  Q   And he was a real young guy when he did that?

15  A   Yeah.

16  Q   He paid for that.  Right?

17  A   Yeah.

18               MR. TREVINO:  Pass the Witness,

19    Judge.

20                CROSS-EXAMINATION

21  BY MS. HERR:

# EXHIBIT 22

## Affidavit of Ann Matthews
## and Accompanying Report

**AFFIDAVIT**

STATE OF TEXAS                              §

COUNTY OF BEXAR                        §


Before me, the undersigned authority on this day did personally appear, Ann Matthews, known to me to be the person signing this affidavit and who did upon his oath state the following:


1. My name is Ann Matthews. I have a Bachelors of Arts degree in Social Studies with a specialization in Psychology from Sul Ross State University, and have been a Mitigation Specialist in Texas since 2001.


2. As a Mitigation Specialist, I work with the capital trial team to develop a bio/psycho/social history of the client, to interview relevant family, friends and others who are suggested by the client's history, collect relevant records that are indicated by the client's history and assist the trial team in developing possible theories and themes of mitigation that may be presented during the guilt/innocence and penalty phases of a capital trial.


3. The American Bar Association's *Guidelines in Death Penalty Representation (ABA Guidelines)* provide in part:

> The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This investigation should comprise efforts to discover all reasonably available mitigating evidence to rebut any aggravating evidence that may be introduced by the prosecutor

> *ABA Guideline 11.41(B)*


4. I have done an initial mitigation review of Carlos Trevino. I have written a social history report, had family interviews and reviewed numerous items provided by the attorneys.


5. It is my understanding that no mitigation research was done in preparation for the trial level of Carlos Trevino's Capital Murder. Further no research was done until I was asked to look into the case. Due to the unfortunate time lapse, several of the family members have past away, and many

of the records that would support Carlos's descriptions of his life are fading. The optimum time to have researched this life was while the records and memories were fresh. The trial attorneys had access to the closest view of Carlos's actual family life, and they chose not to preserve or use that invaluable information.

6. It is my opinion based on the results I have had in other cases, and the current trends in mitigation that had Carlos Trevino been adequately represented at trial, and his life story come out for the jury, he would not be on death row. Much of Carlos life was dictated to him by adults that were unfit to parent. This family life forced him to make adult choices with out the benefit of appropriate training or maturity. These decisions directly lead him to be in a car of men that were subsequently charged with capital murder. Horribly, his legal representation followed his parents model; Carlos was the only member of the party that was tried for Capital Murder. Because of the insufficient case presentation during sentencing, he is now facing death by the state.

7. It is my opinion that if Carlos were given the opportunity to either be re-tried or re-sentenced, the out come would be entirely different. I do not feel that a jury that is shown Carlos's complete life history could decide that he should be executed.

Further, affiant sayeth not.

Sworn to and signed by the affiant on this the ___13th___ day of January, 2004.

_Ann Matt_____
Ann Matthews

Sworn to and subscribed before me by the said Ann Matthews on this the ___13th___ day of January, 2004.

_Jane McRoberts Cobb_____
Notary Public in and for the State at Large
My Commission expires _____

Jane McRoberts Cobb
Notary Public
State of Texas
My Commission Expires
May 27, 2004

Social History Report

# Carlos Trevino

Introduction:

This social history report is intended for use in the process of appealing Mr. Trevino's death conviction from 1998. The information was collected through interviews with Mr. Trevino's family members, his attorneys, reviewing interview reports and transcripts of interviews with Mr. Trevino, school and medical records, and writings by Mr. Trevino. Also reviewed were the psychological assessments of Mr. Trevino by Brown, Nelson, Frank and Associates of Houston who assessed Mr. Trevino in 1998.

Life History:

To begin the social history of Carlos Trevino, it is important to review the family background prior to his birth. Josephine Deleon Trevino, Carlos Trevino's mother was born in 1957. Her parents divorced when she was 4 years old, the children then went to live with the father's mother. Benito Deleon started physically/sexually-molesting Josephine when she was 5 years old; and he continued to do so, regularly, until she was 12 years old. Josephine tried to tell her stepmother, but was told the abuse was her fault.

Josephine's natural mother died of cancer when she was 10-years old. Josephine went to school until she was in the 7th grade. When she was 14 years old her father tried to rape her. Josephine began drinking heavily and acting out sexually.

Carlos Trevino was born January 24, 1975 in San Antonio. He was the oldest child of Josephine Deleon and Horacio Trevino. Carlos weighed four pounds at birth and had to remain in the hospital for a couple of weeks to gain enough weight to be safely viable. Josephine Trevino reports that she drank heavily during the pregnancy, and was

not available for early bonding. Carlos's father Horacio returned to Mexico prior to his birth and has not been seen by the family since.

Josephine soon met Peter Sanchez. April 18, 1977 Peter Anthony Deleon Trevino was born. September 12, 1978 Elizabeth Deleon Trevino was born however, on January 5, 1979 she died; the family was told that she died of SIDS. Josephine reports drinking heavily during these pregnancies as well.

Carlos has memories of being terrified of the violent fights between his mother and her boyfriends. Drinking and drug use was prevalent in the home. Carlos reports memories of being left in the car while his mother was in bars, thou she denies these reports and says they were always safely left with either her sister Irena or Janie.

In 1981 Carlos hit his face on a piano in the home and has had unexplained nose bleeds ever since. About the same time Carlos reports having two cousins that lived nearby kill in separate stabbings. He saw one car covered in blood from one of the victims. Carlos reports feeling scared and confused. Later that year, the 15 year old boy next door died of a cocaine overdose.

January 7, 1982 Carlos's sister Jennifer was born.

In 1984 a car hit Carlos in front of his home. He was hospitalized due to hitting his head on a utility pole. The next year Josephine and Peter Sanchez had their final fight, she had her father come pickup the kids, got drunk with the neighbors, and left Peter. In the next six years, Carlos and his family lived with various relatives and periodically lived in the car or at the park off San Pedro Road.

Carlos reports starting to smoke pot and drinking beer 1986. He learned to drive in 1987 while Josephine was in Mexico with then boyfriend Julian. The same year he started participating in the local street gangs. This started his criminal career; including stealing, trespassing, burglary, and truancy.

In 1989, at fourteen years of age, while still living with his family, Carlos's first girlfriend moved into the home. She lived there until she was five months pregnant, when she left. In 1990 the child Jonathan was born. Carlos found a new girl friend Janet Cruz who had a three-month-old child. She moved into the home. Carlos worked as a roofer to support the family. In 1991 Carlos was expelled from school, at this time he decided to have another child with Janet. Carlos moved into his own home and Carlos Jr. was born in October of 1992.

As his family grew, Carlos's crimes also grew; he was arrested for burglary of a vehicle, unlawful carrying a handgun, and unauthorized use of a motor vehicle. He also moved to injecting cocaine, and smoking crack.

With his 1993 trip to prison, Janet left him. While in prison, Carlos became a member of the Pistolaros, a popular Hispanic prison gang. While he was out of prison on parole, Carlos went out with friends, and now is facing the death penalty.