UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CARLOS TREVINO,                  §
TDCJ No. 999235,                 §
                                 §
           Petitioner,           §
                                 §
V.                               §    CIVIL NO. SA-01-CA-306-XR
                                 §
RICK THALER, Director,           §
Texas Department of Criminal     §
Justice, Correctional            §
Institutions Division,           §
                                 §
           Respondent.           §

## MEMORANDUM OPINION AND ORDER

Petitioner Carlos Trevino filed this federal habeas corpus action pursuant to 28 U.S.C. Section 2254 challenging his July 1997, Bexar County capital murder conviction and sentence of death. For the reasons set forth at length below, petitioner is not entitled to federal habeas corpus relief from this Court but is entitled to a Certificate of Appealability.

## I. Statement of the Case

A.   Factual Background

On the evening of June 9, 1996, while on a trip to buy beer for a party he had been attending,[1] Santos Cervantes enticed

_____

[1] Jay Mata testified at petitioner's trial, in pertinent part, (1) the petitioner, the petitioner's teenage cousin Juan "Tati" Gonzales, Santos Cervantes, Brian "Chuck Wick" Apolinar, and Seanido "Sam" Rey all attended a party held in Mata's backyard on an evening in June, 1996, where beer was consumed and marijuana smoked, (2) when Mata ran out of beer around eight or nine p.m., those five individuals left in Apolinar's vehicle to get more beer, (3) they were gone for some time, (4) when the group returned, they

fifteen-year-old Linda Salinas to get into a car driven by Cervantes' friend Brian Apolinar, with the assurance Apolinar would take Salinas to a nearby fast-food restaurant.[2]  Traveling with

---

did not say where they had been, (5) Mata noticed Cervantes appeared "real nervous" and acted "a little scared," while the petitioner did not appear nervous or frightened, (6) Cervantes had a bag of some sort with him when the group returned to Mata's home, (7) Cervantes asked for a flammable liquid, (8) Mata later noticed Cervantes near a fire in the backyard, (9) when Mata asked petitioner what was being burned, petitioner replied "nothing," (10) and, days later, Mata noticed the remains of a cloth bag and other burned items near the spot where he had seen Cervantes and the fire on the evening in question. Statement of Facts from Petitioner's Trial (henceforth "S.F. Trial"), Volume XVI, testimony of Jay Mata, at pp. 152-210.

   [2] Petitioner's teenage cousin Juan Gonzales testified at petitioner's trial, in pertinent part, (1) he, the petitioner, Santos Cervantes, Brian Apolinar, and Sam Rey left Mata's home to go buy beer at a nearby convenience store, (2) while he was inside the store buying food, Cervantes approached and began talking with a girl near a phone, (3) Cervantes then asked Apolinar if Apolinar would give the girl a ride to Whataburger and Apolinar said "yes," (4) the girl sat on Cervantes' lap in the front passenger seat when the group drove away from the convenience store, (5) Cervantes removed the girl's bra and tossed it to Apolinar, who was driving, and Apolinar tossed it back to Cervantes, (6) he could see Cervantes and Apolinar conversing with one another but, because of the loud music inside the vehicle, could not hear their words, (7) Apolinar drove to Espada Park, where Cervantes and the girl exited the vehicle and went into the woods behind some bushes, (8) Apolinar followed them shortly thereafter, (9) Gonzales, the petitioner, and Rey followed not long thereafter, (10) he then saw Cervantes on top of the girl, having sex with her while Apolinar held the girl down by her wrists, (11) the girl was struggling to get away but unable to do so, (12) both Cervantes and Apolinar struck the girl when she tried to scream, (13) when Cervantes finished, Sam Rey took Cervantes' place and had sex with the girl while the petitioner held her down, (14) after Rey finished, Cervantes threatened the girl and she turned around, (15) Cervantes then had anal intercourse with the girl while first Apolinar, and then Rey, forced the girl to fellate them, (16) the petitioner told Gonzales it was his turn but Gonzales said no and went back to the car with Rey, (17) after a time, Rey left Gonzales at the car to

2

Apolinar, Cervantes, and Salinas that evening were Carlos Trevino (petitioner herein), petitioner's teenage cousin Juan "Tati" Gonzales, and Seanido "Sam" Rey.[3]

Instead of driving to the restaurant, Apolinar drove the group to Espada Park, where Cervantes, Apolinar, and Rey sexually assaulted Salinas while she unsuccessfully struggled to escape.[4] Gonzales overheard Apolinar, Cervantes, and the petitioner discuss their mutual desire not to leave any witnesses behind.[5] At that point, Gonzales returned to the group's vehicle; when the other four men returned, Cervantes and the petitioner had blood on them.[6]

---

return to the scene, (18) shortly thereafter, Gonzales went back into the woods and found the group had moved to a nearby creek bottom, (19) the girl was no longer moving and there was no sound coming from her, (20) he heard Sam Rey comment "we don't need no witnesses," (21) Cervantes repeated the same comment to petitioner, who responded "we'll do what we have to do," (22) Gonzales again returned to Apolinar's vehicle, and (23) when the four others returned to the car, Gonzales observed blood on both Cervantes and petitioner. S.F. Trial, Volume XVIII, testimony of Juan Gonzales, at pp. 167-97; Volume XIX, testimony of Juan Gonzales, at pp. 3-46.

[3] S.F. Trial, Volume XVI, Testimony of Jay Mata, at pp. 152-59; Volume XVIII, testimony of Juan Gonzales, at pp. 167-82.
Throughout the Statement of Facts from petitioner's trial, Rey's first name is spelled "Sienido." However, the affidavit executed by Rey attached to petitioner's motion for stay, filed March 28, 2006, docket entry no. 49, spells Rey's first name as "Seanido." This Court will employ the spelling employed by Rey himself in this statement to police.

[4] S.F. Trial, Volume XVIII, testimony of Juan Gonzales, at pp. 167-97; Volume XIX, testimony of Juan Gonzales, at pp. 24-26.

[5] S.F. Trial, Volume XVIII, testimony of Juan Gonzales, at p. 191.

[6] *Id.*, at p. 192.

3

During the group's ensuing drive away from the Park and back to the Mata residence, Cervantes made a comment that it was "neat" or "cool" about how her neck had snapped and also made a comment about a knife; petitioner responded with the comments "I learned how to kill in prison" and "I learned how to use a knife in prison."[7] When the group returned to the Mata residence, Cervantes burned Salinas' cloth backpack, which she had left in Apolinar's car when the group stopped at Espada Park.[8] When Gonzales asked Cervantes why he had killed the girl, Cervantes responded "mind your own business."[9] While Gonzales never saw the petitioner or anyone else with a knife at the scene of the murder, a few days *before* Salinas' murder, Gonzales had seen Cervantes with a knife and, two days *after* the murder, Cervantes told Gonzales he had broken the knife and thrown it into a river.[10] The petitioner thereafter told Gonzales not to say anything to the police about the incident.[11]

---

[7] S.F. Trial, Volume XIX, testimony of Juan Gonzales, at pp. 4-6, 33-34, 44-45.

[8] S.F. Trial, Volume XIX, testimony of Juan Gonzales, at pp. 7-12, 31; Volume XVI, testimony of Jay Mata, at pp. 159-64, 170-71, 177, 187, 189, 197-207, 210.

[9] S.F. Trial, Volume XIX, testimony of Juan Gonzales, at pp. 29-30.

[10] *Id.*, at pp. 5, 29-30, 45.

[11] *Id.*, at pp. 14-15.

Salinas' partially nude body was discovered in Espada Park the day after the murder, *i.e.*, on June 10, 1996, in the tall grass along a trail leading down to a nearby creek.[12]

An autopsy revealed (1) Salinas suffered two stab wounds to the left side of her neck, one of which was fatal, (2) the fatal stab wound, to the back of the left side of Salinas' neck, partially severed her carotid artery, resulting in massive bleeding, accompanied almost immediately by a rapid decrease in blood pressure and shock, (3) Salinas sustained soft tissue hemorrhaging and bruising in her vaginal area, as well as bruising, hemorrhaging, and a laceration at her anal opening, (4) a small quantity of a metabolite of marijuana was found in Salinas' blood stream but at an insufficient level to suggest she was intoxicated at the time of her death, (5) Salinas sustained no internal injuries to her neck other than those caused by the two stab wounds, (6) there was no physical evidence anyone had attempted to "snap" her neck, and (7) there were scratches on Salinas' legs and fresh bruises to her breasts.[13]

B.    Indictment

On April 8, 1997, a Bexar County grand jury indicted petitioner in cause no. 97-CR-1717-D on a charge of capital murder,

_____

[12] S.F. Trial, Volume XVI, testimony of David Vargas, at pp. 51-71.

[13] S.F. Trial, Volume XIX, testimony of Vincent DiMaio, at pp. 58-91.

5

to wit, intentionally and knowingly causing the death of Linda Salinas by cutting and stabbing her with a deadly weapon while in the course of committing and attempting to commit the aggravated sexual assault of Salinas.[14]

## C.   Unsuccessful Plea Negotiations

Petitioner's original trial counsel, attorney Mario Trevino (no relation to petitioner) negotiated a plea bargain on petitioner's behalf in which petitioner would enter a plea to the capital murder charge and receive a life sentence without having to testify against any of his co-defendants.[15]   During an emotional debriefing with personnel from the Bexar County District Attorney's office, petitioner broke down and, when the de-briefing resumed a week or two later, petitioner had changed his mind and refused to accept the plea bargain offered.[16]

## D.   Guilt-Innocence Phase of Trial

The guilt-innocence phase of petitioner's trial commenced on June 19, 1997.   In addition to the evidence outlined above, the jury heard testimony from DNA and forensic experts establishing (1) the examination of a pair of blue women's shorts and a pair of

---

[14] Transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript"), Volume I, at p. 2.

[15] Statement of Facts from the evidentiary hearing held during petitioner's state habeas corpus proceeding (henceforth "S.F. State Habeas Hearing"), testimony of Mario Trevino, at pp. 27-30.

[16] *Id.*, at pp. 30-31.

white women's panties found at the crime scene, both identified by Linda Salinas' mother as belonging to Linda, revealed the presence of polyester and cotton fibers which were consistent with a pair of slacks owned by the petitioner,[17] (2) a blood stain found on Linda Salinas' white panties contained a mixture of the DNA from at least two persons, with DNA testing eliminating all but Linda Salinas and the petitioner (from among those identified by Juan Gonzales as present at Espada Park on the night of the murder) as possible sources of the DNA included in that mixed bloodstain,[18] and (3) the oral, vaginal, and anal swabs taken from Linda Salinas' body during autopsy failed to reveal the presence of sperm or seminal fluid.[19] On July 1, 1997, after deliberating less than six hours, petitioner's jury returned a guilty verdict.[20]

---

[17] S.F. Trial, Volume XVII, testimony of Karen Lanning, at pp. 141-49, 156-59, 161, 170; Volume XVIII, testimony of Dawn Salinas, at p. 60; Volume XVI, testimony of David Vasquez, at pp. 66-68; Volume XVI, testimony of Ted Prosser, at pp. 102-03, 105, 108-09; Volume XVII, testimony of Barry Gresham, at p. 33.

[18] S.F. Trial, Volume XIX, testimony of Lonnie Ginsberg, at pp. 114-35; Volume XXII, testimony of Lonnie Ginsberg, at pp. 5-63.

[19] S.F. Trial, Volume XXII, testimony of Lonnie Ginsberg, at pp. 7-10, 20.

[20] Trial Transcript, Volume II, at pp. 148-70, 174; S.F. Trial, Volume XIX, at pp. 147-49.
The time stamps on the petitioner's guilt-innocence phase jury charge indicate the charge was delivered around 11:40 a.m. on July 1, 1997 and a time stamp on a note from the jury indicates a verdict was reached by 4:57 p.m. that same date. *Id.*

E.    <u>Punishment Phase of Trial</u>

The punishment phase of petitioner's trial commenced on July 2, 1997.

The prosecution presented evidence establishing (1) petitioner was first referred to the Bexar County juvenile probation office at age thirteen, (2) as a juvenile, petitioner was adjudicated on charges of evading arrest, possession of up to two ounces of marijuana, unauthorized use of a motor vehicle, and unlawfully carrying a weapon (identified as a nine millimeter handgun), and (3) petitioner was convicted as an adult of operating a motor vehicle while intoxicated, burglary of a vehicle, and burglary of a building.[21]    The jury also heard uncontradicted testimony establishing (1) petitioner had identified himself to a juvenile probation officer as a member of a street gang[22] and (2) petitioner was a documented prison gang member whose body bore the tell-tale tattoos indicative of petitioner's membership in the violent prison gang *La Hermidad y Pistoleros Latinos* ("HPL").[23]

The defense presented a single witness, petitioner's aunt, who testified (1) she had known petitioner all his life, (2)

---

[21] S.F. Trial, Volume XXIII, testimony of Lorraine Reagan, at pp. 12-26; Volume XXIII, testimony of Jaime Aleman, at pp. 65-73, 80-82.

[22] S.F. Trial, Volume XXIII, testimony of Lorraine Reagan, at pp. 35-36.

[23] S.F. Trial, Volume XXIII, testimony of Bob Morrill, at pp. 99-132.

petitioner's father was largely absent throughout petitioner's life, (3) petitioner's mother "has alcohol problems right now," (4) petitioner's family was on welfare during his childhood, (5) petitioner was a loner in school, (6) petitioner dropped out of school and went to work for his mother's boyfriend doing roofing work, (7) petitioner is the father of one child and is good with children, often taking care of her two daughters, and (8) she knows petitioner is incapable of committing capital murder.[24]

On July 3, 1997, after deliberating approximately eight hours, petitioner's jury returned its verdict at the punishment phase of trial, finding (1) beyond a reasonable doubt, there is a probability the petitioner would commit criminal acts of violence which would constitute a continuing threat to society, (2) beyond a reasonable doubt the petitioner actually caused the death of Linda Salinas or, if petitioner did not actually cause her death, the petitioner intended to kill her or another, or the petitioner anticipated a human life would be taken, and (3) taking into consideration all of the evidence, including the circumstances of the offense, the petitioner's character and background, and the petitioner's personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment

---

[24] S.F. Trial, Volume XXIII, testimony of Juanita DeLeon, at pp. 135-41.

be imposed upon petitioner.[25]   In accordance with the jury's verdict, the state trial court imposed a sentence of death.[26]

F.   Direct Appeal

Petitioner appealed his conviction and sentence.   In appellant's brief filed September 4, 1998, petitioner presented nineteen claims for relief.[27]   In an opinion issued May 12, 1999, the Texas Court of Criminal Appeals affirmed petitioner's

---

[25] Trial Transcript, Volume II, at pp. 184-87; S.F. Trial, Volume XXIV, at pp. 47-49.

[26] S.F. Trial, Volume XXIV, at p. 50.

[27] In his points of error on direct appeal, petitioner argued (1) the state trial court's denial of petitioner's motion for mistrial at the conclusion of voir dire effectively deprived petitioner of any opportunity to voir dire the jury venire on their views of DNA and scientific evidence, (2) there was legally insufficient evidence to corroborate Juan Gonzales' testimony as an accomplice witness, (3) the trial court erred in admitting Gonzales' hearsay testimony regarding statements made by petitioner and Santos Cervantes, (4) there was legally insufficient evidence to support the jury's affirmative answer to the first capital sentencing special issue, the issue regarding future dangerousness, (5) the trial court erred in admitting the testimony regarding petitioner's membership in HPL, (6) the trial court failed to properly instruct the jury (i.e., define key terms) in the punishment phase jury instructions, (7) due process requires proportionality review of petitioner's capital sentence, (8) the Texas capital sentencing scheme is unconstitutional because (a) it affords the sentencing jury open-ended discretion and is unstructured, (b) the Texas statutory definition of "mitigating evidence" is unconstitutionally narrow, (c) there is no burden of proof assigned on the mitigating evidence special issue, (d) the jury is not instructed on the effect of a single holdout juror, and (e) the many capital sentencing schemes employed in Texas in recent years violate equal protection and due process concerns, (9) the Texas death penalty is unconstitutional as currently administered, and (10) there is racial discrimination in the manner the death penalty is applied in Texas.

conviction and sentence. *Trevino v. State*, 991 S.W.2d 849 (Tex. Crim. App. 1999). Petitioner did not thereafter seek further review of his conviction or sentence via a petition for certiorari directed to the United States Supreme Court.

G. First State Habeas Proceeding

On April 19, 1999, while his direct appeal was still pending, petitioner filed an application for state habeas corpus relief in which he urged forty-six grounds for relief.[28]

The state habeas trial court held an evidentiary hearing on July 10, 2000, during which petitioner called a single witness, his former trial co-counsel, attorney Mario Trevino, who testified, in pertinent part (1) he had no difficulty communicating with petitioner, (2) the defense team contacted Juan Gonzales prior to trial and knew what testimony Gonzales would give, (3) he negotiated a waiver of the death penalty for petitioner but, after initially accepting same, petitioner later rejected this plea bargain offer, (4) petitioner never denied participating in the offense and admitted he was present when Salinas was killed, (5) whenever defense counsel pressed petitioner about the facts of the offense, however, petitioner responded he was too stoned at the

---

[28] The first thirty claims for relief contained in petitioner's original state habeas corpus application re-urged the same legal arguments included in petitioner's appellant's brief. The remaining claims asserted various theories of ineffective assistance by petitioner's trial counsel at both phases of petitioner's capital murder trial.

time of the offense to recall details, (6) petitioner never denied saying "I learned to kill in prison," (7) defense counsel accepted petitioner's assertions there was no way any of petitioner's DNA could have been on Salinas' clothing, and (8) the defense team was shocked when, on the eve of trial, the prosecution produced DNA test results showing petitioner as a possible source of a mixed blood stain found on Salinas' panties.[29]

In an Order issued December 6, 2000, the state habeas trial court issued its findings of fact, conclusions of law, and recommendation that petitioner's state habeas corpus application be denied.[30] In an unpublished, per curiam Order issued April 4, 2001, the Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions and denied petitioner's state habeas corpus application. *Ex parte Carlos Trevino*, WR-48,153-01 (Tex. Crim. App. April 4, 2001).

---

[29] S.F. State Habeas Hearing, testimony of Mario Trevino, at pp. 21-54.

[30] State Habeas Transcript, Volume II, at pp. 64-95.
The state habeas trial court concluded most of petitioner's substantive claims had already been rejected on the merits during petitioner's direct appeal, and therefore, could not furnish a basis for state habeas corpus relief. As to petitioner's ineffective assistance claims, the state habeas trial court concluded there was no evidentiary support for petitioner's arguments about his trial counsels' performance and, based upon the evidence presented during petitioner's state habeas corpus hearing, found nothing unreasonable with the strategic decisions made by petitioner's trial counsel.

H.  Initial Proceedings in this Court

On March 14, 2002, represented by the same attorney (Albert Rodriguez) who had represented petitioner during his original state habeas corpus proceeding, petitioner filed his original petition for federal habeas corpus relief in this Court, asserting four claims for relief. *Docket entry no. 10.*

After the respondent filed an answer and motion for summary judgment (*docket entry no. 12*), attorney Rodriguez filed a motion to withdraw, citing health concerns. *Docket entry no. 14.*  This Court granted attorney Rodriguez's motion for leave to withdraw and appointed new counsel to represent petitioner herein. *Docket entry nos. 17 & 21.*

Petitioner subsequently filed, and this Court granted, an unopposed motion for stay, seeking leave to return to state court and explore a potential mental retardation claim, as well as other unexhausted claims. *Docket entry nos. 36 & 37.*

I.  Second State Habeas Proceedings

On August 15, 2004, petitioner filed his second state habeas corpus application, asserting new claims that (1) his trial counsel rendered ineffective assistance by failing to adequately investigate, develop, and present available mitigating evidence during the punishment phase of petitioner's capital trial and (2) the Supreme Court's holding in *Atkins v. Virginia* precluded petitioner's execution because petitioner suffers from fetal

alcohol syndrome. In an unpublished, per curiam Order issued November 23, 2005, the Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application pursuant to the Texas writ-abuse statute. *Ex parte Carlos Trevino*, WR-48,153-02, 2005 WL 3119064 (Tex. Crim. App. November 23, 2005).

J.    Further Proceedings in this Court

This Court issued a new scheduling order in December 2005. *Docket entry no. 42.* Thereafter, petitioner filed, and this Court granted in August 2006, another motion for stay in which petitioner sought to return to state court and exhaust a new, unexhausted, *Brady* claim based on the discovery of a witness statement given by petitioner's accomplice Seanido "Sam" Rey in which Rey stated that Santos Cervantes told Rey he (Cervantes) had stabbed Salinas. *Docket entry nos. 49, 50 & 54.*

K.    Further State Court Proceedings

Petitioner thereafter filed a motion for appointment of counsel in state court, seeking legal representation in connection with his new *Brady* claim. However, despite the passage of more than two years and the best efforts of counsel for the parties now before this Court to get the state judicial officer in question to act, the state judicial officer to whom the petitioner's motion for appointment of counsel was referred steadfastly refused to rule on petitioner's motion.

L.   Return to this Court

In an Order issued October 2, 2008, this Court lifted the stay and set deadlines for the completion of the remainder of the proceedings in this cause. *Docket entry no. 62.*

On December 8, 2008, petitioner filed his amended petition for federal habeas corpus relief, in which he asserted eight grounds for relief. *Docket entry no. 76.*

Respondent filed his Answer thereto on June 22, 2009. *Docket entry no. 82.*

Petitioner filed his response to respondent's Answer on September 14, 2009.

## II. **AEDPA Standard of Review**

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001).  Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 l.Ed.2d 334 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so

long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534-35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. at 520-21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied

that case to the facts of his case in an objectively unreasonable manner").

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74, 127 S.Ct. at 1939-40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke*. 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196

(2005)("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006)(holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 550 U.S. 921 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006)(holding the same), *cert. denied*, 550 U.S. 920 (2007); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)(holding the

precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002)(*en banc*)(holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

## III. *Brady* Claim

A.  The Claim

In his first claim in his amended petition, petitioner argues his constitutional rights under the Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated when the prosecution withheld from petitioner's trial counsel Seanido Rey's June 12, 1996 statement to police indicating Santos Cervantes claimed to have actually stabbed Salinas.[31]  Because no state court has yet either addressed the merits of this claim or dismissed same as procedurally defaulted, this Court's review of this claim is necessarily *de novo*. *See*

---

[31] Petitioner's Amended Petition, filed December 8, 2008, docket entry no. 76, at pp. 20-26.

*Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

B.   Circumstances That Render State Habeas Processes Ineffective

Respondent correctly points out that petitioner has thus far been unable to obtain a ruling from the state courts on the merits of petitioner's *Brady* claim.  Under the circumstances of this case, that failure cannot reasonably be ascribed to any fault of the petitioner.

It was petitioner's *federal* habeas counsel who first discovered the statement of Seanido Rey that forms the basis for petitioner's *Brady* claim.  When confronted with a non-frivolous *Brady* claim (see docket entry no. 49), this Court stayed this cause for the express purpose of permitting petitioner an opportunity to return to state court to exhaust state habeas remedies on his newly discovered, non-frivolous claim.  Thereafter, petitioner filed a motion for appointment of counsel in the appropriate state trial court for the purpose of obtaining the assistance of counsel to exhaust state habeas remedies on petitioner's *Brady* claim. However, for reasons known only to the state judicial officer who had the responsibility to address petitioner's motion, and despite explicit entreaties from this Court (*see docket entry no. 61*), more

than two years passed with no indication the courts of the State of Texas would *ever* address petitioner's motion.   The applicable federal statute prohibits this Court from granting relief unless the petitioner has either (1) exhausted available state court remedies, (2) there is an absence of available state corrective process, or (3) circumstances exist that render such process *ineffective* to protect the federal habeas petitioner's rights. 28 U.S.C. §2254(b)(1).  The refusal of the responsible state judicial officer to even address petitioner's motion for appointment of counsel for more than two years convinces this Court that circumstances exist that render any otherwise available state habeas processes wholly ineffective to protect petitioner's federal constitutional rights.   Any procedure that compels a death row inmate to litigate a non-frivolous *Brady* claim in the state courts without the assistance of counsel is necessarily ineffective to protect that prisoner's federal constitutional rights.   Therefore, petitioner's failure to exhaust available state remedies with regard to his *Brady* claim is statutorily excused in this case.

C.   The Applicable Constitutional Standard

As this Court has noted on many occasions, few constitutional principles are more firmly established by Supreme Court precedent than the rule that "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective

of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963); *Bartee v. Quarterman*, 574 F. Supp. 2d 624, 690-93 (5th Cir. 2008), *CoA denied*, ___ Fed. Appx. ___, 2009 WL 2351641 (5th Cir. July 31, 2009), *cert. filed November 23, 2009 (09-7757)*; *Moore v. Quarterman*, 526 F. Supp. 2d 654, 678-79 (W.D. Tex. 2007), *CoA denied*, 534 F.3d 454 (5th Cir. 2008); *Berkley v. Quarterman*, 507 F. Supp. 2d 692, 746 (W.D. Tex. 2007), *CoA denied*, 310 Fed. Appx. 665, 2009 WL 405858 (5th Cir. February 18, 2009), *cert. denied*, ___U.S. ___, 130 S.Ct. 366, ___ L.Ed.2d ___ (2009).

The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, *i.e.*, the rule announced in *Brady v. Maryland*, applies even when there has been no request by the accused. *Banks v. Dretke*, 540 U.S. at 690, 124 S.Ct. at 1272; *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 l.Ed.2d 286 (1999); *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Bagley*, 473 U.S. 667, 676 & 685, 105 S.Ct. 3375, 3380 & 3385, 87 L.Ed.2d 481 (1985).

"[T]he individual prosecutor has a duty to learn of any favorable evidence *known to the others acting on the government's behalf* in this case, including the police." *Strickler v. Greene*,

527 U.S. at 281, 119 S.Ct. at 1948 (emphasis added); *Kyles v. Whitley*, 514 U.S. 419, 437-38, 115 S.Ct. 1555, 1567-68, 131 L.Ed.2d 490 (1995).

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," *i.e.*, prejudice must have ensued from its non-disclosure. *Banks v. Dretke*, 540 U.S. at 691, 124 S.Ct. at 1272; *Strickler v. Greene*, 527 U.S. at 281-82, 119 S.Ct. at 1948. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Banks v. Dretke*, 540 U.S. at 698-99, 124 S.Ct. at 1276.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (expressly adopting the "prejudice" prong of the *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the

materiality standard is *not* a sufficiency of the evidence test. *Kyles v. Whitley*, 514 U.S. at 434-35, 115 S.Ct. at 1566. Third, once materiality is established, harmless error analysis has no application. *Kyles v. Whitley*, 514 U.S. at 435-36, 115 S.Ct. at 1566-67. Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley*, 514 U.S. at 436-37, 115 S.Ct. at 1567. The rule in *Brady* applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Bagley*, 473 U.S. at 676 & 685, 105 S.Ct. at 3380 & 3385.

D.   Synthesis

There are many unresolved factual disputes before this Court concerning precisely what documentation was made available to petitioner's trial counsel by the prosecution before and during petitioner's capital murder trial.   More specifically, there appears to be a genuine issue of material fact regarding whether petitioner's accomplice Rey's statement, which indicated Cervantes admitted to Rey that he stabbed Salinas, was ever made available to petitioner's trial counsel.   It is unnecessary to resolve these disputes because, having reviewed the evidence from both phases of petitioner's trial, this Court concludes Rey's statement does not satisfy the "materiality" prong for purposes of *Brady* analysis.

1.   Guilt-Innocence Phase of Trial

The trial testimony of petitioner's teenage cousin Juan "Tati" Gonzales did *not* place the murder weapon in petitioner's hands.

Gonzales' testimony at the guilt-innocence phase of petitioner's trial tended to minimize petitioner's role in the offense and emphasize Cervantes' role as the person who lured Salinas into Apolinar's vehicle, took the lead in beating and sexually assaulting Salinas, and then burned Salinas' backpack.[32] Furthermore, Gonzales was clear that (1) he never saw anyone with a knife or other weapon in their hands at the crime scene, (2) he saw blood on both petitioner and Cervantes when they returned to Apolinar's vehicle, (3) it was Cervantes who brought up the subject of a knife during the group's drive away from Espada Park, (4) Cervantes did own a knife, which Cervantes told Gonzales he destroyed and threw into a river only days after Salinas' murder, (5) Gonzales knew the girl was dead based on Cervantes' statements, and (6) Gonzales asked Cervantes why Cervantes had murdered the girl.[33] Gonzales likewise made it clear he held Cervantes responsible for the girl's murder.[34] Nothing in Rey's statement to police suggests any of the foregoing testimony by Gonzales was factually inaccurate.

---

[32] S.F. Trial, Volume XIX, testimony of Juan Gonzales, at pp. 7-10, 20-26.

[33] S.F. Trial, Volume XVIII, testimony of Juan Gonzales, at p. 192; Volume XIX, testimony of Juan Gonzales, at pp. 4-6, 29-31, 33-34, 44-45.

[34] S.F. Trial, Volume XIX, testimony of Juan Gonzales, at p. 31.

The only evidence before petitioner's jury at the guilt-innocence phase of trial obliquely suggesting petitioner might have been the person who killed Salinas consisted of an exchange between the petitioner and Cervantes recounted by Gonzales in which Cervantes made a comment to petitioner to which petitioner responded with "I learned how to kill."[35] However, according to Gonzales, this comment by petitioner was made in response to Cervantes' bizarre comment about snapping the girl's neck, something which the medical examiner testified had not, in fact, occurred.[36] Furthermore, the only other inculpatory exchange between petitioner and Cervantes recounted for the jury by Gonzales during the guilt-innocence phase of trial consisted of petitioner allegedly responding to Cervantes and Rey's comments about not wanting any witnesses with a statement "we'll do what we have to do."[37] However, on cross-examination, Gonzales admitted that the conversation in question took place at the crime scene in a mixture of both English and Spanish and that petitioner's actual words could have been "do what you have to do."[38] Thus, there was virtually no evidence before the jury at the guilt-innocence phase

---

[35] *Id.*, at p. 5.

[36] *Id.*, at pp. 5-6.

[37] S.F. Trial, Volume XVIII, testimony of Juan Gonzales, at p. 191.

[38] S.F. Trial, Volume XIX, testimony of Juan Gonzales, at pp. 33-34.

of trial, even when Gonzales' testimony is considered in the light most favorable to the prosecution's theory of the case, suggesting the petitioner was the one who actually stabbed Salinas.

Therefore, rather than refuting Gonzales' trial testimony during the guilt-innocence phase of trial, Rey's newly discovered statement to police identifying Cervantes as the person who actually stabbed Salinas did little more than corroborate Gonzales' version of the critical events, which tended to emphasize Cervantes as the principal actor in Salinas' abduction, sexual assault, and murder. Thus, Rey's statement would have possessed little-to-no impeachment value in terms of Gonzales' guilt-innocence phase testimony. Rey's statement, assuming it could have been admitted as that of a co-conspirator made in the furtherance of a criminal conspiracy or under an exception to the Hearsay Rule,[39] at best would have confirmed what Gonzales had already strongly suggested to the jury, *i.e.*, that Cervantes was responsible for Salinas' murder. More significantly, nothing in Rey's statement to police suggests there was anything factually inaccurate about any inculpatory aspect of Gonzales' testimony during the guilt-innocence phase of petitioner's trial.

---

[39] Petitioner has furnished this Court with no affidavit from Rey or any other evidence suggesting Rey was "available" or willing to testify at the time of petitioner's trial to the same facts set forth in Rey's June 12, 1996 affidavit.

At the guilt-innocence phase of trial, the state trial court charged petitioner's jury under the Texas law of parties:

> Our law provides a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is criminally responsible, or by both. Each party to an offense may be charged with commission of the offense.
>
> Mere presence alone will not make a person a party to an offense. A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense.
>
> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. Capital murder and aggravated sexual assault are felonies.
>
> The term "conspiracy", as used in these instructions, means an agreement between two or more persons, with intent that a felony be committed, that they, or one or more of them, engage in conduct that would constitute the offense. An agreement constituting a conspiracy may be inferred from acts of the parties.[40]

Thus, petitioner's jury properly could have convicted petitioner without a showing that petitioner was the person who fatally stabbed Salinas.

Even more significantly, petitioner has alleged no facts, much less furnished this Court with any evidence, suggesting any of the inculpatory comments attributed to the petitioner by Gonzales during the guilt-innocence phase of petitioner's trial were

---

[40] Trial Transcript, Volume II, at pp. 150-51.

factually inaccurate or erroneously recounted. On the contrary, the record now before this Court includes the uncontradicted testimony of petitioner's former lead trial counsel, which established petitioner never informed his trial counsel that any of Gonzales' trial testimony was factually inaccurate.[41] Petitioner never denied to his trial counsel being physically present when Salinas was murdered.[42] Nothing in Rey's statement to police suggests Gonzales testified falsely about the petitioner (1) holding Salinas down while Rey raped her,[43] (2) telling Cervantes either "we'll do what we have to do" or "do what you have to do" in response to comments from Rey and Cervantes about their desire not to leave any witnesses,[44] or (3) telling Gonzales to say nothing to the police about the incident.[45] At best, Rey's hearsay-within-hearsay statement to police establishes Cervantes stabbed Salinas. The medical examiner testified without contradiction that Salinas was stabbed twice. Nothing in Rey's statement forecloses the possibility Cervantes and the petitioner each stabbed Salinas once.

---

[41] S.F. State Habeas Hearing, testimony of Mario Trevino, at pp. 26, 34, 38, 46, 53.

[42] *Id.*, at pp. 34, 38.

[43] S.F. Trial, Volume XVIII, testimony of Juan Gonzales, at pp. 194-96.

[44] S.F. Trial, Volume XVIII, testimony of Juan Gonzales, at p. 191; Volume XIX, testimony of Juan Gonzales, at pp. 33-34.

[45] S.F. Trial, Volume XIX, testimony of Juan Gonzales, at pp. 14-15.

Thus, Rey's statement to police does not afford any basis for impeaching the most salient, inculpatory, portions of Gonzales' testimony at the guilt-innocence phase of petitioner's trial.

Given the record at the guilt-innocence phase of petitioner's trial, there is simply no reasonable probability that, but for the failure of the prosecution to disclose Rey's statement to petitioner's trial counsel, the outcome of the guilt-innocence phase of petitioner's trial would have been different. *See Banks v. Dretke*, 540 U.S. at 698-99, 124 S.Ct. at 1276 (holding evidence is "material" under *Brady* where there exists a "reasonable probability" that, had the evidence been disclosed, the result at trial would have been different).

2. <u>Punishment Phase of Trial</u>

As was explained above, during the punishment phase of petitioner's trial, the jury was faced not only with the brutal details of Salinas' sexual assault and murder, but also with evidence establishing the petitioner (1) came from a poor, broken family background, which including an absent father and an alcoholic mother,[46] (2) had been on his own most of his life,[47] (3) admitted to membership in a street gang as a teenager,[48] (4) had

_____

[46] S.F. Trial, Volume XXIII, testimony of Lorraine Reagan, at pp. 30-36; testimony of Juanita DeLeon, at pp. 135-39.

[47] *Id.*, testimony of Juan Gonzales, at p. 85; testimony of Juanita DeLeon, at pp. 137-39.

[48] *Id.*, testimony of Lorraine Reagan, at pp. 35-36.

been convicted as a youth and adult of a wide range of offenses, including auto theft, burglary, evading arrest, driving while intoxicated, and illegally carrying a handgun,[49] and (5) bore numerous tattoos indicating his membership in a notoriously violent prison gang.[50]  More significantly, petitioner's jury was faced with a record utterly bereft of any indication the petitioner had ever accepted responsibility for his involvement in Salinas' murder or expressed sincere contrition over her death.   On the contrary, Gonzales testified without contradiction during the guilt-innocence phase of trial that, at one point during the sexual assault upon the fifteen-year-old Salinas, the petitioner urged Gonzales to rape Salinas.[51]  Moreover, during the punishment phase of petitioner's trial, Gonzales also testified without contradiction the petitioner (1) told Cervantes "I learned how to kill in prison" and "I learned how to use a knife in prison," and (2) had only been out of prison a few weeks prior to Salinas' murder.[52]

---

[49] *Id.*, testimony of Lorraine Reagan, at pp. 14-26; testimony of Dario Gonzales, at pp. 43-46; testimony of Maria Teresa Espinosa, at pp. 48-51; testimony of John Anthony Riojas, at pp. 58-63; testimony of Jaime Aleman, at pp. 67-72, 80-82.

[50] *Id.*, testimony of Bob Morrill, at pp. 98-132.

[51] S.F. Trial, Volume XVIII, testimony of Juan Gonzales, at p. 185.

[52] S.F. Trial, Volume XXIII, testimony of Juan Gonzales, at pp. 84-85.

Significantly, Gonzales admitted he never saw the petitioner sexually assault or stab Salinas.[53] Thus, nothing in Rey's statement to police (about Cervantes' confession to having stabbed Salinas) contradicts or impeaches any of Gonzales' most aggravating testimony establishing the petitioner (1) held Salinas down while Rey sexually assaulted her, (2) urged Gonzales to participate in the sexual assault of Salinas, (3) said nothing to dissuade Cervantes and Rey from killing Salinas when they commented they did not want to leave any witnesses, (4) had blood on him when he returned to Apolinar's vehicle, (5) urged Gonzales not to tell the police what happened the night of the murder, (6) had been out of prison only a few weeks at the time of Salinas' murder, or (7) told Cervantes he (the petitioner) had "learned how to kill in prison."

In addition, petitioner's sentencing jury also had before it the uncontradicted testimony of Jay Mata establishing that, after their return to Mata's residence the evening of Salinas' murder, the petitioner appeared nonchalant while Cervantes appeared nervous, scared, and introspective.[54]

During the punishment phase of petitioner's capital murder trial, the jury was confronted with three special issues inquiring

---

[53] S.F. Trial, Volume XVIII, testimony of Juan Gonzales, at pp. 192-96; Volume XIX, testimony of Juan Gonzales, at pp. 26-29, 31, 44-45; Volume XXIII, testimony of Juan Gonzales, at pp. 86-88.

[54] S.F. Trial, Volume XVI, testimony of Jay Mata, at pp. 164-66, 188, 209-10.

whether (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society, (2) beyond a reasonable doubt the petitioner actually caused the death of Salinas or, if he did not actually cause Salinas' death, he intended to kill Salinas or another or he anticipated that a human life would be taken, and (3) taking into consideration all of the evidence, including the circumstances of the offense and the petitioner's character, background, and personal moral culpability, there were sufficient mitigating circumstances to warrant a sentence of life imprisonment, rather than a death sentence, be imposed.[55]

Rey's statement to police is most directly relevant to the second special issue, which still allowed an affirmative answer even if the jury were convinced, as Gonzales had strongly suggested throughout his trial testimony (and as Rey stated to police), that Cervantes was the person who actually stabbed Salinas. The upshot of Rey's statement is also somewhat relevant to the mitigation special issue. The problem for petitioner in terms of the materiality analysis under *Brady* is that petitioner does not contest the accuracy of any of Gonzales' relevant trial testimony.

_____

[55] Trial Transcript, Volume II, at pp. 176-89.
While the state trial court's jury instructions do not include the "beyond a reasonable doubt" burden of proof with regard to the first special issue, *i.e.*, the future dangerousness special issue, the verdict form, which petitioner's jury answered unanimously, does include this burden of proof standard in the language of special issue one.

Moreover, nothing in Rey's statement to police dated June 12, 1996 contradicts the accuracy of Gonzales' testimonial recitation of the inculpatory and aggravating statements made by petitioner to Cervantes. Likewise, Rey does not claim in his statement to have actually witnessed Salinas' murder or to possess any personal knowledge of who stabbed Salinas. Instead, like Gonzales, Rey merely claims to have engaged in a conversation after the fact during which Cervantes claimed to have stabbed Salinas himself. In addition, the "mitigating" aspects of Rey's statement to police also must be weighed in light of the absence therein of any admission by Rey that he participated in the sexual assault on Salinas. Rey's sexual assault on Salinas played a prominent role in Gonzales' trial testimony but petitioner does not allege, even at this date, Gonzales was inaccurate in his description of the sexual assault on Salinas.

Under these circumstances, there is no reasonable probability that, but for the failure of the prosecution to disclose to petitioner's trial counsel Rey's statement to police (stating Cervantes had confessed to stabbing Salinas), the outcome of the punishment phase of petitioner's capital murder trial would have been different. More simply, there is no reasonable probability the petitioner's jury would have answered any of the capital sentencing special issues differently had the prosecution made Rey's statement available to petitioner's trial counsel.

E.    Conclusions

Assuming that Rey's recently discovered statement of June 12, 1996 satisfies the other prongs of the *Brady* analysis, petitioner's claim fails because the contents of Rey's statement to police indicating Cervantes claimed to have stabbed Salinas were not "material" within the meaning of *Brady*. *See Banks v. Dretke*, 540 U.S. at 698-99, 124 S.Ct. at 1276 (holding evidence is "material" under *Brady* where there exists a "reasonable probability" that, had the evidence been disclosed, the result at trial would have been different).  Rey's statement does not negate Gonzales' trial testimony.  Viewed in the context of petitioner's trial, there is no reasonable probability the disclosure of Rey's statement to petitioner's trial counsel would have resulted in a different outcome at either phase of petitioner's capital murder trial. Petitioner's first claim herein does not warrant federal habeas relief.

## IV. Ineffective Assistance Claims

A.    The Claims

In the second, third, and sixth claims of his amended petition, petitioner argues his trial counsel rendered ineffective assistance by failing to (1) discover and employ Rey's statement of June 12, 1996 during petitioner's trial, (2) investigate, develop, and present mitigating evidence during the punishment phase of petitioner's capital murder trial, (3) meaningfully convey the plea

bargain offered to petitioner by the prosecution, and (4) object on hearsay grounds to the inculpatory statements made by petitioner recounted at trial by Juan Gonzales.[56]

B.    The Constitutional Standard

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, *i.e.*, establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000).  In so doing, a convicted defendant must carry

---

[56] Petitioner's Amended Petition, filed December 8, 2008, docket entry no. 76, at pp. 26-40, 48-52.

37

the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas court must re-weigh the evidence in aggravation against the totality of

available mitigating evidence. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522 U.S. 1067 (2001).

C.    Failure to Discover and Employ Rey's Statement

Petitioner argues his trial counsel should have investigated the case against petitioner more thoroughly, discovered Rey's statement of June 12, 1996, and employed same during both phases of petitioner's capital murder trial.

1.    Circumstances That Render State Process Ineffective

For the same reasons discussed at length in Section III.B. above, the refusal of the responsible state judicial officer to rule on petitioner's motion for appointment of counsel when petitioner sought legal assistance to fairly present his unexhausted second claim herein to the state habeas court excuses petitioner's failure to exhaust available state remedies on this aspect of petitioner's ineffective assistance claims herein.

2.    Standard of Review

For the reasons discussed in Section III.A. above, this Court must undertake a *de novo* review of petitioner's second claim herein, the ineffective assistance claim, which no state court has yet addressed on the merits or dismissed on procedural grounds.

3.    Synthesis

For the same reasons discussed at length in Section III.D. above, petitioner's complaints about his trial counsel's failure to discover and employ Seanido Rey's June 12, 1996 statement during petitioner's capital murder trial do not satisfy the prejudice prong of *Strickland* analysis.  There is no reasonable probability

40

that, but for the failure of petitioner's trial counsel to discover and employ Rey's statement during petitioner's trial, the outcome of either phase of petitioner's capital murder trial would have been different. Rey's hearsay-within-hearsay statement, even assuming it could have been admitted as a co-conspirator's statement made in the furtherance of a criminal conspiracy or under some other exception to the Hearsay Rule, would have furnished virtually no impeachment value vis-a-vis Gonzales' trial testimony.

Juan Gonzales made it clear throughout his trial testimony that he considered Santos Cervantes the person responsible for the death of Linda Salinas. Rey's hearsay-within-hearsay statement suggesting Cervantes admitted to having stabbed Salinas offers little in the way of truly exculpatory or mitigating evidence. The medical examiner testified without contradiction that Salinas was stabbed twice. Petitioner alleges no new facts, and Rey's statement contains none, that challenge the factual accuracy of Gonzales' trial testimony regarding either the conduct of, or comments made by, petitioner before, during, or after Salinas' murder.

4.    <u>Conclusions</u>

The contents of Seanido Rey's June 12, 1996 statement to police do not satisfy the prejudice prong of *Strickland* analysis. Petitioner's second claim herein does not, therefore, warrant federal habeas corpus relief.

41

D.   <u>Failure to Investigate, Develop, & Present Mitigating Evidence</u>

Petitioner argues that if his trial counsel had investigated petitioner's background more thoroughly, said counsel would have discovered "mitigating evidence" establishing (1) petitioner's mother was an emotionally unstable, physically abusive, alcoholic who abused alcohol throughout her pregnancy with petitioner, (2) petitioner weighed only four pounds at birth and required considerable hospital care during his first few weeks of life, (3) for the rest of his life, petitioner suffered the deleterious effects of Fetal Alcohol Syndrome, as well as his mother's physical and emotional abuse, (4) petitioner suffered numerous serious head injuries as a child for which he received little or no medical care due to the neglect of his mother and the absence of his father, (5) petitioner was exposed to alcohol and drug abuse from an early age and began abusing both alcohol and marijuana himself before he reached age twelve, (6) petitioner became involved in street gangs and street crime by age twelve, (7) petitioner experienced a lifetime of adversity, disadvantage, and disability, (8) petitioner attended school irregularly and performed poorly in school, and (9) petitioner suffers from impaired cognitive abilities.

1.   <u>State Court Disposition</u>

Petitioner first presented this claim to the state courts in his second state habeas corpus application, which the Texas Court

of Criminal Appeals dismissed on writ-abuse grounds. *Ex parte Carlos Trevino*, WR-48,153-02 (Tex. Crim. App. November 23, 2005).

### 2. Procedural Default on Dismissed Claims

Respondent argues petitioner procedurally defaulted on this multi-faceted claim by failing to present same to the state habeas court during petitioner's first state habeas corpus proceeding, which resulted in the dismissal of this claim when presented in petitioner's second state habeas corpus application.[57]

### a. Procedural Default Generally

Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1, 111 S.Ct. 2546, 2557 n.1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999). Procedural defaults only bar federal habeas review when the state procedural rule that forms the basis for the procedural default was "firmly established and regularly followed"

---

[57] Respondent's Answer, filed June 22, 2009, docket entry no. 82, at pp. 38-40.

by the time it was applied to preclude state judicial review of the merits of a federal constitutional claim. *Ford v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 857-58, 112 L.Ed.2d 935 (1991).

The Fifth Circuit has consistently held that federal habeas review is procedurally barred on claims dismissed by the Texas Court of Criminal Appeals under the Texas writ-abuse statute. *See, e.g., Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006)("Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review."), *cert. denied*, 549 U.S. 1343 (2007); *Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005)(holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling), *cert. denied*, 547 F.3d 1136 (2006); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004)(holding the violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied*, 543 U.S. 1124 (2005); *Busby v. Dretke*, 359 F.3d 708, 724 (5th Cir. 2004)("the Texas abuse of the writ doctrine is an adequate ground for considering a claim procedurally defaulted."), *cert. denied*, 541 U.S. 1087 (2004); *Cotton v. Cockrell*, 343 F.3d 746, 755 (5th Cir. 2003)(holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied*, 540 U.S. 1186 (2004).

b.  Exceptions Inapplicable

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750, 109 S.Ct. at 2565; *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine).

While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, petitioner cannot rely upon the allegedly deficient performance or even "ineffective" assistance of his first state habeas corpus counsel as a basis for excusing his failure to present this aspect of his ineffective assistance claims herein to the state courts during petitioner's first state habeas corpus proceeding. A negligent failure or a malicious refusal by

a convicted defendant's state habeas counsel to present a potentially meritorious claim in the course of the defendant's state habeas corpus proceeding effectively precludes federal habeas review of that claim, unless the defendant can satisfy the fundamental miscarriage of justice exception to the federal procedural default doctrine. *See Ruiz v. Dretke*, 2005 WL 2146119, *14 (W.D. Tex. August 29, 2005)(holding a state habeas counsel's inexplicable failure to assert glaringly obvious grounds for state habeas corpus relief constituted a procedural barrier to federal habeas review of those same unexhausted claims), *affirmed*, 460 F.3d 638 (5th Cir. 2006), *cert. denied*, 549 U.S. 1283 (2007). Infirmities in state habeas corpus proceedings, even those that arise exclusively from the gross incompetence of a petitioner's state habeas counsel, do not constitute grounds for federal habeas relief and are insufficient to excuse a federal habeas petitioner's procedural default on a federal constitutional claim. *Ruiz v. Dretke*, 460 F.3d 638, 644-45 (5th Cir. 2006), *cert. denied*, 549 U.S. 1283 (2007).

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335-36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a

petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346-48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements that render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S.Ct. at 2523. Petitioner has alleged no specific facts satisfying this "factual innocence" standard. Instead petitioner merely cites to a plethora of new, double-edged, mitigating evidence, which he argues was available at the time of petitioner's trial and which might have convinced his jury to answer the final capital sentencing special issue, *i.e.*, the mitigation special issue, in a manner favorable to petitioner.

Even with this additional, potentially mitigating evidence, petitioner would have remained "eligible" for the death penalty because none of this evidence had any potentially mitigating effect with regard to the first two capital sentencing special issues before petitioner's jury. In fact, evidence showing petitioner's virtually life-long criminal history, Fetal Alcohol Syndrome, long history of alcohol and narcotics abuse, as well as petitioner's abused and neglected childhood would likely have solidified the

47

jury's affirmative answer to the first capital sentencing special issue, *i.e.*, the future dangerousness special issue.

Moreover, some of petitioner's purportedly "new" mitigating evidence was cumulative of the evidence already before petitioner's capital sentencing jury. For instance, both Juan Gonzales and Juanita DeLeon testified during the punishment phase of petitioner's trial that petitioner came from a poor family and had been on his own for most of his life.

Finally, petitioner's "new" mitigating evidence does not satisfy the "factual innocence" standard the Supreme Court discussed in *Sawyer v. Whitley*, *supra*, because that evidence focuses almost exclusively on the "mitigation" or *Penry* special issue submitted to the jury at the punishment phase of petitioner's capital murder trial and not on petitioner's "eligibility" for the death sentence.

The Supreme Court explained in *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), that the Eighth Amendment addresses two different but related aspects of capital sentencing: the eligibility decision and the selection decision. *Tuilaepa*, 512 U.S. at 971, 114 S.Ct. at 2634. The Supreme Court's analysis of those two aspects of capital sentencing provides a comprehensive system for analyzing Eighth Amendment claims:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we

48

have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravated circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.   * * *

We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U.S. at 971-73, 114 S.Ct. at 2634-35 (citations omitted).

The Supreme Court clearly held in *Tuilaepa* that states may adopt capital sentencing procedures that rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa*, 512 U.S. at 974, 114 S.Ct. at 2636. The Supreme Court held further, at the *selection* stage, states are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record," and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638.

In *Loving v. United States*, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), the Supreme Court discussed the first part of the *Tuilaepa* analysis, *i.e.*, the eligibility decision, as follows:

> The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving*, 517 U.S. at 755, 116 S.Ct. at 1742 (citations omitted).

The Supreme Court subsequently reaffirmed the vitality of the *Tuilaepa* analysis and elaborated on the distinction between the narrowing function or *eligibility* decision and the *selection* phase of a capital sentencing proceeding in *Buchanan v. Angelone*, 522 U.S. 269, 275-77, 118 S.Ct. 757, 761-62, 139 L.Ed.2d 702 (1998).

Under Texas law, the *eligibility* decision discussed in *Tuilaepa*, *Loving,* and *Buchanan* occurs at the guilt-innocence phase of trial. *See Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993)(recognizing the Texas capital sentencing scheme makes the *eligibility* determination discussed in *Tuilaepa* at the guilt-innocence phase of trial). Thus, petitioner cannot satisfy the "factual innocence" exception to the procedural default doctrine solely by identifying additional mitigating

evidence that might have been relevant to the final Texas capital sentencing special issue, i.e., the mitigation special issue. *See Sawyer v. Whitley*, 505 U.S. at 347, 112 S.Ct. at 2523 (the "actual innocence" requirement focuses on those elements that render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error).

Petitioner's "new" mitigating evidence fails to establish by clear and convincing evidence that, but for his trial counsel's failure to more thoroughly investigate petitioner's background and to develop evidence showing petitioner suffered a childhood of neglect and abuse at the hands of his alcoholic mother, no reasonable juror would have found petitioner *eligible* for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346-48, 112 S.Ct. at 2523. Petitioner's "new" mitigating evidence is double-edged in nature. This "new" mitigating evidence tends to reinforce the aggravating aspects of petitioner's life history, which was already before petitioner's capital sentencing jury, including the evidence showing petitioner's early drug and alcohol abuse, trouble in school, early and lengthy participation in criminal conduct, and unwillingness to conform his behavior to societal norms.[58]

---

[58] Petitioner's juvenile probation officer testified to most of these same matters during the punishment phase of petitioner's capital murder trial. S.F. Trial, Volume XXIII, testimony of

Because petitioner has failed to satisfy the "actual innocence" test set forth in *Sawyer v. Whitley*, he is not entitled to relief from his procedural default under the fundamental miscarriage of justice exception to the procedural default doctrine.

3.  No Merits

Alternatively, this Court independently concludes petitioner's complaint about his trial counsel's failure to more thoroughly investigate petitioner's background and to develop the "new" mitigating evidence identified in petitioner's pleadings herein fails to satisfy the prejudice prong of the *Strickland* test.  In making this conclusion, this Court must re-weigh the totality of petitioner's proffered mitigating evidence, including petitioner's "new" mitigating evidence, against the evidence in aggravation. *Wiggins v. Smith*, 39 U.S. 510, 534, 123 S.Ct. 2527, 2542 (2003)("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.").

The evidence before the sentencing jury at petitioner's capital murder trial was summarized in Sections I.E. and III.D.2. above.  Petitioner's "new" mitigating evidence consists of double-edged evidence detailing petitioner's history of childhood abuse and neglect (both physical and emotional), alcohol and narcotics abuse, spotty attendance and poor performance in school, Fetal

Lorraine Reagan, at pp. 12-36.

Alcohol Syndrome, and ensuing tendency to exercise poor judgment. Despite the foregoing, however, petitioner also furnishes a number of affidavits that describe petitioner as a hard-working, non-violent, loving father.[59] This "new" mitigating evidence must also be weighed in the context of the other, uncontradicted, evidence now before this Court, which shows (1) petitioner's callous comments regarding Salinas before and after her murder (including petitioner's suggestion that Gonzales should participate in the sexual assault on Salinas and petitioner's failure to object when Rey and Cervantes suggested the need to eliminate witnesses), (2) petitioner's participation in the violent assault upon Salinas (*i.e.,* holding her down while others sexually assaulted her), (3) petitioner's subsequent directive to Gonzales not to talk to police about the incident, (4) petitioner's nonchalant demeanor immediately following the murder upon his return to the party at the Mata residence, (5) petitioner's many tattoos reflecting his membership in a notorious prison gang, and (6) the complete and total absence of any indication the petitioner has ever expressed sincere contrition or genuine remorse over Salinas' murder.

The latter point cannot be over-emphasized. Salinas' murder was particularly brutal and senseless. Yet petitioner has

---

[59] *See, e.g.,* Affidavits of Juanita Trevino DeLeon, Janet Cruz, Mario Cantu, and Ruben Gonzalez, attached as Exhibits 19, 25, 26, and 27, respectively, to Petitioner's Amended Petition, filed December 8, 2008, docket entry no. 76.

consistently refused to acknowledge his role in her murder, even to his own trial counsel, claiming instead to have been "too stoned" to remember exactly what happened that evening.[60]  Petitioner's own affidavit, executed June 11, 2004, contains not even a scintilla of sincere contrition; instead petitioner expresses hostility and blames his trial counsel for allegedly misrepresenting the terms of a proffered plea bargain for a life sentence without accepting any responsibility for his own rejection of the offer after it was accurately described to petitioner.[61]

Absent some indication the petitioner has willingly accepted responsibility for his role in Salinas' brutal rape and murder, the evidence showing petitioner's long history of alcohol and drug abuse, long history of criminal misconduct, and membership in violent street and prison gangs precludes this Court from finding this aspect of petitioner's ineffective assistance claims herein satisfies the prejudice prong of *Strickland*.  There is simply no reasonable probability that, but for the failure of petitioner's trial counsel to present petitioner's capital sentencing jury with the additional, double-edged, mitigating evidence now before this

---

[60] S.F. State Habeas Hearing, testimony of Mario Trevino at pp. 34-38.

[61] Petitioner's Affidavit, attached as Exhibit 16 (Exhibit Volume III) to Petitioner's Amended Petition, filed December 8, 2008, docket entry no. 76.

Court, the outcome of the punishment phase of petitioner's capital trial would have been different.

    4.   <u>Conclusion</u>

Petitioner procedurally defaulted on his complaints about his trial counsels' failure to adequately investigate petitioner's background and to develop and present available mitigating evidence by failing to present those same complaints to the state habeas court in the course of petitioner's first state habeas corpus proceeding.  None of the exceptions to the procedural default doctrine apply to this aspect of petitioner's ineffective assistance claims herein.  Alternatively, petitioner's complaints about his trial counsels' failure to adequately investigate petitioner's background and develop and present mitigating evidence fail to satisfy the prejudice prong of *Strickland*.

E.   <u>Failure to "Meaningfully" Convey Plea Bargain Offer</u>

Petitioner argues that if his trial counsel had somehow done a better job explaining the prosecution's plea offer, or employed a member of petitioner's family to convince petitioner to accept the life sentence offered by the prosecution, petitioner might have relented and chosen to accept the life sentence offered by the State.[62]

---

[62] More specifically, petitioner's affidavit states in pertinent part as follows:

       Before my trial started, my attorney Mr. Mario Trevino came to me with a plea bargain for a forty (40) year sentence.  He told me that I would have to testify

1.  <u>State Court Disposition</u>

Petitioner first presented this claim to the state courts in his second state habeas corpus application, which the Texas Court of Criminal Appeals dismissed on writ-abuse grounds. *Ex parte Carlos Trevino*, WR-48,153-02 (Tex. Crim. App. November 23, 2005).

2.  <u>Procedural Default</u>

For reasons similar to those discussed at length in Section IV.D.2. above, petitioner procedurally defaulted on this aspect of his ineffective assistance claims herein. Petitioner should have included this complaint in his initial state habeas corpus application. The factual and legal bases for these complaints were available to petitioner at the time he filed and litigated his first state habeas corpus proceeding. In fact, petitioner was

---

against the others that were also/been [sic] charged with the murder. I did not want to testify.

He later came back to me that [sic] I would not have to testify. He told me that I would still get a forty (40) year sentence.

When we went to the D.A.'s office to sign the paperwork, I saw that it was for a Life sentence, and that I wouldn't be able to see parole until forty (40) years. He told me a life sentence was 30 years.

I was mad with my attorney for not telling me the truth. He wanted to mess me over. I did not trust him. At that point I had only seen him twice.

If my attorney had explained to me the terms of a plea bargain, if he had brought one or more of my family members to explain the fact that being alive for sure was better than risking the chance to get the death penalty, if he had explained that taking the life plea meant that I would be around for my children, my wife and my family, I would have chosen life and would not have gone to trial.

*Id.*

personally aware of the factual basis for this complaint prior to the commencement of his capital murder trial. Petitioner cannot rely on the alleged incompetence of his first state habeas counsel to excuse his failure to present this complaint during his first state habeas corpus proceeding. *Ruiz v. Dretke*, 460 F.3d at 644-45.

Moreover, petitioner's complaint that he got angry with his trial counsel for allegedly misrepresenting the terms of the proffered plea bargain and, thereafter, irrationally refused to accept that offer does not satisfy the "fundamental miscarriage of justice" exception to the procedural default doctrine. Petitioner's own affidavit establishes that, when he arrived at the District Attorney's Office, petitioner was surprised to learn the plea bargain being offered him was for a life sentence with no possibility of parole for forty years.[63] Thus, even if petitioner's trial counsel had previously misrepresented the terms of the plea bargain offered to petitioner, petitioner admits he learned what those terms actually were when he arrived at the District Attorney's Office *before petitioner rejected same*. Simply put, petitioner knew exactly what he would get if he accepted the plea bargain offered, *i.e.*, a life sentence without the possibility of parole for forty years, and the risk he might receive a sentence of death if he proceeded to trial. Petitioner has presented this Court with no specific factual allegations, much less any evidence,

---

[63] *Id.*

establishing petitioner was *non compos mentis* or otherwise mentally incompetent on the date petitioner went to the Office of the Bexar County District Attorney and rejected the plea bargain offered to him.   Under such circumstances, it was petitioner's rejection of the plea bargain, rather than any previous mis-characterization of the plea bargain offered by petitioner's trial counsel, that led petitioner to a capital murder trial that resulted in his death sentence.

      3.   <u>No Merit</u>

     Alternatively, this Court independently concludes this aspect of petitioner's ineffective assistance claims herein fails to satisfy either prong of *Strickland*.   Even assuming petitioner's trial counsel erroneously described to petitioner the details of the plea bargain offered by the prosecution, petitioner admits he was accurately informed of the details of the plea bargain offered to him when petitioner arrived at the District Attorney's Office *before petitioner rejected same*.[64]   Thus, petitioner's refusal to accept the plea bargain offered to him cannot be attributed to any deficiency in the performance of petitioner's trial counsel. Furthermore, there was no duty imposed on petitioner's trial counsel to convince or persuade petitioner to accept the favorable terms of the plea bargain petitioner's trial negotiated for petitioner once petitioner was accurately advised of the details of

---

[64] *Id.*

the plea bargain offered by the prosecution. Petitioner's assertion that he did not fully comprehend the consequences of rejecting the life sentence offered by the prosecution in its plea bargain proposal when he chose to reject that offer is incredible. The difference between receiving a life sentence with no chance of parole for at least forty years and receiving a sentence of death is self-evident. The decision to accept or reject the plea bargain in question belonged exclusively to petitioner. He admits he was accurately informed of the details of the plea bargain offer before he rejected same. Petitioner alleges no specific facts showing he was mentally incompetent on the date he rejected the prosecution's offer of a life sentence. Under such circumstances, petitioner's trial counsel was not obligated to "explain" the difference between a life sentence and a sentence of death to petitioner.[65]

### 4. Conclusion

Petitioner procedurally defaulted his complaint about his trial counsel's alleged failure to accurately communicate the plea bargain offered by the prosecution when petitioner failed to raise that same complaint in his original state habeas corpus proceeding.

---

[65] In his own affidavit, petitioner's former trial counsel, attorney Mario Trevino, states his impression that petitioner's change in attitude toward the plea bargained life sentence may have resulted from petitioner receiving directives from petitioner's prison gang (HPL) not to accept the plea bargain. See Affidavit of Mario Trevino, attached as Exhibit 15 (Exhibits - Volume III) to Petitioner's Amended Petition, filed December 8, 2008, docket entry no. 76.

Moreover, petitioner's complaint fails to satisfy either prong of *Strickland* because petitioner admits he was accurately informed of the details of the plea bargain offered to him prior to the time petitioner rejected same.

F.   Failure to Object to Gonzales' "Damaging" Testimony

Petitioner argues his trial counsel should have objected on hearsay grounds to the testimony of Juan Gonzales recounting (1) Cervantes' and Rey's conversation with petitioner at the crime scene regarding their mutual desire not to leave behind any witnesses and (2) inflammatory statements made by petitioner to Santos Cervantes during the group's drive back to the Mata residence following Salinas' murder.

1.   State Court Disposition

Petitioner's trial counsel attempted to exclude a portion of the foregoing testimony consisting of petitioner's own oral statements through a pretrial motion[66] but the state trial court ruled against petitioner.[67]

On direct appeal, petitioner raised points of error challenging the admission of portions of this same testimony relating to petitioner's and Cervantes' statements as his third,

---

[66] On May 15, 1997, petitioner filed a motion to exclude any statements made by the defendant. Trial Transcript, Volume I, at pp. 104-09.

[67] Order of May 22, 1997, found at Trial Transcript, Volume I, at p. 108; S.F. State Habeas Hearing, testimony of Mario Trevino, at pp. 13-14.

fourth, and fifth points in appellant's brief. The Texas Court of Criminal Appeals ruled petitioner's and Cervantes' statements in question were not hearsay but, rather, were admissible under applicable state law as admissions of a party-opponent and as adopted admissions. *Trevino v. State*, 991 S.W.2d at 852-53.

Petitioner presented these same ineffective assistance arguments to the state habeas court, albeit in somewhat more obtuse form than herein, as his thirty-fifth through forty-second claims for relief in his original state habeas corpus application.[68] The state habeas trial court concluded all of the testimony of Gonzales about which petitioner complained was admissible and, therefore, there was nothing professionally deficient, nor prejudicial within the meaning of *Strickland*, in the failure of petitioner's trial counsel to object to same.[69] The Texas Court of Criminal Appeals expressly adopted these conclusions when it rejected petitioner's first state habeas corpus application on the merits. *Ex parte Carlos Trevino*, WR-48,153-01 (Tex. Crim. App. April 4, 2001).

2. <u>Synthesis</u>

Because the state habeas court rejected this portion of petitioner's ineffective assistance claims herein on the merits, this Court's federal habeas review of same is limited by the AEDPA.

---

[68] State Habeas Transcript in WR-48,153-01, Volume I, at pp. 76-83.

[69] State Habeas Transcript in WR-48,153-01, Volume II, at pp. 92-93.

Furthermore, the Texas Court of Criminal Appeals' construction of applicable state law during petitioner's first state habeas corpus proceeding (including the state habeas court's conclusion that Gonzales' trial testimony was admissible) binds this Court's federal habeas review of same. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005)("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004)("In our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law.").

The state habeas court concluded, as a matter of state evidentiary law, Gonzales' testimony was admissible. This conclusion binds this Court. *Bradshaw v. Richey*, 546 U.S. at 76, 126 S.Ct. at 604. The failure of petitioner's trial counsel to raise meritless hearsay objections to Gonzales' testimony did not cause the performance of said counsel to fall below an objective level of reasonableness. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002)(holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926 (2003); *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir. 1998)(nothing deficient regarding trial counsel's failure to seek

admission of a document the state court concluded was inadmissible), *cert. denied*, 526 U.S. 1100 (1999); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997)(failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied*, 525 U.S. 969 (1998).

Likewise, petitioner was not "prejudiced" within the meaning of *Strickland* by his trial counsel's failure to make a meritless hearsay objection to Gonzales' testimony. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999)(holding a complaint about counsel's failure to raise a meritless objection fails to satisfy the prejudice prong of *Strickland* because the failure to make a meritless objection has no impact on the outcome of the proceeding).

3. Conclusion

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's complaints about the failure of his trial counsel to object on hearsay grounds to Juan Gonzales' testimony at both phases of petitioner's capital murder trial was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. Petitioner's sixth claim herein does not warrant federal habeas relief under the AEDPA.

## V. Quasi-*Atkins* Claim

### A.   The Claim

In his fourth claim herein, petitioner argues he suffers from developmental disabilities and  permanent cognitive disabilities resulting from fetal Alcohol Syndrome Disorder sufficiently analogous to mental retardation so as to render him constitutionally ineligible for the death penalty under the legal principles discussed in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)(holding the Eighth Amendment precludes the execution of mentally retarded capital murderers).[70]

### B.   State Court Disposition

Petitioner presented his claim seeking an expansion of the holding in *Atkins* beyond mentally retarded capital murderers to any capital murderer who suffers from Fetal Alcohol Syndrome to the state courts for the first time in his second state habeas corpus application.   The Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application as an abuse of the writ. *Ex parte Carlos Trevino*, WR-48-153-02 (Tex. Crim. App. November 23, 2005).

### C.   Procedural Default

Respondent correctly points out the dismissal of this claim on state procedural grounds in the course of petitioner's second state habeas corpus proceeding constitutes a barrier to federal habeas

---

[70] Petitioner's Amended Petition, at pp. 40-44.

review of same. *Coleman v. Thompson*, 501 U.S. at 735 n.1, 111 S.Ct. at 2557 n.1. Petitioner's failure to comply with the Texas writ-abuse statute constitutes an independent and adequate ground for dismissal of a claim for federal habeas relief. Federal habeas review is procedurally barred on claims dismissed by the Texas Court of Criminal Appeals under the Texas writ-abuse statute. *See Coleman v. Quarterman*, 456 F.3d at 542 ("Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review."); *Aguilar v. Dretke*, 428 F.3d at 533 (holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling). Petitioner has not alleged sufficient specific facts to satisfy either the "cause and actual prejudice" or "fundamental miscarriage of justice" exceptions to the procedural default doctrine.

D.   *Teague* Foreclosure

    1.   In General

Moreover, respondent also correctly points out adoption of the new rule advocated by petitioner herein, i.e., expansion of the holding in *Atkins* to include capital murderers who suffer from Fetal Alcohol Syndrome, is barred by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989)(foreclosing adoption of a new constitutional rule in a federal habeas corpus proceeding or other collateral review). Under the holding in *Teague*, federal courts are generally

barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one that was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997)(holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to

the non-retroactivity principle. *Caspari v. Bohlen*, 510 U.S. at 390, 114 S.Ct. at 953.

*Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks*, 536 U.S. 266, 268-72, 122 S.Ct. 2147, 2148-51, 153 L.Ed.2d 301 (2002)(applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir.)(recognizing the continued vitality of the *Teague* non-retroactivity doctrine under the AEDPA), *cert. denied*, 539 U.S. 979 (2003).

### 2.  Finality of Petitioner's Conviction & Sentence

A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen*, 510 U.S. at 390, 114 S.Ct. at 953.  Petitioner's conviction became final for *Teague* purposes not later than August 11, 1999, i.e., the ninety-first day after the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence on direct appeal and the date the deadline for the filing of petitioner's petition for writ of certiorari with the United States Supreme Court expired. *Beard v. Banks*, 542 U.S. 406, 411-12, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004)(recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed

petition for certiorari has been denied); *Caspari v. Bohlen*, 510 U.S. at 390, 114 S.Ct. at 953 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."); 21 U.S.C. §2101(d)(the deadline for filing a certiorari petition from a state criminal conviction shall be established by Supreme Court rule); Sup. Ct. Rule 13.1 (setting the deadline for the filing of a certiorari petition at 90 days from the date of the state court judgment for which review is sought).

3. <u>Surveying the Legal Landscape as of that Date</u>

As of the date petitioner's conviction and sentence became final for *Teague* purposes, no federal court had ever held a convicted capital murderer was constitutionally exempt from the death penalty because he or she suffered from the deleterious effects of Fetal Alcohol Syndrome. Nor had any federal court held Fetal Alcohol Syndrome to be the legal equivalent of "mental retardation," as that term was defined in *Atkins*. Thus, the rule advocated by petitioner constitutes a "new rule" within the meaning of *Teague.*

4.  <u>Exceptions Inapplicable</u>

    a.  <u>The Recognized Exceptions</u>

The remaining question for this Court is whether the new rule advocated by petitioner falls within either of the two recognized exceptions to the *Teague* barrier.  The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, *i.e.*, a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157, 117 S.Ct. at 1973.

    b.  <u>Nothing Implicit in the Concept of Ordered Liberty</u>

The new rule advocated by petitioner herein does not fall within the parameters of the second exception to the *Teague* non-retroactivity.  Petitioner's fetal alcohol syndrome did not implicate the fundamental fairness of petitioner's capital murder trial.  Moreover, petitioner's own expert reports the extent of petitioner's "fetal alcohol syndrome" (FAS) or fetal alcohol effect (FAE) do not indicate the presence of mental retardation or appear to have significantly interfered with petitioner's ability to either (1) know right from wrong, (2) appreciate the nature and

quality of his actions at the time of his capital offense, or (3) refrain from any activities that resulted in his capital murder conviction.[71]

### c. A New Categorical Rule Unwarranted

The new rule advocated by petitioner herein, *i.e.*, a categorical exclusion of the death penalty for offenders who suffer from fetal alcohol syndrome, would fall within the category of rules recognized in the first exception to the *Teague* foreclosure doctrine. However, extending the holding in *Atkins* to persons such as petitioner who suffer from fetal alcohol syndrome does not appear to be warranted by the same considerations that led to the adoption of the rule in *Atkins*.

In its landmark opinion in *Atkins v. Virginia*, the United States Supreme Court listed several reasons why it believed carving out a categorical exception from execution for mentally retarded capital murderers was warranted: (1) there appeared to be a developing consensus among the state legislatures that executing mentally retarded murderers was inappropriate; (2) there was serious question as to whether the justifications for capital punishment - retribution and deterrence of capital crimes by prospective offenders - possessed any efficacy vis-a-vis the mentally retarded who, by virtue of their mental impairment,

---

[71] Report of Dr. Rebecca A. Dryer, attached as Exhibit 24 (Exhibits Volume V) to Petitioner's Amended Petition, filed December 8, 2008, docket entry no. 76, at p. 17 of 18.

possessed diminished capacities to understand and process information, communicate, abstract from mistakes and learn from experience, engage in logical reasoning, control their impulses, and understand the reactions of others; and (3) the reduced capacity of mentally retarded offenders necessarily meant such offenders faced an increased risk the death penalty would be imposed in spite of factors that may have called for a less severe penalty, *i.e.*, the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation owing to their diminished ability to meaningfully assist defense counsel and testify effectively on their own behalf and their unexpressive demeanor, which might create an unwarranted impression of lack of remorse. *Atkins v. Virginia*, 536 U.S. at 311-21, 122 S.Ct. at 2246-52.

Petitioner has presented this Court with no fact-specific allegations, much less any evidence, showing either (1) there is a developing national consensus among legislative bodies rejecting the efficacy of execution for capital murderers who suffer from fetal alcohol syndrome; (2) offenders who suffer from fetal alcohol syndrome, as a group, necessarily possess diminished capacities to understand and process information, communicate, abstract from mistakes and learn from experience, engage in logical reasoning, control their impulses, and understand the reactions of others; or (3) offenders who suffer from fetal alcohol syndrome necessarily

face the same or similar increased risk the death penalty will be imposed in spite of factors that may have called for a less severe penalty as do mentally retarded offenders. In short, petitioner has not presented this Court with any evidence establishing an individual suffering from fetal alcohol syndrome or fetal alcohol effects necessarily suffers the same type of debilitating and mitigating effects as an individual who suffers from mental retardation. While fetal alcohol syndrome is often associated with mental retardation, there is no evidence before this Court establishing an equivalency between fetal alcohol syndrome and mental retardation in terms of the inability of an individual suffering from fetal alcohol syndrome to recognize the "wrongness" of his or her own conduct, learn from his or her mistakes, or conform his or her conduct to societal norms. Thus, these is no evidentiary basis now before this Court justifying the adoption of an *Atkins*-like categorical ban on the execution of capital murderers who suffer from fetal alcohol syndrome.

E.    Conclusion

Petitioner procedurally defaulted on his argument that the holding in *Atkins* should be extended to include offenders who suffer from fetal alcohol syndrome. Moreover, the Supreme Court's holding in *Teague v. Lane* precludes this Court from adopting the new rule advocated by petitioner in the context of this federal

habeas corpus proceeding.  Accordingly, petitioner's fourth claim herein does not warrant federal habeas corpus relief.

## VI. <u>Failure to Hold Hearing on Motion for New Trial</u>

A.    <u>The Claim</u>

In his fifth claim herein, petitioner complains the state trial court failed to hold an evidentiary hearing in conjunction with its denial of petitioner's motion for new trial, which was based on arguments that (1) petitioner was prevented from properly conducting voir dire due to the trial court's refusal to permit petitioner's trial counsel to re-question eleven members of the jury venire panel about their views on scientific evidence and (2) the state trial court erred in denying petitioner's motion for continuance.[72] Petitioner attempts to couch these complaints in the form of a constructive ineffective assistance claim.

B.    <u>State Court Disposition</u>

To fully understand petitioner's fifth claim herein, it is necessary to return to the voir dire phase of petitioner's trial.

On June 17, 1997, after more than two weeks of individual voir dire, the prosecution advised petitioner's trial counsel for the first time that it had DNA blood typing that matched petitioner's

---

[72] Petitioner's Amended Petition, at pp. 45-48.
Petitioner's motion for new trial, filed in petitioner's state trial court on July 25, 1997, appears at Supplemental Trial Transcript, at pp. 4-9.

blood to an item of evidence (Salinas' panties) found at the crime scene.[73]

The following day, on June 18, 1997, petitioner's trial counsel advised the state trial court of this fact and requested the trial court appoint an expert to assist petitioner's defense team in its trial preparations, which request the trial court granted.[74] After a brief return to individual voir dire, petitioner's trial counsel explained to the state trial court that they had relied during their previous individual voir dire on numerous representations by the prosecution that no DNA testing existed that linked the petitioner to any physical evidence and, therefore, they had failed to question the venire members about their views on scientific evidence.[75] Petitioner's trial counsel then moved for a mistrial based on their inability to voir dire the jury venire members who had already undergone voir dire examination on their views of scientific evidence.[76] The state trial court denied defense counsel's motion for mistrial.[77] Petitioner's trial counsel then advised the trial court they had secured the services of an independent DNA-testing facility to check the findings of the

---

[73] S.F. Trial, Volume XV, at p. 3.

[74] *Id.*, at pp. 3-4.

[75] *Id.*, at pp. 33-34.

[76] *Id.*, at p. 35.

[77] *Id.*

prosecution's DNA expert and the trial court indicated its satisfaction with the funding request and time-frame for re-testing suggested by petitioner's trial counsel.[78]

Also on June 18, 1997, petitioner's trial counsel filed formal motions for continuance and for appointment of a DNA-expert to assist the defense team.[79] The state trial court denied petitioner's motion for continuance but granted petitioner's motion requesting appointment of a DNA-expert to assist the defense team.[80]

The following day, June 19, 1997, the guilt-innocence phase of petitioner's capital murder trial commenced.

On July 25, 1997, a little more than three weeks after the conclusion of petitioner's capital murder trial, petitioner's trial counsel filed a motion for new trial, which provided, in pertinent part, as follows:

> A. Defendant was denied effective assistance of counsel during voir dire. The right to be represented by counsel includes counsel's right to question the members of the jury panel to intelligently exercise peremptory challenges. Defendant's trial counsel was denied the opportunity to question and discover jurors' views on an issue applicable to the case, to wit: scientific evidence/DNA. During pre-trial hearing Defendant's trial counsel was [sic] informed by the State that no DNA evidence connecting this defendant to the crime had been found and that there was no DNA evidence to be used in Defendant's trial. After 11 jurors had been accepted by defendant to hear this case, the State informed

---

[78] *Id.*, at pp. 35-40.

[79] Trial Transcript, Volume II, at pp. 133-42.

[80] Trial Transcript, Volume II, at pp. 136 & 140-41.

Defendant's counsel that DNA blood testing conducted on
the victim's panties did in fact connect this defendant
to the crime.
B.    The Court erred in denying defendant's Motion for
Continuance.  After the jury had been selected but prior
to the jury being sworn, defendant's trial counsel moved
for a continuance based on the facts related above.
Consequently, defendant was denied effective assistance
of counsel because he was forced to proceed to trial
without adequate preparation to cross[-]examine the
state's expert witness [on] his DNA testing procedure and
the results of his DNA testing.[81]

The state trial court held no hearing on petitioner's motion

for new trial.  It was subsequently denied as a matter of law.

On direct appeal, petitioner's first point of error argued the

state trial court's denial of petitioner's motion for mistrial had

improperly denied petitioner the opportunity to inquire during voir

dire regarding the venire members' views regarding scientific

evidence, including DNA blood evidence.[82]  In its opinion affirming

petitioner's conviction and sentence, the Texas Court of Criminal

Appeals rejected this argument on the merits, finding as follows:

The State asserts that before jury selection, it had
informed appellant that though they had not discovered
any incriminating DNA evidence, DNA testing was being
conducted and that results had at that point not been
prejudicial.   But according to the State, it also
informed appellant that it was conducting further testing
on an article of the victim's clothing.  That appellant
had this information is confirmed by his own arguments
when he moved for mistrial.

*Trevino v. State*. 991 S.W.2d at 851.

---

[81] Supplemental Trial Transcript, at pp. 4-5.

[82] Appellant's Brief, at pp. 2-10.

The Texas Court of Criminal Appeals found and concluded further:

> In presenting his claim to the trial court, appellant's counsel admitted that the State had informed him before jury selection of its continuing DNA tests on the victim's clothing. Counsel admitted that since none of the DNA testing had been incriminating, he decided to "let it go." Counsel's decision not to query the venire regarding DNA evidence was a strategic decision and the product of neither prosecutorial misconduct nor trial court error. Under these facts, we cannot hold that the trial court abused its discretion in denying appellant's motion. Appellant's first point of error is overruled.

*Trevino v. State*. 991 S.W.2d at 851 (*citation omitted*).

In his thirty-second claim for relief in his original state habeas corpus application, petitioner argued his trial counsel rendered ineffective assistance by (1) failing to adequately prepare a defense to the DNA evidence and (2) agreeing to the appointment of a defense DNA-expert while trial was underway.[83] Petitioner argued further that "prejudice" within the meaning of *Strickland* had to be presumed because his trial counsel had "admitted" in petitioner's motion for new trial to having rendered ineffective assistance, thereby creating "an inherent conflict," and the state trial court thereafter failed to appoint substitute counsel to represent petitioner *sua sponte*.[84]

Petitioner's co-counsel at trial, attorney Mario Trevino, testified during petitioner's state habeas corpus proceeding, in pertinent part, that (1) he argued ineffective assistance of

---

[83] State Habeas Transcript, Volume I, at pp. 65-68.

[84] *Id.*, at pp. 67-68.

counsel in petitioner's motion for new trial because he believed he had been improperly prevented from examining the jury venire during voir dire regarding their views on DNA evidence, (2) the initial DNA test results were beneficial to petitioner, (3) the DNA tests results on the victim's clothing that came back on the eve of trial did link petitioner to the crime, (4) he put all the justifications for a mistrial into the record when he made that motion, (5) he was aware of no evidence relating to his motion for mistrial that could have been presented to further bolster that motion, (6) when he was advised by the prosecution at the start of voir dire that additional DNA testing was being done on some "spots" found on the victim's clothing, he discussed with petitioner the possibility of moving for a continuance but petitioner insisted there was no possibility any of the new test results would link him to the offense, (7) based on petitioner's representations, defense counsel chose to proceed with voir dire rather than move for a continuance at that point, (8) he was aware of no evidence suggesting any of the prosecution's DNA evidence introduced during petitioner's trial was inaccurate, (9) he only filed a motion for new trial urging ineffective assistance to "preserve error" on such a claim in case he had made a mistake, and (10) in hindsight, his only mistake was in relying upon petitioner's assurances there was "no way"

petitioner's DNA was going to be found on the victim's clothing.[85] Petitioner presented the state habeas court with no evidence establishing there was anything inaccurate in the prosecution's trial testimony regarding the DNA test results obtained from Salinas' panties, *i.e.*, the testimony showing neither Salinas nor petitioner could be eliminated as a possible source of the mixed blood sample found on Salinas' panties.

The state habeas trial court construed petitioner's thirty-second claim as a complaint that petitioner's trial counsel had been ineffective for failing to adequately prepare to cross-examine the prosecution's DNA expert and concluded (1) petitioner's trial counsel obtained the assistance of a DNA expert, (2) petitioner's trial counsel were unaware of any evidence showing the prosecution's DNA expert's conclusions were incorrect, (3) the DNA test results obtained by the prosecution's expert were not inconsistent with the account of the victim's murder petitioner related to his trial counsel, (4) there was no evidence suggesting there was anything inaccurate in the prosecution's DNA expert's trial testimony, and (5) therefore, petitioner had failed to satisfy either prong of the *Strickland* test.[86]  The Texas Court of Criminal Appeals adopted these findings and conclusions when it

---

[85] S.F. State Habeas Hearing, testimony of Mario Trevino, at pp. 6-8, 46-51, 54-55.

[86] State Habeas Transcript, Volume II, at p. 91.

rejected petitioner's first state habeas corpus application. *Ex parte Carlos Trevino*, WR-48,153-01 (Tex. Crim. App. April 4, 2001).

C.    Synthesis

The state habeas court reasonably concluded petitioner's complaints about his trial counsel's performance in connection with the prosecution's DNA evidence failed to satisfy either prong of *Strickland*.

    1.    No Deficient Performance

In determining to proceed with voir dire while the prosecution was still analyzing DNA samples from Salinas' clothing, petitioner's trial counsel reasonably relied upon petitioner's assurances his DNA would not be found on any of her clothing. This reliance was reasonable in light of the fact none of the prosecution's earlier DNA tests had found any incriminating evidence. As soon as petitioner's trial counsel were made aware of the incriminating evidence linking petitioner's blood to Salinas' panties, said counsel immediately moved for mistrial, a continuance, and appointment of their own DNA expert. Petitioner does not allege any facts showing it was unreasonable for said counsel to wait until that date to make any of those motions. The state appellate court reasonably found the failure of petitioner's trial counsel to voir dire petitioner's jury venire on their views of DNA evidence was a strategic decision based on the absence, to that date, of any DNA evidence in the record linking the petitioner

to the crime. Petitioner's trial counsel timely filed a motion for new trial once more complaining about their inability to voir dire the jury venire regarding DNA evidence but there is no evidence showing that strategic decision was objectively unreasonable. In so doing, petitioner's trial counsel properly preserved for state appellate review petitioner's complaint about the denial of his motion for mistrial.

Moreover, petitioner's trial counsel cross-examined the prosecution's DNA expert extensively, obtaining concessions that the mixed blood stain in question could have come from more than two sources and it was unclear when that stain was deposited on Salinas' panties.[87] Petitioner does not identify any further questions his trial counsel should have directed to the prosecution's DNA expert.

Petitioner alleged no facts before the state habeas court, much less furnished that court with any evidence, showing either petitioner's trial counsel (1) knew or had reason to suspect at the start of voir dire that any incriminating DNA evidence would appear, (2) had any reasonable basis for requesting the assistance of a DNA expert prior to their being notified of the possible presence of the petitioner's blood on Salinas' panties, (3) were ever aware of any facts or evidence showing there was anything

---

[87] S.F. Trial, Volume XXII, testimony of Lonnie Ginsberg, at pp. 4-46.

erroneous or inaccurate about the prosecution's DNA expert's testimony that Salinas and the petitioner could not be excluded as possible sources of the mixed blood stain found on Salinas' panties, or (4) failed to ask any pertinent or relevant questions of the prosecution's DNA expert on cross-examination of that witness. Under such circumstances, there was nothing objectively unreasonable with the determination by the state habeas court that petitioner's complaints about his trial court's conduct vis-a-vis the prosecution's DNA evidence failed to satisfy the first prong of *Strickland*.

    2.  <u>No Prejudice</u>

Moreover, because petitioner failed to present the state habeas court with evidence showing there was anything erroneous or inaccurate about the prosecution's DNA evidence inferentially linking petitioner's blood to Salinas' panties, the state habeas court reasonably concluded petitioner also failed to satisfy the prejudice prong of *Strickland*.

Petitioner has failed to allege any facts before the state habeas court, much less furnish that court with any evidence, showing how he was "prejudiced" within the meaning of *Strickland* by his trial counsels' failure to voir dire the jury venire on their views of DNA evidence. Petitioner's presence at the crime scene, established through the uncontradicted testimony of petitioner's own cousin, was hardly a subject of rational debate throughout

petitioner's trial. Gonzales' testimony that he saw both Cervantes and the petitioner with blood on them following Salinas' murder is consistent with the prosecution's DNA test results, as it affords a rational explanation for how a mixture of possibly Salinas' and the petitioner's blood might have been found on Salinas' panties, which were found some distance from her body, even if one assumes the petitioner did not personally sexually assault Salinas. Gonzales testified Salinas' underwear had been removed by a person or persons unknown before he and the petitioner ever arrived on the scene to witness her sexual assault by Cervantes.[88] Gonzales denied that the petitioner ever removed any of Salinas' clothing.[89] In sum, the DNA test results at petitioner's trial were not critical to the outcome of petitioner's trial; rather, they represented little more than corroborative evidence regarding Gonzales' otherwise uncontradicted, unchallenged, testimony placing the petitioner at the scene where Salinas was sexually assaulted and murdered.

Moreover, petitioner alleges no facts showing there were any questions his trial counsel could have asked the prosecution's DNA expert that would have undermined his credibility, or otherwise impeached his conclusions.

---

[88] S.F. Trial, Volume XIX, testimony of Juan Gonzales, at p. 27.

[89] *Id.*, at p. 28.

Even at this late date, petitioner has alleged no facts, much less furnished this Court with any evidence, showing the prosecution's DNA expert testified falsely or in any manner inaccurately in describing the DNA test results on the mixed blood sample found on Salinas' panties. Thus, even assuming petitioner's trial counsel should have disregarded petitioner's assurances and requested the assistance of a DNA expert much earlier than said counsel did so or asked additional questions of the prosecution's DNA expert on cross-examination, petitioner has alleged no facts, and furnished no evidence, showing a reasonable probability that, but for either of those failures, the outcome of either phase of petitioner's capital murder trial would have bene different.

3. <u>No Presumption of Prejudice in re Motion for New Trial</u>

Petitioner attempts to circumvent the dearth of facts or evidence showing he was "prejudiced" within the meaning of *Strickland* or entitled to a presumption of prejudice because his trial counsel filed a motion for new trial in which said counsel confessed his own ineffectiveness and the state trial court allowed that motion to be denied as a matter of law by the passage of time without appointing a new counsel to represent petitioner at an evidentiary hearing.[90]  These arguments are without merit for at least three reasons.

---

[90] Petitioner Amended Petition, at pp. 47-48.

### a. *Strickland's* First Prong is *Objective*

First, as explained above, the *Strickland* test's first prong focuses on the *objective* reasonableness of counsel's conduct, not on said counsel's *ex post facto*, subjective beliefs about the efficacy of his or her own conduct. A convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. at 521, 123 S.Ct. at 2535; *Williams v. Taylor*, 529 U.S. at 390-91, 120 S.Ct. at 1511. In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).

Given the circumstances as described by petitioner's trial counsel during his uncontradicted testimony at petitioner's state habeas corpus hearing, there was nothing *objectively unreasonable* about the failure of petitioner's trial counsel to either (1) voir

dire the jury venire regarding their views on the efficacy of DNA evidence, (2) make a request for the appointment of a DNA expert to assist the defense team earlier than counsel did, (3) move for a continuance earlier than counsel did, or (4) further cross-examine the prosecution's DNA expert. Until June 17, 1997, petitioner's trial counsel had no rational basis to believe there would be any incriminating DNA evidence presented at petitioner's trial. Under such circumstances, there was nothing *objectively* unreasonable with the decision by petitioner's trial counsel to forego voir dire questions inquiring into the potential jurors' views of DNA evidence. Petitioner's trial counsel cannot be faulted for failing to foresee prior to the commencement of voir dire that petitioner's blood would be found in a mixed sample on Salinas' panties. *See Sharp v. Johnson*, 107 F.3d 282, 290 n.28 (5th Cir. 1997)("clairvoyance is not a required attribute of effective representation"); *Garland v. Maggio*, 717 F.2d 199, 207 (5th Cir. 1983)(same).

b. <u>No Presumption of Prejudice Applicable</u>

Second, there is no clearly established federal law mandating a presumption of prejudice in circumstances such as petitioner's case. The Supreme Court has recognized a "presumption of prejudice" or waived the satisfying the prejudice prong of *Strickland* in only two narrow categories of cases, neither of which applies to petitioner's case.

## (1) *Cuyler v. Sullivan* Inapplicable

The Sixth Amendment right to counsel includes the right to representation that is free from any conflict of interest. *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006); *United States v. Vasquez*, 298 F.3d 354, 360 (5th Cir. 2002), *cert. denied*, 537 U.S. 1024 (2002); *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993), *cert. denied*, 510 U.S. 1016 (1993). A conflict of interest exists when defense counsel places himself in a position conducive to divided loyalties. *United States v. Vasquez*, 298 F.3d at 360; *United States v. Vaquero*, 997 F.2d at 89.

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *United States v. Infante*, 404 F.3d 376, 390-91 (5th Cir. 2005); *Ramirez v. Dretke*, 396 F.3d 646, 649 (5th Cir. 2005); *United States v. Salado*, 339 F.3d 285, 291 (5th Cir. 2003). The *Cuyler* standard differs substantially from the *Strickland* test in that *Cuyler* requires no showing of "prejudice." *See Strickland v. Washington*, 466 U.S. at 692, 104 S.Ct. at 2067 (recognizing prejudice is presumed under the *Cuyler* test only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."); *United*

*States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002)("When a defendant has been able to show that his counsel 'actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance,' constitutional error has occurred and prejudice is inherent in the conflict."); *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000)(discussing the distinction between the *Cuyler* and *Strickland* tests).

Under the *Cuyler* test, an "actual conflict" exists when defense counsel is compelled to compromise his duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client. *Perillo v. Johnson*, 205 F.3d at 781. A defendant must show more than a speculative or potential conflict. *United States v. Garcia-Jasso*, 472 F.3d at 243; *United States v. Infante*, 404 U.S. at 391. The defendant must demonstrate that his counsel made a choice between possible alternative courses of action; if he did not make such a choice, the conflict remained hypothetical. *United States v. Garcia-Jasso*, 472 F.3d at 243. The mere possibility of a conflict, absent a showing that the attorney actively represented conflicting interests, is not sufficient. *Cuyler v. Sullivan*, 446 U.S. at 350, 100 S.Ct. at 1719 ("But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective

assistance."); *United States v. Villarreal*, 324 F.3d 319, 327 (5th Cir. 2003).

"An adverse effect on counsel's performance may be shown with evidence that counsel's judgment was actually fettered by concern over the effect of certain trial decisions on other clients." *United States v. Infante*, 404 F.3d at 393; *Perillo v. Johnson*, 205 F.3d at 807. The defendant must establish adverse effect by demonstrating there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict. *United States v. Infante*, 404 F.3d at 393; *Perillo v. Johnson*, 205 F.3d at 781; *Beathard v. Johnson*, 177 F.3d 340, 345 (5th Cir. 1999), *cert. denied*, 528 U.S. 954 (1999). "A conflict of interest is present 'whenever one defendant stands to *gain significantly* by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also representing.'" *Ramirez v. Dretke*, 396 F.3d at 650. "An actual conflict of interest exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing." *United States v. Salado*, 339 F.3d at 291; *United States v. Rico*, 51 F.3d 495, 509 (5th Cir. 1995), *cert. denied,* 516 U.S. 883 (1995).

In *Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995)(*en banc*), *cert. denied*, 517 U.S. 1157 (1996), the Fifth Circuit rejected a broad-ranging application of the *Cuyler* standard to complaints of ineffective assistance arising from alleged conflicts of interest by defense counsel. *See Beets v. Scott*, 65 F.3d at 1268 (holding that not every potential conflict, even in multiple client representation cases, is an "actual conflict' for Sixth Amendment purposes). Subsequently, the Fifth Circuit has consistently refused to apply the *Cuyler* test outside the context of multiple representation situations. *See*, *e.g.*, *United States v. Garza*, 429 F.3d 165, 172 (5th Cir. 2005)("*Cuyler* only applies where an attorney was effectively, if not technically, representing multiple clients in the same proceeding."), *cert. denied*, 546 U.S. 1220 (2006); *United States v. Newell*, 315 F.3d at 516 (holding *Strickland* "more appropriately gauges an attorney's alleged conflict of interest arising not from multiple client representation but from a conflict between the attorney's personal interest and that of his client"); *Perillo v. Johnson*, 205 F.3d at 781 ("An 'actual conflict' exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.").

Petitioner alleges no specific facts sufficient to bring his case within the conflict of interest line of cases following

*Cuyler*. At best, petitioner's trial counsel filed a motion for new trial in which said counsel urged a ground for relief phrased in terms of constructive ineffective assistance of counsel but which actually was an attack upon the state trial court's denial of petitioner's motion for mistrial. Petitioner's complaints about the performance of his trial counsel during jury selection do not satisfy either the "actual conflict" or "adverse effect" requirements of the narrow *Cuyler* exception to the *Strickland* standard. Thus, this line of cases has no application to petitioner's situation.

(2) *United States v. Cronic* Inapplicable

In *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Supreme Court held that a presumption of prejudice similar to that recognized in *Cuyler* arises in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that even competent counsel very likely could not render effective assistance. *United States v. Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047. As examples of the latter two situations, respectively, the Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)(defendant was denied the opportunity to cross-examine

the prosecution's key witness for bias), and the incendiary
circumstances surrounding the trial of the so-called "Scottsboro
Boys" addressed in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77
L.Ed. 158 (1932)(no individual attorney was appointed to represent
the defendants and trial proceeded after a volunteer attorney from
another state appeared on the first day of trial but confessed he
had not had an opportunity to prepare for trial). *United States v.
Cronic*, 466 U.S. at 659-61, 104 S.Ct. at 2047-48.

In *Bell v. Cone*, 535 U.S. 685, 695-96, 122 S.Ct. 1843, 1851,
152 L.Ed.2d 914 (2002), the Supreme Court reiterated that the
second exception to the requirement of *Strickland* "prejudice" it
had envisioned in *Cronic* was limited to situations in which
defense counsel *completely* failed to subject the prosecution's case
to meaningful adversarial testing. *See Bell v. Cone*, 535 U.S. at
697-98, 122 S.Ct. at 1851-52 (holding complaints about trial
counsel's waiver of closing argument at the punishment phase of
trial and failure to adduce mitigating evidence insufficient to
create a presumption of prejudice absent a showing trial counsel
completely failed to challenge the prosecution's case throughout
the sentencing proceeding).

The presumption of prejudice recognized in *Cronic* does not
apply where the defendant complains of merely shoddy or poor
performance by his trial counsel; for a defendant to be entitled to
such a presumption, his attorney's failure must be complete. *See*

*Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. at 1851 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing); *Riddle v. Cockrell*, 288 F.3d 713, 718 (5th Cir. 2002)(holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense), *cert. denied*, 537 U.S. 953 (2002); *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000)("'A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.' We have found constructive denial in cases involving the absence of counsel from the courtroom, conflicts of interest between defense counsel and the defendant, and official interference with the defense; and have stated that constructive denial will be found when counsel fails to subject the prosecution's case to any meaningful adversarial testing."(*citations and footnote omitted*)).

At all times throughout voir dire and trial, petitioner was represented by both his trial counsel, attorneys Mario Trevino and Gus Wilcox. Petitioner has alleged no facts showing he was ever completely devoid of legal representation during jury selection or

trial; the first *Cronic* exception to *Strickland* has no application to petitioner's trial.

Petitioner's allegations that his trial counsel inadequately questioned the jury venire during voir dire (about their views on DNA evidence), failed to make a timely request for the assistance of a DNA expert, failed to timely move for a mistrial and continuance, and failed to adequately cross-examine the prosecution's DNA expert do not fall within the narrow scope of the presumed prejudice rule announced in *Cronic*. *Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. at 1851 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing). The second *Cronic* exception to *Strickland* does not apply to petitioner's voir dire or trial.

Finally, petitioner presented the state habeas court with no evidence showing his trial counsel were ever involved in a relationship with any party, person, or other being (including another client or former client) which had any deleterious effects on said counsel's performance during voir dire or trial analogous to the extreme situations in which the Supreme Court has held the third *Cronic* exception to *Strickland* applicable. On the contrary, the record before the state habeas court appears to suggest the petitioner's trial counsel's only mistake in judgment was to rely on petitioner's ultimately erroneous assurances that his DNA would not be found on Salinas' clothing. Petitioner failed to present

the state habeas court with any evidence showing his trial counsels' relationship with any person, place, or thing (other than their reliance on petitioner's own assurances) had any deleterious impact on the outcome of petitioner's trial.

c. No Constitutional Right to an Evidentiary Hearing

Third, there is no constitutional right to an evidentiary hearing in connection with a motion for new trial when that motion, like the one filed by petitioner, raises purely legal arguments that do not require evidentiary development. *See United States v. Runyan*, 290 F.3d 223, 248 (5th Cir.)(holding a motion for new trial may be ruled on without an evidentiary hearing and the decision to hold a hearing rests within the sound discretion of the trial court), *cert. denied* 537 U.S. 888 (2002); *United States v. Blackburn*, 9 F.3d 353, 358 (5th Cir. 1993)(same), *cert. denied*, 513 U.S. 830 (1994).

Petitioner's motion for new trial, although partially cast in the verbiage of ineffective assistance, was, in fact, little more than an effort to re-litigate petitioner's previously unsuccessful motions for mistrial and continuance. Petitioner alleged no specific facts in support of his constructive ineffective assistance claim that identified any specific deficiencies in his trial counsel's performance or showed how those acts or omissions would have affected the outcome of petitioner's trial. As petitioner's trial counsel candidly admitted during his testimony

at petitioner's state habeas corpus hearing, the trial court was fully aware of the reasons why petitioner believed he was entitled to a mistrial, as well as the reasons why petitioner felt he had been entitled to a continuance.[91]  Petitioner alleged no facts, and presented no evidence to the state habeas court, suggesting what evidence could have been presented during an evidentiary hearing to support petitioner's motion for new trial.

As was explained at length above, petitioner did not allege any facts suggesting his trial counsel actually rendered ineffective assistance under the *Strickland* test in connection with petitioner's voir dire.  Rather, petitioner's first ground in his motion for new trial argued the trial court had effectively deprived petitioner of the opportunity to voir dire the jury venire regarding their views on DNA evidence by refusing to grant petitioner's motion for mistrial.  Petitioner's second ground in his motion for new trial argued the state trial court had erred in denying petitioner's motion for continuance.  Petitioner does not identify any specific facts or evidence that he claims could or should have been developed by a substitute counsel, or anyone else, in support of either of these two grounds for relief.  Under such circumstances, there was no duty imposed on the state trial court to hold an evidentiary hearing to resolve petitioner's conclusory

---

[91] S.F. State Habeas Hearing, testimony of Mario trevino, at pp. 48-49.

motion for new trial. *See United States v. Demik*, 489 F.3d 644, 646-47 & n.3 (5th Cir.)(holding a defendant's conclusionary allegations of ineffective assistance of counsel were insufficient to require an evidentiary hearing on a motion for new trial where the defendant did not allege any specific facts showing precisely what actions his attorney should have taken or exactly how those actions would have affected the outcome of his trial), *cert. denied*, 552 U.S. 982 (2007).

Moreover, any error committed by the state trial court in failing to grant petitioner an evidentiary hearing on petitioner's motion for new trial was ameliorated, if not rendered harmless, by virtue of the fact the petitioner was afforded a full and fair opportunity to litigate, with an evidentiary hearing, the propriety of the trial court's denial of his motion for new trial and failure to grant petitioner an evidentiary hearing on same (in connection with petitioner's thirty-second ground for relief) in the course of petitioner's first state habeas corpus proceeding. During his first state habeas corpus proceeding, petitioner presented the state courts with no evidence supporting either of his grounds for new trial or establishing that any such evidence has ever existed. Any error in the failure of the state trial court to hold an evidentiary hearing in connection with petitioner's motion for new trial was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)(holding the test for

harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict").

D.    Conclusion

Petitioner failed to present the state habeas court with any evidence showing either (1) his trial counsel suffered from "an actual conflict of interest" which had an "adverse effect," within the meaning of *Cuyler*, on petitioner's capital murder trial, or (2) petitioner was constructively denied legal representation at any point during voir dire or trial within the meaning of *Cronic*. Any error by the state trial court in denying petitioner's motion for new trial without holding an evidentiary hearing was harmless. Accordingly, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's fifth claim herein, when presented in the form of petitioner's thirty-second claim for state habeas relief in petitioner's original state habeas corpus proceeding, was the product of a reasonable application of the clearly established standard announced in *Strickland* and was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. Petitioner's fifth claim herein does not warrant federal habeas relief.

## VII. Unconstitutionally Vague "Aggravating" Factors

A.   The Claim

In his seventh claim herein, petitioner argues the lack of statutory definitions or definitions in his punishment phase jury instructions of various key terms employed in the Texas capital sentencing special issues rendered those special issues unconstitutionally vague.[92]

B.   State Court Disposition

Petitioner raised this same challenge to the Texas capital sentencing special issues as his ninth point of error on direct appeal.[93]   The Texas Court of Criminal Appeals summarily rejected this argument, along with several other facial challenges to the constitutionality of the Texas capital sentencing scheme, based on long-standing but un-cited precedent. *Trevino v. State*, 991 S.W.2d at 855.

Petitioner raised this same complaint again as his twenty-first ground for relief in his original state habeas corpus application.[94]   The state habeas court concluded this argument was foreclosed by virtue of the fact (1) petitioner had procedurally defaulted on this claim by failing to request the state trial court include definitions of any of the terms petitioner now claimed to

---

[92] Petitioner's Amended Petition, at pp. 52-53.

[93] Appellant's Brief, at pp. 50-61.

[94] State Habeas Transcript, Volume I, at pp. 45-49.

99

be "vague" in petitioner's punishment phase jury instructions, (2) the Texas Court of Criminal Appeals had already rejected this argument on the merits in the course of petitioner's direct appeal, and (3) the Texas Court of Criminal Appeals had repeatedly rejected this same argument.[95] The Texas Court of Criminal Appeals adopted the habeas trial court's conclusions when it denied petitioner's first state habeas corpus application. *Ex parte Carlos Trevino*, WR-48,153-01 (Tex. Crim. App. April 4, 2001).

C.    <u>Synthesis - No Merit</u>

This Court has repeatedly rejected challenges to the allegedly vague "aggravating" factors employed in the Texas capital sentencing special issues, primarily because this argument misconstrues the nature of the Texas capital sentencing scheme. Unlike most of the cases relied upon by petitioner, Texas is not a "weighing jurisdiction" where capital sentencing jurors must balance "aggravating" versus "mitigating" factors before rendering a verdict at the punishment phase of a capital trial. *See Hughes v. Johnson*, 191 F.3d 607, 621-23 (5th Cir. 1999)(holding no Eighth Amendment violation resulted from Texas Court of Criminal Appeals' refusal to engage in proportionality review of capital sentencing jury's answer to mitigation special issue because Texas is a non-weighing jurisdiction), *cert. denied*, 528 U.S. 1145 (2000).

---

[95] State Habeas Transcript, Volume II, at pp. 78-79.

Petitioner's challenges to the allegedly vague terms employed in the Texas capital sentencing scheme's future dangerousness and "mitigation" or *Penry* special issues have repeatedly been rejected by both this Court and the Fifth Circuit because (1) each of the key terms included in these special issues is fully capable of a commonsense, practical meaning that eliminates the need for lengthy, legalistic, definitions and (2) applicable Supreme Court precedent permits a capital sentencing jury to exercise broad discretion to *withhold* a death sentence from a defendant who is otherwise eligible to receive same so long as the jury is permitted to consider all mitigating evidence presented during trial. *See Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005)(listing the many Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society" in the first Texas capital sentencing special issue), *cert. denied*, 547 U.S. 1073 (2006); *Moore v. Quarterman*, 526 F. Supp. 2d 654, 721-24 (W.D. Tex. 2007)(listing the many opinions of this Court and the Fifth Circuit rejecting challenges premised on the alleged vagueness of the future dangerousness capital sentencing special issue and holding the allegedly vague terms in the mitigation or *Penry* special issue are constitutionally sufficient because (1) Texas is not a weighing jurisdiction, (2) the Eighth Amendment permits granting a capital sentencing jury unfettered discretion to *withhold* a death sentence

once it has determined a defendant is eligible to receive same, and (3) the *Penry* special issue does not preclude the capital sentencing jury's consideration of any relevant mitigating evidence), *CoA denied*, 534 F.3d 454 (5th Cir. 2008); *Martinez v. Dretke*, 426 F. Supp. 2d 403, 530 (W.D. Tex. 2006)(holding the Texas capital sentencing special issues need not be accompanied by definitions because the key terms therein are susceptible of a logical, commonsense, interpretation by rational jurors and the Eighth Amendment does not preclude granting a Texas jury unfettered discretion (in the mitigation special issue) to *withhold* the death penalty so long as the jury is permitted to consider all mitigating evidence before it in so doing), *CoA denied*, 270 Fed. Appx. 277, 2008 WL 698946 (5th Cir. March 17, 2008); *Salazar v. Dretke*, 393 F. Supp. 2d 451, 488-91 (W.D. Tex. 2005)(same), *affirmed*, 260 Fed. Appx. 643, 2007 WL 4467587 (5th Cir. December 20 2007), *cert. denied*, ___ U.S. ___, 128 S.Ct. 2963, 171 L.Ed.2d 893 (2008). Petitioner's complaints about the alleged "vague" terms employed in the Texas capital sentencing special issues do not possess any arguable merit.

D.   Conclusion

The Texas Court of Criminal Appeals' rejections on the merits, in the course of both petitioner's direct appeal and original state habeas corpus proceeding, of petitioner's complaints about allegedly vague "aggravating" factors in the Texas capital

sentencing special issues were neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's direct appeal and state habeas corpus proceedings. Petitioner's seventh claim herein does not warrant federal habeas relief.

## VIII. <u>Failure to Advise Jury re Effect of a Hung Jury</u>

A.    <u>The Claim</u>

In his eighth and final substantive claim herein, petitioner argues the Texas capital sentencing scheme prevents the trial court from advising a capital sentencing jury of the effect of a single holdout juror, *i.e.*, of a hung jury.[96]

B.    <u>State Court Disposition</u>

Petitioner presented this same argument as his fourteenth point of error on direct appeal.[97]  The Texas Court of Criminal Appeals summarily rejected this argument, along with several other facial challenges to the constitutionality of the Texas capital sentencing scheme, based on long-standing but un-cited precedent. *Trevino v. State*, 991 S.W.2d at 855.

---

[96] Petitioner's Amended Petition, at p. 53.

[97] Appellant's Brief, at pp. 71-72.

Petitioner raised this same complaint again as his thirtieth ground for relief in his original state habeas corpus application.[98] The state habeas court concluded this argument was foreclosed by virtue of the fact (1) the Texas Court of Criminal Appeals had already rejected this argument on the merits in the course of petitioner's direct appeal and (2) the Texas Court of Criminal Appeals had repeatedly rejected this same argument.[99]  The Texas Court of Criminal Appeals adopted the habeas trial court's conclusions when it denied petitioner's first state habeas corpus application. *Ex parte Carlos Trevino*, WR-48,153-01 (Tex. Crim. App. April 4, 2001).

C.    *Teague* Foreclosure

Respondent correctly argues this claim is foreclosed by the *Teague* non-retroactivity doctrine. *Alexander v. Johnson*, 211 F.3d 895, 897-98 (5th Cir. 2000); *Webb v. Collins*, 2 F.3d 93, 95 (5th Cir. 1993).

D.    Synthesis - No Merit

Moreover, this constitutional complaint possesses no arguable merit.    The Supreme Court implicitly rejected petitioner's arguments underlying this claim. *See Jones v. United States* 527 U.S. 373, 382, 119 S.Ct. 2090, 2099, 144 L.Ed.2d 370 (1999)(holding the Eighth Amendment does not require a capital sentencing jury be

---

[98] State Habeas Transcript, Volume I, at pp. 63-64.

[99] State Habeas Transcript, Volume II, at pp. 86-87.

instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death).

Furthermore, on numerous occasions, the Fifth Circuit has expressly rejected the legal premise underlying petitioner's eighth claim herein, *i.e.*, the argument a Texas capital murder defendant is constitutionally entitled to have his punishment-phase jury instructed regarding the consequences of a hung jury or a single holdout juror. *See, e.g., Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir.)(recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict), *cert. denied*, 551 U.S. 1193 (2007); *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005)(holding the same arguments underlying petitioner's nineteenth claim herein were so legally insubstantial as to be unworthy of a certificate of appealability), *cert. denied*, 546 U.S. 1177 (2006); *Alexander v. Johnson*, 211 F.3d at 897-98 (holding the *Teague v. Lane* non-retroactivity doctrine precluded applying such a rule in a federal habeas context); *Davis v. Scott*, 51 F.3d 457, 466-67 (5th Cir.)(same), *cert. denied*, 516 U.S. 992

(1995); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994)(rejecting application of the Supreme Court's holding in *Mills v. Maryland* to a Texas capital sentencing proceeding), *cert. denied*, 513 U.S. 1067 (1995).

Finally, this Court has repeatedly rejected this same claim. *See, e.g., Bartee v. Quarterman*, 574 F. Supp. 2d at 702-03 (rejecting arguments that the Constitution requires an instruction informing a capital sentencing jury of the results of its failure to reach unanimous verdict); *Moore v. Quarterman*, 526 F. Supp. 2d at 729 (listing the Fifth Circuit opinions and opinions of this Court rejecting this same argument); *Blanton v. Quarterman*, 489 F. Supp. 2d 621, 644-45 (W.D. Tex. 2007)(rejecting complaint that a Texas capital sentencing jury must be instructed on the effect of a single hold-out juror), *affirmed*, 543 F.3d 230 (5th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Martinez v. Dretke*, 426 F. Supp. 2d at 534-36 (relying on the Supreme Court's holding in *Jones v. United States* to reject the same arguments raised by petitioner herein premised on the Supreme Court's holdings in *Mills v. Maryland* and *Caldwell v. Mississippi*).

No federal court has ever held a Texas capital defendant has a constitutional right to a punishment-phase jury instruction advising his capital sentencing jury of the effect of hung jury or a single hold-out juror.

E.    Conclusion

Petitioner's proposed new rule is barred by the holding in *Teague v. Lane.* The state habeas court's rejections on the merits, in the course of both petitioner's direct appeal and first state habeas corpus proceeding, of petitioner's complaint about the failure of his punishment-phase jury charge to inform the jury regarding the effect of a single hold-out juror were neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in petitioner's trial and first state habeas corpus proceeding.

## IX. **Certificate of Appealability**

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA.

*Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. §2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000)(holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right.

*Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4. This Court is authorized to address the propriety of granting a CoA *sua sponte*. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner

must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Foster v. Quarterman*, 466 F.3d at 364; *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th Cir. 2006); *Pippin v. Dretke*, 434 F.3d at 787; *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Sonnier v. Quarterman*, 476 F.3d at 364-69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

Most of petitioner's claims herein fail to satisfy the standard for obtaining a CoA. Both the Fifth Circuit and this Court have repeatedly rejected the legal arguments underlying petitioner's seventh and eighth claims herein. The holding in *Teague v. Lane* forecloses adoption of the new rules advocated by petitioner in his fourth and eighth claims herein. There is no arguable factual or legal basis for petitioner's fifth claim herein. Petitioner's complaint about his trial counsel's failure to raise hearsay objections to the most damaging testimony offered against him at trial (*i.e.*, petitioner's sixth claim herein) is without arguable merit because the relevant state courts determined the testimony in question was admissible under state evidentiary rules. Thus, petitioner is not entitled to a CoA on his fourth through eighth claims herein.

Petitioner's first three claims herein present a more complex series of legal, factual, and procedural issues.

Petitioner's first and second claims herein (*i.e.*, petitioner's *Brady* claim and petitioner's complaint that his trial counsel failed to adequately utilize Rey's statement to impeach and cross-examine prosecution witnesses) do not warrant a CoA with

regard to the guilt-innocence phase of petitioner's trial because (1) under applicable Texas law, it did not matter whether Cervantes or petitioner actually delivered the fatal stab wound to Salinas, (2) the jury already had before it considerable evidence, in the form of Gonzales' testimony, showing Cervantes was the person who most likely stabbed Salinas, and (3) Rey's written statement does not refute or impeach any of Gonzales' trial testimony. Juan Gonzales repeatedly emphasized during his testimony at both phases of trial that he never saw who stabbed Salinas but he had seen Cervantes with a knife days before the murder and Cervantes told Gonzales days after the murder he had destroyed and disposed of the same knife. Furthermore, Gonzales testified that when he asked Cervantes directly why Cervantes had killed the girl, Cervantes replied brusquely "shut up" and told Gonzales to mind his own business. Moreover, other than the oblique comments made by petitioner during the group's drive back to the party after the murder, there was no evidence suggesting petitioner had done anything with regard to using a knife at the crime scene. In his written statement to police, Rey did not claim to have personal knowledge regarding who actually stabbed Salinas. Instead, Rey merely recited a conversation he had with Cervantes in which Cervantes claimed to have stabbed Salinas. There was no eyewitness testimony at trial regarding exactly who stabbed Salinas. The medical examiner did testify, however, that her neck showed no

indications anyone had attempted to strangle or "snap" her neck. Finally, regardless of whether petitioner personally used the knife to stab Salinas (who could have been stabbed by both Cervantes and the petitioner), Rey's statement recounting Cervantes' hearsay confession would have been of little-to-no value in impeaching Gonzales' trial testimony since neither Rey nor Gonzales claimed to have any personal knowledge of who stabbed Salinas.

The question is far more complicated with regard to these same complaints and the punishment phase of petitioner's trial. Reasonable minds could differ regarding whether Rey's statement satisfies the "materiality" prong of *Brady* and the "prejudice" prong of *Strickland.* While Rey's written statement corroborates Gonzales' implicit suggestions that Cervantes was the only person with a knife at the crime scene, neither Rey nor Gonzales claimed to have personal knowledge regarding who actually stabbed Salinas. Moreover, Rey's statement would not have impeached Gonzales' trial testimony regarding the inculpatory conversations between petitioner and Cervantes as the group drove away from Espada Park. There is also the fact that the medical examiner testified that Salinas was stabbed twice. Rey's written statement did not negate the possibility Cervantes and petitioner each stabbed Salinas once. Nonetheless, Gonzales' testimony at trial that Cervantes and Rey both expressed their desire not to leave behind any witnesses was undisputed. Likewise, Gonzales made it clear the petitioner

appeared to be ambivalent regarding the fate of Salinas.  It is also clear from Gonzales' testimony that Cervantes took the lead in the assault upon Salinas, assaulting her first, striking her, and threatening her to induce her submission to more assaults by others.  Rey's written statement made it clear Cervantes had claimed responsibility for stabbing Salinas and that Rey recalled Cervantes making this statement *before* the conversation between Cervantes and petitioner in the car that Gonzales recounted to the jury.  Under such circumstances, reasonable minds could conclude the information contained in Rey's statement may have led the jury to find petitioner less morally culpable for Salinas' death than others present the night of the offense.  Therefore, petitioner is entitled to a CoA on his first two claims herein limited to whether this aspect of petitioner's ineffective assistance complaints and petitioner's *Brady* claim satisfy the "materiality" and "prejudice" prongs of the *Brady* and *Strickland* tests, respectively, in connection with the punishment phase of petitioner's trial.

Petitioner's third claim herein, *i.e.,* his complaint of ineffective assistance arising from his trial counsel's failure to adequately investigate petitioner's background and develop and present mitigating evidence during the punishment phase of his trial regarding petitioner's deprived and abusive childhood, was procedurally defaulted.  Reasonable minds could not disagree on this point.  Nonetheless, reasonable minds could disagree over

whether petitioner has satisfied the "fundamental miscarriage of justice" exception to the procedural default doctrine in connection with this claim. Petitioner's federal habeas counsel has presented this Court with evidence suggesting petitioner suffers from the effects of Fetal Alcohol Syndrome, including the inability to express remorse in a recognizable manner. Furthermore, petitioner has presented this Court with evidence showing even the most minimal investigation into petitioner's background (through rudimentary interviews with family members and review of relevant school and medical records) would have revealed a wealth of additional mitigating evidence far more substantial that the superficial account of petitioner's childhood given by petitioner's lone witness during the punishment phase of trial. Under these circumstances, reasonable minds could disagree over whether petitioner has satisfied the fundamental miscarriage of justice exception to the procedural default doctrine with regard to his *Wiggins* claim, *i.e.*, petitioner's complaint that his trial counsel rendered ineffective assistance at the punishment phase of trial by failing to (1) adequately investigate petitioner's background and (2) discover, develop, and present available mitigating evidence.

For the reasons discussed at length herein, petitioner is not entitled to a Certificate of Appealability in connection with his fourth through eighth claims herein. Nonetheless, petitioner is

entitled to a CoA with regard to those portions of his first three claims herein identified in this section.

Accordingly, it is hereby **ORDERED** that:

1. All federal habeas corpus relief requested in petitioner's amended petition herein is **DENIED.**

2. Petitioner is **DENIED** a Certificate of Appealability on his fourth through eighth claims presented in his amended petition herein.

3. Petitioner is **GRANTED** a Certificate of Appealability on the following issues: (1) whether petitioner's *Brady* claim (*i.e.,* petitioner's first claim herein) and petitioner's complaints about his trial counsel's failure to discover and utilize Rey's written statement to cross-examine and impeach prosecution witnesses (*i.e.,* petitioner's second claim herein) satisfy the "materiality" and "prejudice" prongs of the *Brady* and *Strickland* tests, respectively, in connection with the punishment phase of petitioner's trial; and (2) whether petitioner has satisfied the fundamental miscarriage of justice exception to the procedural default doctrine with regard to his *Wiggins* claim, i.e., petitioner's complaint that his trial counsel rendered ineffective assistance at the punishment phase of trial by failing to (1) adequately investigate petitioner's background and (2) discover, develop, and present available mitigating evidence (petitioner's third claim herein). In all

other respects, petitioner is **DENIED** a CoA with regard to his first three claims herein.

4.   All other pending motions are **DISMISSED** AS MOOT.

5.   The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

It is so ORDERED.

SIGNED this 21st day of December, 2009.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE