## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CARLOS TREVINO**, | § | |
| **TDCJ No. 999235,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| **V.** | § | **CIVIL NO. SA-01-CA-306-XR** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner Carlos Trevino filed this federal habeas corpus action pursuant to 28 U.S.C. Section 2254 challenging his July 1997, Bexar County capital murder conviction and sentence of death. The facts and circumstances of the Petitioner's capital offense and the evidence presented during both phases of Petitioner's capital murder trial are set forth in detail in this Court's original opinion denying federal habeas corpus relief. *Trevino v. Thaler*, 678 F.Supp.2d 445, 449-53 (W.D. Tex. 2009), *aff'd*, 449 F. App'x. 415 (5th Cir. Nov. 14, 2011), *vacated and remanded*, ___ U.S. ___, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013).

Following remand to this Court by the Fifth Circuit, *Trevino v. Thaler*, 740 F.3d 378 (5th Cir. 2014), this Court granted Petitioner's multiple requests for additional time to investigate and develop Petitioner's remaining claims for relief (*ECF nos. 118 & 138 & Text Orders issued April 29, 2014, May 5, 2014, and July 3, 2014)* and authorized Petitioner to expend resources in excess of the statutory cap set forth in 18 U.S.C. Section 3599(g)(2) for investigative and expert assistance *(ECF nos. 127, 138, 149)*. Petitioner filed his second amended federal habeas corpus petition on February

3, 2015 *(ECF no. 143)*, asserting therein a single claim for relief, to wit, the argument that Petitioner's trial counsel rendered ineffective assistance by failing to adequately investigate Petitioner's background and present compelling mitigating evidence.  For the reasons set forth herein, Petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

## I. Procedural Background and the Fifth Circuit's Remand

On January 21, 2014, the Fifth Circuit remanded this cause to this Court with the following instructions:

> In light of the Supreme Court's decision in *Trevino v. Thaler,* ___ U.S.___, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013), we remand to the district court for full reconsideration of the Petitioner's ineffective assistance of counsel claim in accordance with both *Trevino* and *Martinez v. Ryan,* ——U.S. ——, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012).  If the Petitioner requests it, the district court may in its discretion stay the federal proceeding and permit the Petitioner to present his claim in state court.

*Trevino v. Stephens*, 740 F.3d at 378.

Petitioner now has been granted resources and time within which to develop his claim of ineffective assistance.  Before denying federal habeas corpus relief initially, this Court twice stayed this federal habeas corpus action to permit Petitioner to return to state court to exhaust available state habeas corpus remedies on then-unexhausted claims.  The first such stay was granted June 15, 2004. *ECF no. 36.*  The Texas Court of Criminal Appeals dismissed Petitioner's second state habeas corpus application on state writ-abuse principles more than a year later. *Ex parte Carlos Trevino*, WR 48,153-02, 2005 WL 3119064 (Tex. Crim. App. Nov. 23, 2005).

Petitioner then requested and, on August 2, 2006 this Court granted, a second stay in these proceedings to permit him to return to state court and exhaust available state habeas remedies on still more then-unexhausted claims. *ECF no. 54.*  The Petitioner's federal habeas corpus counsel then

2

filed a motion for appointment of counsel on Petitioner's behalf in state court.  In an Order issued August 8, 2008, this Court attempted to break the state court log jam by requesting some ruling by the state court on Petitioner's then-pending motion. *ECF no. 61*.  When the responsible state judicial officer made clear to Petitioner's federal habeas counsel that the state court would never rule on Petitioner's motion seeking legal representation, in an Order issued October 2, 2008, this Court lamented the delay of more than two years resulting from the state trial judge's intransigence and concluded no legitimate basis existed for continuing to hold this case in abeyance.  *ECF no. 62.*

On December 8, 2008, Petitioner filed his first amended federal habeas corpus petition and asserted eight claims for relief, three of which consisted of ineffective assistance claims and a constructive ineffective assistance claim.  More specifically, in his second, third, and sixth claims, Petitioner argued his trial counsel rendered ineffective assistance by failing to  (1) discover and employ Seanido Rey's statement of June 12, 1996 during Petitioner's trial, (2) investigate, develop, and present mitigating evidence during the punishment phase of Petitioner's capital murder trial, (3) meaningfully convey the plea bargain offered to Petitioner by the prosecution, and (4) object on hearsay grounds to the inculpatory statements made by Petitioner recounted at trial by Juan Gonzales.  This Court concluded that all four of these ineffective assistance complaints lacked merit. *Trevino v. Thaler*, 678 F.Supp.2d at 466-76.  In the alternative, this Court concluded the second and third of these complaints (i.e., those contained in Petitioner's third claim in his first amended petition) were also procedurally defaulted.  *Id.*, at 467-71, 473-74.

In his fifth claim in his first amended petition, Petitioner argued he was constructively denied the effective assistance of counsel as a result, in part, of the state trial court denying Petitioner an evidentiary hearing on Petitioner's motion for new trial.  This Court denied relief on the merits under

3

the AEDPA, expressly finding the Texas Court of Criminal Appeals' rejection on the merits of this claim in the course of Petitioner's first state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the Petitioner's first state habeas corpus proceeding. *Id.*. at 480-91.

Thus, of the five claims of ineffective assistance (or constructive ineffective assistance) presented by Petitioner in his first amended federal habeas corpus petition, this Court concluded all five lacked merit under applicable federal law. Only two of those complaints of ineffective assistance were subject to alternative conclusions by this Court that they had also been procedurally defaulted, i.e., the two ineffective assistance complaints contained in Petitioner's third claim herein. The other three ineffective assistance claims were rejected on the merits by the state courts and this Court concluded those rejections were consistent with the deferential standard of review mandated by the AEDPA. Therefore, the Fifth Circuit's remand Order issued January 21, 2014 does not appear to pertain to this Court's disposition of Petitioner's ineffective assistance claims contained in Petitioner's second, fifth, or sixth claims herein.[1] As best this Court can discern, the Fifth Circuit's remand Order is limited to this Court's disposition of those ineffective assistance claims which this

---

[1] Likewise, nothing in the Fifth Circuit's remand Order appears to resurrect those wholly unexhausted ineffective assistance claims Petitioner raised for the first time in his response to respondent's Answer which this Court held were not properly before this Court in the Order denying Petitioner's motion to alter or amend judgment. *See Trevino v. Thaler*, 2010 WL 376416 (W.D. Tex. January 25, 2010)(explaining that Petitioner presented many new factual allegations and new legal theories supporting his ineffective assistance claims as well as several completely new ineffective assistance claims for the first time in his response to Respondent's Answer and that these new legal theories and factual allegations were not properly before this court in Petitioner's federal habeas corpus proceeding).

Court held, in the alternative, to have been procedurally defaulted, i.e., the ineffective assistance complaints contained in Petitioner's original third claim herein.

With regard to Petitioner's complaint that his trial counsel failed to investigate Petitioner's background and present all then- available mitigating evidence, this Court originally concluded as follows:

> Alternatively, this Court independently concludes Petitioner's complaint about his trial counsel's failure to more thoroughly investigate Petitioner's background and to develop the "new" mitigating evidence identified in Petitioner's pleadings herein fails to satisfy the prejudice prong of the *Strickland* test. In making this conclusion, this Court must re-weigh the totality of Petitioner's proffered mitigating evidence, including Petitioner's "new" mitigating evidence, against the evidence in aggravation. *Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003) ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.").

> The evidence before the sentencing jury at Petitioner's capital murder trial was summarized in Sections I.E. and III.D.2. above. Petitioner's "new" mitigating evidence consists of double-edged evidence detailing Petitioner's history of childhood abuse and neglect (both physical and emotional), alcohol and narcotics abuse, spotty attendance and poor performance in school, Fetal Alcohol Syndrome, and ensuing tendency to exercise poor judgment. Despite the foregoing, however, Petitioner also furnishes a number of affidavits that describe Petitioner as a hard-working, non-violent, loving father. This "new" mitigating evidence must also be weighed in the context of the other, uncontradicted, evidence now before this Court, which shows (1) Petitioner's callous comments regarding Salinas before and after her murder (including Petitioner's suggestion that Gonzales should participate in the sexual assault on Salinas and Petitioner's failure to object when Rey and Cervantes suggested the need to eliminate witnesses), (2) Petitioner's participation in the violent assault upon Salinas ( *i.e.,* holding her down while others sexually assaulted her), (3) Petitioner's subsequent directive to Gonzales not to talk to police about the incident, (4) Petitioner's nonchalant demeanor immediately following the murder upon his return to the party at the Mata residence, (5) Petitioner's many tattoos reflecting his membership in a notorious prison gang, and (6) the complete and total absence of any indication the Petitioner has ever expressed sincere contrition or genuine remorse over Salinas' murder.

> The latter point cannot be over-emphasized. Salinas' murder was particularly brutal and senseless. Yet Petitioner has consistently refused to acknowledge his role in her murder, even to his own trial counsel, claiming instead to have been "too

stoned" to remember exactly what happened that evening.  Petitioner's own affidavit, executed June 11, 2004, contains not even a scintilla of sincere contrition; instead Petitioner expresses hostility and blames his trial counsel for allegedly misrepresenting the terms of a proffered plea bargain for a life sentence without accepting any responsibility for his own rejection of the offer after it was accurately described to Petitioner.

Absent some indication the Petitioner has willingly accepted responsibility for his role in Salinas' brutal rape and murder, the evidence showing Petitioner's long history of alcohol and drug abuse, long history of criminal misconduct, and membership in violent street and prison gangs precludes this Court from finding this aspect of Petitioner's ineffective assistance claims herein satisfies the prejudice prong of *Strickland.*  There is simply no reasonable probability that, but for the failure of Petitioner's trial counsel to present Petitioner's capital sentencing jury with the additional, double-edged, mitigating evidence now before this Court, the outcome of the punishment phase of Petitioner's capital trial would have been different.

*Trevino v. Thaler*, 678 F.Supp.2d at 471-72 (*Footnotes omitted*).

With regard to Petitioner's complaint that his trial counsel failed to "meaningfully" convey

the prosecutor's plea offer to Petitioner, this Court concluded as follows:

Alternatively, this Court independently concludes this aspect of Petitioner's ineffective assistance claims herein fails to satisfy either prong of *Strickland.*  Even assuming Petitioner's trial counsel erroneously described to Petitioner the details of the plea bargain offered by the prosecution, Petitioner admits he was accurately informed of the details of the plea bargain offered to him when Petitioner arrived at the District Attorney's Office *before Petitioner rejected same.*  Thus, Petitioner's refusal to accept the plea bargain offered to him cannot be attributed to any deficiency in the performance of Petitioner's trial counsel.  Furthermore, there was no duty imposed on Petitioner's trial counsel to convince or persuade Petitioner to accept the favorable terms of the plea bargain Petitioner's trial negotiated for Petitioner once Petitioner was accurately advised of the details of the plea bargain offered by the prosecution.  Petitioner's assertion that he did not fully comprehend the consequences of rejecting the life sentence offered by the prosecution in its plea bargain proposal when he chose to reject that offer is incredible.  The difference between receiving a life sentence with no chance of parole for at least forty years and receiving a sentence of death is self-evident.  The decision to accept or reject the plea bargain in question belonged exclusively to Petitioner.  He admits he was accurately informed of the details of the plea bargain offer before he rejected same.  Petitioner alleges no specific facts showing he was mentally incompetent on the date he rejected the prosecution's offer of a life sentence.  Under such circumstances, Petitioner's trial

counsel was not obligated to "explain" the difference between a life sentence and a
sentence of death to Petitioner.

*Trevino v. Thaler*, 678 F.Supp.2d at 474 (*Footnotes omitted*).

This Court's alternative conclusions with regard to the two complaints of ineffective
assistance contained in Petitioner's third claim in his first amended petition herein set forth above
did not rest on procedural default rulings either expressly made by the state courts or implied based
on state writ-abuse principles. This Court's alternative conclusions concerning the lack of merit
possessed by the ineffective assistance complaints contained in Petitioner's third claim in
Petitioner's first amended petition herein are not impacted in any manner by either (1) the Supreme
Court's holding in *Trevino v. Thaler*, ___ U.S. ___, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013),
extending to Texas and other jurisdictions the new procedural rule announced in *Martinez v. Ryan,*
566 U.S. 1 (2012), or (2) the Fifth Circuit's procedural rulings on procedural default matters
contained in either *Trevino v. Thaler,* 449 F. App'x. 415 (5th Cir. Nov. 14, 2011), or *Trevino v.*
*Stephens*, 740 F.3d 378 (5th Cir. 2014). To date, neither the Fifth Circuit nor the Supreme Court has
rejected this Court's legal conclusions or factual findings underlying its determination that
Petitioner's claims of ineffective assistance by his trial counsel asserted in his first amended petition
lacked merit.

## II. Application of *Martinez v. Ryan* to Petitioner's Latest Claim

The United States Supreme Court has recognized an equitable exception to the doctrine of
procedural default where a federal habeas corpus petition can make a showing that his failure to
exhaust available state remedies *on a federal constitutional claim of ineffective assistance by trial*
*counsel* resulted from deficient performance on the part of the Petitioner's state habeas counsel.
More specifically, the Supreme Court's holding in *Martinez v. Ryan*, 566 U.S. 1 (2012), carved out

of the Supreme Court's procedural default jurisprudence a narrow exception for *claims of ineffective assistance by trial counsel* which were not raised in a convicted criminal defendant's state habeas corpus proceeding because of the ineffective assistance of the defendant's state habeas counsel. *See Martinez v. Ryan*, 566 U.S. at ___, 132 S. Ct. at 1315 ("Inadequate assistance of counsel at initial review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial). "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez v. Ryan*, 566 U.S. at ___, 132 S.Ct. at 1320.

In *Trevino v. Thaler*, ___ U.S. ___, ___, 133 S. Ct. 1911, 1912, 185 L. Ed. 2d 1044 (2013), the Supreme Court reaffirmed the narrow focus of its holding in *Martinez*: "In *Martinez v. Ryan,* 566 U.S. 1, __, 132 S. Ct. 1309, 1320, 182 L. Ed. 2d 272, this Court held that 'a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.'" Significantly, the Supreme Court remanded Petitioner's case to the Fifth Circuit for determination of whether Petitioner's claim of ineffective assistance by his trial counsel was substantial and whether Petitioner's initial state habeas counsel was ineffective. *Trevino v. Thaler*, ___ U.S. at ___. 133 S. Ct. at 1921 ("Likewise, we do not decide here whether Trevino's claim of ineffective assistance of trial counsel is substantial or whether Trevino's initial state habeas attorney was ineffective.").

8

Petitioner's second amended petition contains factual allegations regarding the performance of Petitioner's trial counsel, but includes very few specific factual allegations regarding the performance of Petitioner's first state habeas counsel, who filed a state habeas corpus application containing more than forty claims for relief on April 19, 1999 and questioned Petitioner's trial counsel during an evidentiary hearing held July 10, 2000.[2]  *Trevino v. Thaler*, 678 F.Supp.2d at 454-55.  While Petitioner relies heavily upon a 2004 affidavit from Petitioner's mother to support his allegations of ineffective assistance by Petitioner's *trial* counsel, at no point does Petitioner present any specific factual allegations, much less any competent evidence, showing Petitioner's mother was available or willing from 1997 to 2000 to furnish Petitioner's *state habeas* counsel with the same information about Petitioner's background as that contained in her 2004 statement.  In fact, at least one of the "new" documents Petitioner presents to this Court suggests Petitioner's mother drank heavily on a daily basis during her pregnancy with Petitioner, continued drinking and began using drugs in the 1980's, and did not become sober until approximately 2006.[3]  Likewise, while Petitioner

---

[2] Petitioner does argue in conclusory fashion that his state habeas counsel filed a state habeas application which contained only record-based claims but, aside from Petitioner's latest complaint in his second amended petition that his trial counsel failed to investigate, develop, and present additional mitigating evidence, Petitioner identifies no potentially meritorious additional claims which he believes his state habeas counsel should have asserted.  *Second Amended Petition*, at pp. 49-52.  Significantly, Petitioner does not allege any specific facts showing the "new" mitigating evidence which forms the basis for the ineffective assistance claim contained in Petitioner's second amended petition was reasonably available to Petitioner's first state habeas counsel at the time of Petitioner's initial state habeas corpus proceeding.  Petitioner alleges no facts showing that he or his mother or any other family member or other person possessing personal knowledge of Petitioner's background ever made Petitioner's first state habeas counsel aware of any of the new information about Petitioner's background contained in Petitioner's second amended petition.  In fact, Petitioner's pleadings herein are bereft of any allegations that Petitioner communicated any information to his initial state habeas counsel about Petitioner's background.

[3] During Petitioner's capital murder trial, Petitioner's aunt testified without contradiction that Petitioner's mother was unable to attend Petitioner's trial due to alcohol problems.  Statement of

furnished his federal habeas corpus counsels' investigator and Dr. Dyer with extensive new information regarding his own background, Petitioner does not allege any facts, much less furnish any evidence, showing he furnished (or was even willing to furnish) any of this "new" information to his state habeas counsel while said counsel was preparing and presenting Petitioner's first state habeas corpus application in the 1997-2000 time frame.  Petitioner has failed to allege any specific facts in his second amended petition showing that any of the "new" mitigating information which forms the basis for Petitioner's latest ineffective assistance claim was reasonably available, through the exercise of due diligence, to Petitioner's first state habeas counsel in the 1997-2000 time period during which Petitioner's first state habeas corpus proceeding was fully litigated.

The Constitution does not require appellate counsel to raise every non-frivolous ground that might be pressed on appeal.  *United States v. Fields*. 565 F.3d 290, 294 (5th Cir.), *cert. denied*, 558 U.S. 914 (2009).  Appellate counsel is not ineffective solely because of failure to present every ground urged by the defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("Neither *Anders* nor any other decision of this Court suggests, however, that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel,

---

facts from Petitioner's state trial court proceedings (henceforth "S.F. Trial"), Volume XXIII, testimony of Juanita DeLeon, at pp. 135-36.

Petitioner presents this Court with a new but wholly unsigned document which appear to be a summary or notes from an interview by an unidentified person with Petitioner's mother which state, in part, that (1) Petitioner's mother began drinking at age sixteen, rapidly increased her consumption of alcohol until she was drinking eighteen to twenty-four beers daily, and continued to drink heavily and used marijuana while Petitioner inhaled spray paint and grew "out of control," and (2) her drinking grew worse in 1993, and (3) she did not become sober until 2006.  Unsigned Interview notes from October 31, 2014 interview with Josephine Trevino, attached as Exhibit 31 to *Second Amended Petition*.  Even if the foregoing is disregarded for lack of proper authentication, the fact remains Petitioner has failed to present this Court with any specific factual allegations, much less any evidence, showing his mother was available and willing to testify on Petitioner's behalf at Petitioner's 1997 capital murder trial.

as a matter of professional judgment, decides not to present those points."). To prevail on a claim of ineffective assistance by appellate counsel, a petitioner must identify with specificity grounds for relief that he claims should have been included in his appellate brief and demonstrate a reasonable probability that, but for appellate counsel's failure to include those points of error, the defendant would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). The foregoing principles apply with equal force to assertions of ineffective assistance by a state habeas counsel.

Petitioner has failed to carry his burden under the *Martinez v. Ryan* standard of showing that his first state habeas corpus counsel rendered ineffective assistance during Petitioner's initial state habeas corpus proceeding. Petitioner's first state habeas corpus counsel cannot reasonably be faulted, much less declared "ineffective," for failing to develop and present an ineffective assistance claim during Petitioner's initial state habeas corpus proceeding premised upon "new" mitigating evidence absent some showing this "new" mitigating evidence was reasonably available to said counsel at the time of Petitioner's initial state habeas corpus proceeding. Instead, Petitioner relies almost exclusively upon "new" information furnished by himself and his mother to Petitioner's federal habeas counsel and their experts without presenting any evidence showing that his mother was available and willing to furnish the same information to Petitioner's initial state habeas counsel. Petitioner alleges no specific facts showing that any of the "new" mitigating evidence which underlies his latest ineffective assistance claim was reasonably available to Petitioner's initial state habeas counsel during the 1997-2000 time frame in which Petitioner's initial state habeas corpus proceeding was litigated. Furthermore, for the reasons discussed below, Petitioner has also failed to allege specific facts which show Petitioner's assertion of ineffective assistance by his trial counsel (contained in Petitioner's second amended petition) is "substantial" within the meaning of the

*Martinez v. Ryan* exception to the doctrine of procedural default.  For the reasons discussed below, this Court concludes the Petitioner's ineffective assistance claim lacks sufficient arguable merit to warrant a Certificate of Appealability.  There is no reasonable probability that, but for the failure of Petitioner's initial state habeas counsel to assert the same ineffective assistance claim contained in Petitioner's second amended petition herein, the outcome of Petitioner's initial state habeas corpus proceeding would have been any different.

### III. Analysis of the Merits of Petitioner's Latest Ineffective Assistance Claim

A.      Petitioner's Second Amended Petition

In his second amended petition, Petitioner claims that his trial counsel failed to investigate and present available compelling mitigating evidence at the punishment phase of his trial and that such failure deprived him of his Sixth and Fourteenth Amendment rights to the effective assistance of counsel.[4]      Specifically, Petitioner argues that his trial counsel "conducted a de minimus

---

[4] Petitioner presents a number of documents in support of his *Second Amended Petition* which Respondent correctly points out are not only inadequately authenticated, many are not even signed.  Petitioner supported his first amended petition *(ECF no. 76)* with several sworn statements, a few of which are submitted once again as Exhibits 21-26 to Petitioner's *Second Amended Petition*. Unlike the sworn statements presented with Petitioner's first amended petition, the interview notes taken by an unidentified individual during interviews with Janet Torres, Jennifer DeLeon, Josephine Trevino, Juanita DeLeon, Mario Cantu, and Peter Anthony Trevino attached as Exhibits 29-34 to Petitioner's *Second Amended Petition* are neither signed by the purported interview subjects nor authenticated by a notary nor executed in a manner consistent with 28 U.S.C. Section 1746.  Given the fact those interview notes contain many comments about the appearance and demeanor of the interview subjects which would not normally be included in a witness statement, they appear to be exactly what Respondent alleges - hearsay within hearsay - and are unsigned and wholly unauthenticated.  Likewise, the "report" submitted as Exhibit 35 to Petitioner's *Second Amended Petition* is not signed by any person who purportedly prepared same and is not signed by the Petitioner himself, who apparently furnished the bulk of the information used to create same.  This document, like the unsigned time line submitted as Exhibit 36, appears to be a summary of hearsay information furnished primarily by Petitioner and Petitioner's mother when neither was under oath and was prepared by someone whose identity is not clear from the face of those instruments nor from any accompanying affidavits.  Ordinarily, the Petitioner's unsigned exhibits could not be considered

investigation into Petitioner's social and family history, or gather available relevant records" and

"failed to inquire into *any* area of Petitioner's life experiences, and did not meet with or talk to any

of Petitioner's family members, educators,[5] social professionals, medical doctors or mental health

experts prior to trial." Petitioner further argues that trial counsel only called one witness, Petitioner's

aunt, and had only met her one time, just an hour prior to her trial testimony.[6] Petitioner complains

that his trial counsel failed to retain a mitigation expert and never retained an expert in the field of

prison gangs.[7] Petitioner further complains that his trial counsel failed to cross examine various

---

by this Court for any purpose in this proceeding. Out of an abundance of caution, however, this Court will consider same so as to avoid the necessity of re-considering the merits of Petitioner's claims in the context of a Rule 59(e) motion should same be filed at a latter date with signed copies of the same exhibits attached thereto.

[5] Petitioner's educational records reflect that he repeated the second and third grades, failed the seventh and eighth grades and was expelled during his ninth grade for selling drugs. *Second Amended Petition*, at p. 36. Those record do not reveal, however, that Petitioner needed testing for any intellectual deficits or examination for any emotional or psychological problems. *Second Amended Petition*, Exhibits 27 & 40. Furthermore, contrary to the evidence presented during the punishment phase of Petitioner's 1997 capital murder trial, Petitioner's new witnesses and evidence assert that Petitioner was expelled from Sam Houston High School for dealing drugs, not that Petitioner simply dropped out of school.

[6] As correctly pointed out by Respondent, however, neither the trial testimony of Juanita DeLeon nor the statements or interview notes furnished by Petitioner in support of his *Second Amended Petition* establish that Ms. DeLeon's meeting with Petitioner's trial counsel at the Bexar County courthouse on the day she testified at Petitioner's trial was her first and only meeting with Petitioner's defense team prior to the day she testified.

[7] Petitioner faults his trial counsel for failing to obtain the services of an expert on prison conditions and procedures but offers no fact-specific allegations, much less an affidavit from an expert on that subject who was available and willing to testify at the time of Petitioner's capital murder trial, suggesting what type of potentially beneficial testimony such an expert might have been able to furnish at the punishment phase of Petitioner's 1997 capital murder trial. Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007). Petitioner offers no specific factual allegations suggesting there was any expert on prison

prosecution witnesses, who testified as to Petitioner's juvenile and adult criminal records, and Petitioner's previous encounters with law enforcement officers.[8]   Finally, although Petitioner complains that his trial counsel did not retain an expert to testify as to prison gangs and violence, Petitioner complains that his trial counsel failed to object to the testimony of an employee of the Institutional Division of the Texas Department of Criminal Justice, who provided testimony regarding gangs and gang violence.[9]

---

conditions or procedures available at the time of Petitioner's capital murder trial who could have presented any testimony beneficial to Petitioner's efforts to secure a life sentence.  Nor does Petitioner suggest with any reasonable degree of specificity exactly what testimony such a witness could have furnished in 1997.

[8] Petitioner faults his trial counsel for failing to cross-examine more of the prosecution's punishment phase witnesses but does not allege any facts which either (1) identify exactly what areas of questioning his trial counsel should have undertaken or (2) suggest how cross-examination of the prosecution witnesses could have furnished any beneficial testimony.  As with his complaints about an uncalled prison expert, Petitioner's complaints about the failure of his trial counsel to cross-examine all of the prosecution's punishment phase witnesses on unspecified subjects are conclusory and do not support a finding of ineffective assistance under *Strickland.  See Day v. Quarterman*, 566 F.3d at 540-41 (conclusory assertions of ineffective assistance during cross-examination and conclusory assertions trial counsel failed to examine medical records prior to trial failed to satisfy prejudice prong of *Strickland* analysis); *Collier v. Collins*, 300 F.3d 577, 587 (5th Cir.) (conclusory allegations of ineffective assistance do not raise a constitutional issue in a federal habeas corpus proceeding), *cert. denied*, 537 U.S. 1084 (2002).

[9] Petitioner does not identify with specificity any arguably legitimate grounds for challenging the admission of the trial testimony of prosecution expert Bob Morrill, who testified concerning the process within the Texas Department of Criminal Justice for confirming an inmate's gang membership or the fact TDCJ officials determined Petitioner was a documented member of the Hermidad y Pistoleros Latinos gang.  S.F. Trial, Volume XXIII, testimony of Bob Morrill, at pp. 90-132.  Petitioner has offered no factual allegations, much less any evidence, in support of his *Second Amended Petition* suggesting there was anything factually inaccurate about Mr. Morrill's trial testimony.  In fact, as he did with the Petitioner's juvenile probation officer, Petitioner's trial counsel utilized cross-examination of Mr. Morrill to elicit potentially beneficial testimony showing that (1) as a documented HPL member, Petitioner would be placed in administrative segregation, i.e., 23-hour lockup, if returned to the state prison system, (2) there were no records of any prison disciplinary proceeding having been brought against petitioner during Petitioner's prior state prison incarceration, and (3) Petitioner's gang information would be forwarded to state parole officials

Further, Petitioner argues cryptically that his "previous involvement in the juvenile system would have revealed issues resolved and unresolved from his childhood."  Also, "[a]mple evidence of childhood trauma at home … should have been pursued, head injuries, black-outs, delusional stories, family troubles, drug and/or alcohol addiction [should have] put trial counsel on notice of mental and psychological issues that should have been investigated."  Petitioner argues that his mother "drank heavily throughout his pregnancy" and that he only weighed four pounds at birth and remained in the neonatal intensive care unit for several weeks."[10]  He also argues that from ages two to nine, he suffered from four different injuries to his head.  While growing up, he was exposed to stabbings, drug use by his mother and other family members, and mental and physical abuse.

"To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable."  *Gregory v. Thaler,* 601 F.3d 347, 352 (5th Cir.), *cert. denied*, 562 U.S. 911 (2010).  "An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'"  *Id.*

Petitioner asserts that trial counsel could have called various witnesses who would have offered supportive testimony (e.g., Janet Cruz, the mother of his two children; Mario Cantu, friend; Ruben Gonzalez, employer; Jennifer DeLeon, his sister).[11]

---

before Petitioner could be released on parole.  *Id.*, at pp. 117-19, 131, 137.

[10] Petitioner alleges his birth records were destroyed.  *Second Amended Petition*, at p. 30.

[11] As explained above, however, the latest set of documents submitted by Petitioner as Exhibits 29-34 are all unsigned and unauthenticated.  The remaining documents submitted by Petitioner contain a mixed bag of evidence.  More specifically, Janet Cruz's sworn statement

One of the experts recently retained opines that Petitioner "presents with characteristics of Fetal Alcohol Affect", and a "low average range of intellectual functioning."[12]  She further opines that his "history of Fetal Alcohol Affect, along with his history of physical and emotional abuse" contributed to his "inability to make appropriate decisions."[13]  She opines that this may also have contributed to Petitioner rejecting the plea offer made to him that would have spared him from the death sentence.

_____

(Exhibit 23 to the *Second Amended Petition*), states that, while Petitioner was a caring husband and father, her relationship with Petitioner deteriorated due to Petitioner's behavior when he was under the influence of alcohol.  Cruz states "It was like there was two parts to him."

Mario Cantu states in Exhibit 24 to the *Second Amended Petition* that Petitioner was not a violent person but, instead, was a follower and a peaceful person.  Ruben Gonzales, whose sworn statement appears as Exhibit 25 to the *Second Amended Petition*, echoes Cantu's comments, stating Petitioner was not a violent person, loved his children, and would not get into fights.  Petitioner's sister Jennifer DeLeon furnished a sworn statement, Exhibit 26 to the *Second Amended Petition*, in which she states Petitioner felt left out during his childhood, often stuck up for their mother when their mother fought with Petitioner's step-father, and her father once threw Petitioner out of the house.  These statements all tend to corroborate the trial testimony of Petitioner's aunt Juanita DeLeon regarding the Petitioner's difficult childhood and good character traits.  S.F. Trial, Volume XXII, testimony of Juanita DeLeon, at pp. 135-41.  They do not, however, offer anything truly "new" in terms of mitigating evidence.

[12] Report of Dr. Rebecca A. Dyer, May 6, 2004, Exhibit 22 to *Second Amended Petition*.
In addition, Petitioner's current mitigation expert, Linda Mockridge states in an unsigned report dated October 8, 2014 that "documents … to support [evidence of fetal exposure to alcohol and Fetal Alcohol Syndrome] have now been destroyed.  Two critical documents that are confirmed to be destroyed are the Labor and Delivery records for Josephine Trevino for the birth of Carlos, which usually include blood work and the physical state of the mother.  The second document would be the birth records and Neo-natal stay for Carlos after the birth; these would document the AGPAR score, low birth weight, the premature birth and the struggle of the baby in the weeks following his birth."  Exhibit 37 to *Second Amended Petition*.  Ms. Mockeridge states that these records would have been available at the time of the trial, but she provides no evidentiary support for this conclusion.

[13] May 6, 2004 Report of Dr. Rebecca A. Dyer, Exhibit 22 to *Second Amended Petition*, at p. 17.

Another expert opines that based on his preliminary assessment, Petitioner suffers from "8 domains" of poor "cognitive functioning," (i.e., academics, verbal and visuospatial memory, visuospatial construction, processing speed, executive functioning, communication skills, daily living skills and socialization skills).[14]  This expert states that although his assessment is a "critical component in the FASD diagnostic process," the diagnosis of FASD must be made by a medical doctor.[15]  According to this expert, yet unexamined is whether Petitioner's "FASD has resulted in an organic brain disorder."[16]  In summary, Petitioner argues that, had the "jury been able to consider [Petitioner's] mixed up and unexplainable turbulent and chaotic life history on the mitigating side of the scale, there is unquestionably a reasonable probability that at least one juror would have struck a different balance."

B.      The Respondent's Answer

The State responds that the Petitioner has procedurally defaulted on his claim of ineffective assistance of trial counsel and this Court has already considered the merits of the claim in its previous order, and that merits determination was not found to be inadequate or incorrect by either the Fifth Circuit or the United States Supreme Court.  *(ECF no. 147 citing this Court's original Memorandum Opinion and Order at pp. 52-55).*  Alternatively, the State argues that the Petitioner continues to fail to establish that his trial counsel rendered deficient performance and prejudice within the meaning of the dual prongs of *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

---

[14] Unsigned, e-mail Report dated January 14, 2015 of Dr. Paul Connor, Exhibit 37 to *Second Amended Petition*.

[15] *Id.*

[16] *Id.*

The State also relies heavily upon the un-controverted evidence heard by the jury during the punishment phase. *Trevino v. Thaler*, 678 F.Supp.2d at 452-53. Prior to this murder, Petitioner was arrested for evading arrest, carrying a weapon, and possessing marijuana. He was placed on probation. While on probation he was arrested for burglary of a building and burglary of a vehicle. He was placed on intensive supervision. The jury heard evidence that Petitioner had prior convictions for unlawful possession of a weapon, driving while intoxicated, evading arrest and unauthorized use of a motor vehicle. The jury also heard of the Petitioner's membership in the La Hermidad y Pistoleros Latinos (HPL) gang. HPL's rules and regulations were read to the jury, along with the membership oath that requires members to "promise under oath and a decree and punishment of death to be true and firm, [and] to comply by the ruling imposed by the Brotherhood…."[17]

The State also notes that evidence concerning Petitioner's turbulent childhood, alcoholic mother, poor performance in school and involvement in drugs and street crime was presented to the jury. The jury heard that Petitioner and his siblings were raised in a poor, high-crime neighborhood by a single mother, whose only source of income was welfare. The jury also heard that Petitioner was a teenage father. The State points out that, in closing argument at the punishment phase of trial, Petitioner's trial counsel was able to point to potentially mitigating evidence before the jury, arguing the following:

> You heard his - - Mr. Trevino as you heard has come from a pretty harsh background. His father has been nonexistent. His mother couldn't even come up here to talk to you, to ask for her son's life. She's an alcoholic. How much of a chance did he have? He's been in trouble. He's been out on the streets. His probation officer said he

---

[17] Statement of Facts from Petitioner's trial court proceedings (henceforth "S.F. Trial"), Volume XXIII, testimony of Bob Morrill, at pp. 106, 110-12.

lived in a very rough neighborhood. Yeah, he's committed a few crimes but if you look at them, they are not the signs of an evil person. There's no evil in those crimes that they brought up to you. Yeah, they are criminal. Possession of marijuana, unlawfully carrying a weapon, maybe a criminal trespass, taking a car. Fine. Okay. They are there. Is that an evil person that does that? No. It's some kid that's lost, wandering around in the neighborhood. On those facts they want you to condemn him to death. That's unfair. The other party, the one that's uncharged, he's walking out there right now. Is that fair?[18]

The State further argues that much of the "new" evidence proffered by Petitioner in support of his second amended petition is "double-edged" in nature. The State is correct.[19]

With regard to Jennifer De Leon's unsigned statement, she indicates that when they lived in a housing project Petitioner was "respected" and "no one messed with us."[20] She further described Petitioner as "always high" from sniffing spray paint.[21]

---

[18] The full closing statement given by Petitioner's trial counsel at the punishment phase of trial appears at S.F. Trial, Volume XXIV, at pp. 22-40.

[19] The Affidavit of Ann Matthews and accompanying Social History of Petitioner. collectively submitted as Exhibit 20 to Petitioner's *Second Amended Petition*, includes information suggesting Petitioner began abusing alcohol and marijuana in 1986 (around age 12), was expelled from high school in 1991 (around age 17), and, as his family grew, Petitioner moved to injecting cocaine and smoking crack. None of the foregoing potentially damaging information was communicated to Petitioner's capital sentencing jury during the punishment phase of Petitioner's trial. On the contrary, Petitioner's trial counsel elicited testimony on cross-examination from prosecution witness and Petitioner's former juvenile probation officer Lorraine Reagan that Petitioner's father was absent from the home during the time Petitioner was on juvenile probation, his parents divorced at some point, his family depended upon AFDC payments and lived in a high crime area, he associated with undesirable characters, he had trouble in school and eventually dropped out, but Petitioner was nonetheless a responsible probationer who followed the rules and completed community service. S.F. trial, Volume XXIII, testimony of Lorraine Reagan, at pp. 30-36. Ms. Reagan also testified on direct examination that Petitioner followed the rules and participated in substance abuse counseling while on juvenile probation. *Id.*, at pp. 24-25.

[20] Unsigned Interview notes from November 15, 2014 interview of Jennifer DeLeon, Exhibit 30 to *Second Amended Petition*, at p. 3.

[21] *Id.* at p. 4.

Janet Cruz, the mother of one of Petitioner's two children, gave a sworn statement stating that her relationship with the Petitioner deteriorated "because of the way he treated me when he was under the influence of alcohol" and that there were two sides to Petitioner's personality.[22]

Petitioner's former girlfriend Janet Torres gave an unsigned statement in which she described Petitioner as "always jealous," "angry," "violent," and "impulsive" even when not drunk or on drugs, and she stated he wanted "full control" over her.[23]  Torres states Petitioner told his friends that they could not look at Torres or he would beat the "crap" out of them.[24]  She states that Petitioner pulled a gun on her and her father on one occasion for "no reason" and held a gun to her face on another occasion when she told him she wanted to leave him.[25]  When Torres left him, she was forced to return because Petitioner threatened to kill her if she "went with another man."[26]  She stated that, on another occasion, Petitioner became violent, hit his head into hers, and put a knife to her throat when she refused to have sex and then attempted to rape her anally.[27]  Torres also states that Petitioner often struck his brother Peter for no reason.[28]

---

[22] Sworn Statement of Janet Cruz, Exhibit 23 to *Second Amended Petition*, at pp. 1-2.

[23] Unsigned Interview notes from November 15, 2014 interview of Janet Trorres, Exhibit 29 to *Second Amended Petition*, at pp. 2-6.

[24] *Id.,* at p. 2.

[25] *Id.*, at pp.  2-3.

[26] *Id.*, at p. 3.

[27] *Id.*, at p. 5.

[28] *Id.*, at p. 2.

Mario Cantu stated in his unsigned interview notes that once Petitioner joined HPL, Petitioner became more violent and had a gun all the time.[29]

Petitioner's half-brother Peter Trevino acknowledged in his unsigned interview notes that Petitioner smoked marijuana, "did spray paint," and stole cars.[30]  Rather than a passive follower, Peter described Petitioner as a "magnet [who] drew people to him."[31]  He further acknowledged that Petitioner couldn't control his temper, hit women, and struck him many times for no reason.[32]

Finally, this Court has previously noted the double-edged nature of a diagnosis of Fetal Alcohol Syndrome or Fetal Alcohol Effects.[33]  This Court has also noted that a diagnosis of Fetal Alcohol Syndrome or Fetal Alcohol Effects or Fetal Alcohol Spectrum Disorder was not within the mainstream of psychological diagnosis and treatment at the time of Petitioner's 1997 capital murder trial.[34]

---

[29] Unsigned Interview notes from November 14, 2014 interview with Mario Cantu, Exhibit 33 to *Second Amended Petition*, at pp. 1-2.

[30] Unsigned Interview notes from November 24, 2014 interview with Peter Anthony Trevino, Exhibit 34 to *Second Amended Petition*, at pp. 1-2.

[31] *Id.*, at p. 1.

[32] *Id.*, at pp. 1-2.

[33]  "[P]ursuit of a defense at the punishment phase of petitioner's trial premised upon petitioner suffering from fetal alcohol syndrome or fetal alcohol effects would have amounted to an admission by petitioner's trial counsel that petitioner would, in fact, pose a substantial risk of future violent conduct." *Sells v. Thaler*, 2012 WL 2562666, *58 (W.D. Tex. June 28, 2012), *CoA denied*, 536 F. App'x 483 (5th Cir. July 22, 2013), *cert. denied*, ___ U.S. ___, 134 S. Ct. 1786, 188 L. Ed. 2d 612 (2014).

[34] "[A]s of the date of petitioner's capital murder trial, i.e., 2002, 'fetal alcohol syndrome'" and 'fetal alcohol effects' were terms only just beginning to find acceptance among the mainstream within the mental health community. *Sells v. Thaler*, 2012 WL 2562666, *59 (W.D. Tex. June 28, 2012).  Neither term appears in the 2000 edition of the DSM–IV–TR."  *Garza v. Thaler*, 909 F.Supp.2d 578, 647 (W.D. Tex. 2012), *CoA denied*, 738 F.3d 669 (5th Cir. 2013), *cert. denied*, ___

In sum, the "new" evidence presented by Petitioner, while admittedly containing some mitigating aspects (particularly those concerning Petitioner's mother's alcoholism and the likelihood Petitioner suffers from Fetal Alcohol Spectrum Disorder), also contains a plethora of information which would have assisted the prosecution in obtaining an affirmative answer to the Texas capital sentencing scheme's future dangerousness special issue.

C.     The Applicable Standard of Review

Petitioner has presented this Court with a considerable number of new affidavits, statements, and other documents in support of his claim for relief in his second amended petition which Petitioner has never presented to any state court.  Petitioner's newest claim of ineffective assistance is unexhausted.  28 U.S.C. §2254(b) (2), however, empowers a federal habeas court to deny an unexhausted claim on the merits.  *Pondexter v. Quarterman*, 537 F.3d 511, 527 (5th Cir. 2008), *cert, denied*, 555 U.S. 1219 (2009); *Moreno v. Dretke*, 450 F.3d 158, 166 (5th Cir. 2006), *cert. denied*, 549 U.S. 1120 (2007).

Because no state court has ever addressed the merits of the ineffective assistance claim contained in Petitioner's second amended petition, this Court's review of that federal constitutional claim is necessarily *de novo*.  *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (holding *de novo* review of the allegedly deficient performance of Petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

---

U.S. ___, 134 S. Ct. 2876, 189 L. Ed. 2d 839 (2014).

D.     Ineffective Assistance of Counsel Claims - Generally

To establish ineffective assistance of counsel, a petitioner must show that counsel's representation fell below an objective standard of reasonableness, and to establish prejudice he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000)(*citing Strickland v. Washington*, 466 U.S. 668 (1984)).

A few highlights from *Strickland* should be noted. "Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. "Prevailing norms of practice as reflected in American Bar Association standards" are mere guides. *Id*.

In addition, the Court provided the following cautionary remarks:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana*, *supra*, 350 U.S., at 101, 76 S. Ct., at 164. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689.

Nevertheless, trial counsel must make a reasoned decision not to conduct a mitigation investigation. *Canales v. Stephens*, 765 F. 3d 551, 570 (5th Cir. 2014). Further, "[d]efense attorneys

23

in capital cases have an obligation to conduct a thorough investigation of the defendant's background." *Loden v. McCarty*, 778 F. 3d 484, 497 (5th Cir. 2015). "Such an investigation requires that defense counsel interview witnesses and request relevant records, such as school, medical, or military service records." *Id*. "Further, when such interviews or records suggest pertinent avenues for investigation, the defense attorney must follow up on those leads." *Id*.

E.    No Deficient Performance

In this case trial counsel attempted to find family members "that could give us some idea as to where or how Mr. Trevino grew up. What was going on in his life. What were the circumstances, you know, regarding his past. And we tried to find them, but really, I don't think we came up with any witnesses. We tried to contact his mother as best we could. She was from out of the city."[35] Trial counsel retained an investigator to track down the Petitioner's education records.[36] Contrary to the suggestions contained in Petitioner's latest petition, Petitioner's trial counsel was not wholly inattentive to developing mitigation evidence. Trial counsel interviewed Petitioner's stepfather. Petitioner failed to assist his trial counsel in identifying any family members or others who may have provided mitigating testimony.[37] *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.

---

[35] Statement of Facts from Petitioner's state habeas corpus evidentiary hearing, held July 10, 2000 (henceforth "S.F. State Habeas Hearing"), Testimony of Mario Trevino, at pp. 41-42. Petitioner's trial counsel also testified without contradiction during Petitioner's state habeas corpus hearing that Petitioner's mother was aware of the Petitioner's trial but she refused to communicate with Petitioner's defense counsel. *Id.*, at pp. 42-43. Petitioner has not alleged any facts showing this testimony was in any way factually inaccurate.

[36] *Id.*, at p. 43.

[37] *Id.*, at p. 43.

Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.  In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.").

Although Petitioner complains that "new" information regarding his troubled childhood, alcoholic mother, low birth weight, and allegedly non-existent neonatal care were not investigated by his trial counsel, these allegations were raised by Petitioner's mother, Josephine Trevino, in a sworn statement dated March 25, 2004.  Petitioner had the opportunity to fully develop and present this Court with this same information long before this Court's 2009 decision denying Petitioner's first amended federal habeas corpus petition.[38]   Moreover, Ms. Trevino acknowledges in that

_____

[38] Petitioner filed his original federal habeas corpus petition March 14, 2002.  *(ECF no. 10)*. Petitioner filed his first amended petition on December 8, 2008 *(ECF no. 76)*.

Much of Petitioner's "new" mitigating evidence could and should have been presented to this Court in the context of this Court's resolution of the claims contained in Petitioner's first amended petition but which does not clearly indicate whether the information contained therein was available to Petitioner's trial counsel at the time of Petitioner's 1997 capital murder trial.  For instance, the affidavit of Ann Matthews and Social History report attached as Exhibit  20 to Petitioner's second amended petition is dated January 13, 2004.  The Social History Report prepared by Ms. Matthews states it is based upon information received from Petitioner and his family members and, in part, upon a psychological assessment performed in 1998.  Nowhere in her Report, however, does Ms. Matthews suggest any of the information upon which she relied to prepare her Report was available

affidavit that she did not have an address or telephone number during the time of Petitioner's trial.[39] More importantly, at no point in her sworn statement or more recent interview, does Josephine Trevino state that she was available and willing to testify during Petitioner's 1997 capital murder trial as to the same matters set forth in her sworn statement and interview notes.  Accordingly, it is difficult to understand how trial counsel could reasonably be blamed for not locating Ms. Trevino prior to Petitioner's 1997 capital murder trial and presenting potentially mitigating evidence from this witness.

There is no competent evidence presented showing that, prior to the punishment phase, Petitioner's trial counsel was aware of the mother's excessive use of alcohol during her pregnancy with Petitioner or of any evidence then-existing which showed Petitioner was born prematurely, had a low birth weight, or required neonatal care.  *See Garza v. Stephens*, 738 F. 3d 669, 681 (5th Cir. 2013) (holding allegation of failure to investigate and introduce evidence of possible Fetal Alcohol Syndrome did not satisfy deficient performance prong of *Strickland* analysis because there was no showing any of the defendant's family had made trial counsel aware of the defendant's mother's abuse of alcohol while she was pregnant with the defendant).  The rampant speculation in several of the reports generated by Petitioner's experts and investigators regarding the information which might have been contained in Petitioner's neonatal and juvenile medical records is exactly that - speculation.

---

at the time of Petitioner's trial.

[39] "But when Carlos' trial happened, none of his lawyers ever got in touch with me, and I didn't have an address or a telephone number to contact, so they could talk to me."  Sworn Statement of Josephine Trevino dated March 25, 2004 at p. 3.

This Court has carefully considered the new evidence presented in support of Petitioner's second amended petition and concludes Petitioner has failed to carry his burden of establishing the performance of Petitioner's trial counsel fell below an objective level of reasonableness.  In other words, this Court finds the performance of Petitioner's trial counsel, viewed in the context of the information available through the exercise of due diligence to said counsel prior to Petitioner's 1997 capital murder trial, did not fall below an objective level of reasonableness.  Petitioner has failed to carry his burden of satisfying the deficient performance prong of the *Strickland* analysis.

F.    No Prejudice

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the Petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. 15, 20 (2009); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).  *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different.  *Wong v. Belmontes*, 558 U.S. at 27.  The prejudice inquiry under *Strickland* requires evaluating whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable." *Brown v. Thaler*, 684 F. 3d 482, 491 (5th Cir. 2012)(*citing Harrington v. Richter*, 562 U.S. 86 (2011)), *cert. denied*, ___ U.S. ___, 133 S. Ct. 1244, 185 L. Ed. 2d 190 (2013).

Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness satisfy  the prejudice prong of the *Strickland* analysis only by

naming the witness, *demonstrating the witness was available to testify and would have done so*, setting out the content of the witness' proposed testimony, and showing the testimony would have been favorable to a particular defense. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

Petitioner argues that his trial counsel "conducted a de minimus investigation into Petitioner's social and family history, or gather available relevant records" and "failed to inquire into any area of Petitioner's life experiences, and did not meet with or talk to any of Petitioner's family members, educators , social professionals, medical doctors or mental health experts prior to trial." As indicated above, trial counsel did interview and present Petitioner's aunt as a trial witness. She did provide, albeit in a cursory fashion, the facts that Petitioner's mother was an alcoholic and Petitioner's family lived on welfare in public housing. Trial counsel could have presented some additional testimony from the individuals he now identifies but, in addition to noting that Petitioner was raised in a very troubled household and neighborhood, and that he was kind and caring at times, these individuals also have described Petitioner as a man quickly prone to angry and violent outbursts.

Trial counsel could have secured Petitioner's educational records, but those records merely reflect poor grades, attendance issues, no indication for the need for special education classes, no medical issues, and that Petitioner was expelled from school. By Petitioner's mother's own account, she rarely took her children to receive medical treatment; accordingly, it is uncertain what, if any, medical records could have been secured by trial counsel. With regard to Petitioner's birth records, there is no indication (other than a hearsay statement by Ms. Mockridge) that Petitioner's hospital

records have been destroyed and there is no competent evidence before the Court to establish that Petitioner's neonatal medical records were available to trial counsel during the punishment phase.

Petitioner relies heavily on the claim that he may be suffering from Fetal Alcohol Effects or Fetal Alcohol Syndrome or Fetal Alcohol Spectrum Disorder and that his trial counsel failed to develop this theory.  To establish this theory, however, trial counsel needed medical records.  As stated above, there is no competent evidence before the Court to establish that those medical records were available to Petitioner's trial counsel for use during the punishment phase or Petitioner's 1997 trial.  Alternatively, Petitioner argues that his mother should have been located so that she could have testified to the amount of alcohol she consumed during the pregnancy.  But by the mother's own admission she did not have any physical address or telephone number during Petitioner's trial. Accordingly, in the absence of Petitioner or his family members assisting his trial counsel in locating his mother (assuming she wanted to be located), trial counsel was not deficient in the performance of his duties.  Petitioner has provided no competent evidence to suggest that Petitioner's mother could have been readily located at the punishment phase portion of trial.

This case is very different than *Williams v. Taylor*, 529 U.S. 362 (2000).  In *Williams*, "Williams turned himself in, alerting police to a crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with the police after that. While this, coupled with the prison records and guard testimony, may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."  *Id.* at 398.  Likewise, this case is different than *Rompilla v. Beard*, 545 U.S. 374 (2005).  In *Rompilla*, trial counsel failed to examine a file which he knew portions of the

29

contents was going to be used by the prosecution.  Had trial counsel reviewed the file, he would have discovered "test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling." *Id*. at 391.

Petitioner's trial counsel focused on an argument that Petitioner's past criminal history did not reflect a history that indicated future dangerousness.  Although trial counsel could have expounded in greater detail the poor economic conditions in which Petitioner was raised, the lack of parental emotional and physical support, and the poor to non-existent mothering that Petitioner encountered from womb to trial, as the Fifth Circuit has noted a capital defendant's disadvantaged background, though, can be a "double-edged' sword that "also might suggest [Petitioner], as a product of his environment, is likely to continue to be dangerous in the future. " *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002).

The facts of Petitioner's capital offense were particularly brutal.  A teenage girl was abducted, violently sexually assaulted, and fatally stabbed; after which Petitioner helped dispose of her possessions and informed others he had "learned how to use a knife in prison." *Trevino v. Thaler*, 678 F.Supp.2d at 449-52.  The evidence presented during the punishment phase of Petitioner's capital murder trial showed Petitioner had a lengthy history of criminal activity, both as a juvenile and adult, and Petitioner had been out of prison for only a few weeks before he participated in his capital offense. *Id.*, at 452-53.  There was also no evidence before the jury showing Petitioner had ever demonstrated any sincere remorse or genuine contrition for this offense.

The defense presented evidence during the punishment phase of Petitioner's trial showing Petitioner's father was largely absent during Petitioner's childhood, Petitioner's mother had alcohol

problems, Petitioner's family was on welfare during his childhood, Petitioner was a loner in school and dropped out of school and went to work for his mother's boyfriend, and Petitioner was the father of one child and was good with children.  As explained above, the vast majority of Petitioner's "new" evidence is double-edged in nature or merely reaffirms the evidence of Petitioner's difficult childhood that was actually presented to Petitioner's capital sentencing jury.  Moreover, nowhere in any of the new sworn statements or new interview notes Petitioner presents in support of his second amended petition are there any statements indicating any of those witnesses were available and willing to testify during Petitioner's 1997 capital murder trial.  *See Woodfox v. Cain*, 609 F.3d at 808 (holding petitioner complaining of uncalled witness must show the witness was available and willing to testify to satisfy the prejudice prong of *Strickland*); *Day v. Quarterman*, 566 F.3d at 538 (holding the same).  Having re-weighed the "new" mitigating evidence together with the mitigating evidence actually presented to Petitioner's jury at trial against (1) the facts and circumstances of Petitioner's offense and (2) Petitioner's history of violent criminal and antisocial behavior detailed in Petitioner's new evidence, this Court finds there is no reasonable probability that, but for the failure of Petitioner's trial counsel to more fully investigate Petitioner's background, develop, and present any of the "new" evidence contained in Petitioner's second amended petition and the exhibits accompanying same, the jury's answers to any of the Texas capital sentencing scheme's special issues would have been any different.  In fact, as explained above, much of this "new" evidence would likely have assisted the prosecution in obtaining an affirmative answer to the future dangerousness special issue.  Petitioner's ineffective assistance claim in his second amended petition fails to satisfy the prejudice prong of the *Strickland* analysis.

## IV. <u>Request for an Evidentiary Hearing</u>

Where a federal habeas corpus petitioner's claims lack merit on their face, further factual development is not necessitated. *See Register v. Thaler*, 681 F.3d 623, 627-30 (5th Cir. 2012) (recognizing District Courts possess discretion regarding whether to allow factual development, especially when confronted with claims foreclosed by applicable legal authority). "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009) (quoting *Schriro v. Landrigan,* 550 U.S. 465, 468 (2007)). "In determining whether to grant a hearing, under Rule 8(a) of the habeas Court Rules 'the judge must review the answer [and] any transcripts and records of state-court proceedings... to determine whether an evidentiary hearing is warranted.' " *Richards v.* Quarterman, 566 F.3d at 562-63 (*quoting Hall v. Quarterman,* 534 F.3d 365, 368 (5th Cir.2008) (*in turn quoting Schriro,* 550 U.S. at 473)). In making this determination, courts must consider whether an evidentiary hearing could "enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Richards v. Quarterman*, 566 F.3d at 563 (*quoting Schriro,* 550 U.S. at 474).

Petitioner has failed to allege specific facts which, if proven, would entitle Petitioner to federal habeas corpus relief in this cause. Petitioner is not entitled to an evidentiary hearing before this Court on his second amended petition.

## V. <u>Certificate of Appealability</u>

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36

(2003); 28 U.S.C. §2253(c)(2).  Likewise, under the AEDPA, appellate review of a habeas petition

is limited to the issues on which a CoA is granted.  *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10

(5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate

review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of

appellate review of denial of a habeas petition limited to the issues on which CoA has been granted).

In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate

review to those issues on which CoA is granted.  *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; 28

U.S.C. §2253(c)(3).

    A CoA will not be granted unless the petitioner makes a substantial showing of the denial

of a constitutional right.  *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537

U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893

(1983).  To make such a showing, the petitioner need *not* show he will prevail on the merits but,

rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the

petition should have been resolved in a different manner or that the issues presented are adequate

to deserve encouragement to proceed further.  *Tennard v. Dretke*, 542 U.S. at 282; *Miller-El v.

Johnson*, 537 U.S. at 336.  This Court is required to issue or deny a CoA when it enters a final Order

such as this one adverse to a federal habeas petitioner.  *Rule 11(a), Rules Governing Section 2254

Cases in the United States District Courts*.

    The showing necessary to obtain a CoA on a particular claim is dependent upon the manner

in which the District Court has disposed of a claim.  "[W]here a district court has rejected the

constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The

petitioner must demonstrate that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338 (*quoting Slack v. McDaniel*, 529 U.S. at 484); *accord* Tennard v. Dretke**,** 542 U.S. at 282.  In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling.  *See Slack v. McDaniel*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor.  *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, 558 U.S. 993 (2009); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).  Nonetheless, a CoA is not automatically granted in every death penalty habeas case.  *See Miller-El v. Cockrell,* 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course.").

While it might be possible to argue with this Court's application of the deficient performance prong of the *Strickland* test to Petitioner's complaint of ineffective assistance by his trial counsel, reasonable minds could not disagree over this Court's conclusion that Petitioner's complaint of ineffective assistance by his trial counsel fails to satisfy the prejudice prong of *Strickland*.  Likewise, reasonable minds could not disagree that Petitioner failed to allege any specific facts showing that

his initial state habeas counsel rendered ineffective assistance during Petitioner's initial state habeas corpus proceeding sufficient to satisfy the prejudice prong of *Strickland* and the initial hurdle to merits review of an otherwise procedurally defaulted claim under the test in *Martinez v. Ryan*.

This Court independently reviewed the entire record from Petitioner's trial, direct appeal, and multiple state habeas corpus proceedings and concludes once again that Petitioner's ineffective assistance complaint premised upon "new" mitigating evidence fails to satisfy either prong of the *Strickland* analysis. Viewed in the light most favorable to the jury's verdict, the evidence of Petitioner's guilt was overwhelming. At the punishment phase of Petitioner's trial, the jury was furnished with information concerning Petitioner's extensive criminal history. The new evidence presented by Petitioner consists of proposed testimony from Petitioner's family and friends showing (as did the evidence at Petitioner's trial) that Petitioner suffered from an abused and neglected childhood, bereft of positive parental influence, and typified by instability and a wholesale lack of nurturing by his family. That same evidence, however, also depicts Petitioner as a highly violent individual who abused alcohol and drugs from any early age, became sexually active and impregnated two different women while he was still a teenager, and joined a violent street gang as a youth. Petitioner's proposed new evidence showing he suffers from Fetal Alcohol Syndrome or Fetal Alcohol Spectrum Disorder is likewise double-edged in nature and unsupported by any showing that evidence of Petitioner's mother's abuse of alcohol while she was pregnant with Petitioner was reasonably available at the time of Petitioner's 1997 capital murder trial (due to the unavailability of Petitioner's mother at that time due to her continued alcohol and drug abuse and the unavailability of Petitioner's neonatal medical records). Petitioner has alleged no specific facts showing he or his mother (or any of the other individuals who have furnished sworn statements

35

herein) were available and willing to testify during Petitioner's 1997 capital murder trial (or during Petitioner's initial state habeas corpus proceeding) about Petitioner's background or his mother's history of alcohol abuse.  Petitioner is not entitled to a CoA on either his *Martinez v. Ryan* argument or his *Strickland* claim.

Accordingly, it is hereby **ORDERED** that:

1.  All relief requested in Petitioner's second amended federal habeas corpus petition, filed February 3, 2015*(ECF no. 143)*, is **DENIED**.

2.  Petitioner is **DENIED** a Certificate of Appealability on all claims herein.

3.  Petitioner's request for an evidentiary hearing is **DENIED**.

4.  All other pending motions are **DISMISSED AS MOOT**.

**SIGNED this 11th day of June, 2015.**

**XAVIER RODRIGUEZ**
**UNITED STATES DISTRICT JUDGE**